1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11    LARRY J. WEBSTER,                          No.  CIV S-93-306 LKK DAD DP

12                 Plaintiff,

13          v.                                   DEATH PENALTY CASE

14    KEVIN CHAPPELL, WARDEN,                    FINDINGS AND RECOMMENDATIONS
      California State Prison at San
15    Quentin,

16                 Respondent.

17

18                                  **BACKGROUND**

19          Petitioner Larry J. Webster is a state prisoner under sentence of death.  He seeks relief

20    pursuant to 28 U.S.C. § 2254.   In 2000, in response to respondent's motion for summary

21    judgment, the court denied respondent's motion for summary judgment as to several claims

22    within the petition, denied federal habeas relief as to numerous other claims by granting

23    respondent's motion for summary judgment in part and granted habeas relief with respect to two

24    of petitioner's claims on the grounds that the retrospective application of the construction of two

25    special circumstances in petitioner's case by the state courts violated his right to due process.

26    (Dkt. No.  232.)  The granting of habeas relief with respect to those two claims was subsequently

27    reversed by the Ninth Circuit Court of Appeals and the matter was remanded.  Webster v.

28    Woodford, 369 F.3d 1062 (9th Cir. 2004).

                                              1

1    In 2006, the undersigned granted petitioner's motion for an evidentiary hearing with

2   respect to the following three remaining claims of his petition:  (1) ineffective assistance of

3   counsel at the penalty phase; (2) denial of meaningful appellate review; and (3) insufficient

4   narrowing of death-eligible offenses.[1]   After lengthy development of the evidence and

5   submission thereof to the court, the parties filed separate memoranda of points and authorities

6   addressing those three claims.  They also submitted final arguments addressing the following

7   claims which had survived summary judgment but were not the subject of the ordered evidentiary

8   hearing:  (1) an Eighth Amendment challenge to the "lying in wait" special circumstance; (2)

9   improper penalty phase instructions; (3) the trial court's failure to adequately review the sentence;

10   (4) ineffective assistance of counsel for failure to present a mental health defense at the guilt

11   phase; (5) ineffective assistance of counsel regarding petitioner's motion to suppress; (6)

12   application of Proposition 8 violated the Ex Post Facto Clause; (7) the trial court erred in failing

13   to record sidebar conferences; (8) the improper admission of testimony; (9) ineffective assistance

14   of counsel during jury selection; and (10) cumulative error.

15    These findings and recommendations thus address all remaining evidentiary hearing and

16   non-evidentiary hearing claims.  After consideration of the pleadings, briefs, and arguments of

17   counsel, after careful review of the state court record, and in light of the facts developed in the

18   evidentiary hearing and by expansion of the record under Rule 7 of the Rules Governing § 2254

19   cases, the court makes the following findings and recommends that federal habeas relief be

20   granted as to petitioner's claim that he received ineffective assistance of counsel in connection

21   with the penalty phase of his trial.

22   /////

23   /////

24   /////

25

26   [1]  These are claims 22, 7, and 2 of the Second Amended Petition.  (Dkt. No. 73.)  That petition
     addresses many of petitioner's claims in overlapping fashion, making their identification by claim
27   number somewhat difficult.  The parties and court have agreed on the identity of all remaining,
     undecided non-evidentiary hearing claims.  (See Dkt. Nos. 421, 423 and 426.)  The claim
28   numbers applicable to each claim are identified by respondent in an April 2009 status report filed
     with the court.  (Dkt. No. 428 at 2-3.)

2

1

**STATEMENT OF FACTS**[2]

2      Petitioner Larry J. Webster and three other men, Joseph Madrigal, Carl Williams and

3  Robert Coville, were jointly tried on charges arising from the death of William Burke.

4  I.  Guilt Trial

5     A.  Prosecution evidence

6
7          The principal prosecution witnesses were Bruce Smith and
Michelle Cram.  As the jury knew, Smith had already pled guilty to
second degree murder in connection with the homicide, and Cram
had been granted immunity in return for her testimony.

8

9          Smith and Cram provided the following account, differing
only in minor details:  In late August 1981, [petitioner], Joseph
Madrigal, Carl Williams, Robert Coville, Smith, and the 17-year-
old Cram were living at a riverbank encampment in Sacramento.
[Petitioner] was the group leader.  On the night of August 29,
Smith, Madrigal, and Coville robbed a nearby convenience store.
Quick response by the police forced the trio to hide for several
hours before returning to camp.

10
11
12

13          The next day, August 30, [petitioner] and Williams made
one of several trips to buy beer, which the camp residents were
consuming at a steady pace.  When the men returned in early
afternoon, [petitioner] said they had met two "outlaws" ("street
persons" or "survivors") at the Shell station near the convenience
store. [Petitioner] reported there was still intense police activity in
the area because of the robbery, and he suggested the group needed
to leave town.   [Petitioner] said he had arranged to use the
"outlaws'" car for joint drug purchases or robberies that evening.
The opportunity arose, he suggested, to lure one of the "outlaws"
back to the camp, kill him, and steal the car.

14
15
16
17
18

19          Madrigal, Coville, and Williams expressed enthusiasm for
the plan.  According to Cram, [petitioner] said he personally would
kill and dismember the victim; according to Smith, Coville said he
"hadn't killed somebody in quite a while" and would "take care of
it."  When Cram expressed skepticism about [petitioner's] boasts,
he insisted he was serious. [Petitioner] said this would be Cram's
first criminal lesson and would help her become more independent
from Williams, with whom she was living.

20
21
22
23

24          It was decided that because the "outlaws" knew Williams,
he would walk back to the Shell station with [petitioner] to meet
them.  Madrigal would go along.  Once the three returned to camp
with the intended victim, either [petitioner] (according to Cram) or
Coville (according to Smith) would kill him.  [Petitioner] showed
Smith where to dig a grave and told Cram to clean up the campsite
and pack in preparation for the group's departure. [Petitioner],

25
26
27

28  [2] This statement of facts is taken from the opinion of the California Supreme Court in People v.
Webster, 54 Cal. 3d 411 (1991) and is presumed correct.  Bean v. Calderon, 163 F.3d 1073, 1087
(9th Cir. 1998) (quoting 28 U.S.C. § 2254(d)(8) (1996)).

3

Williams, and Madrigal then left for a 7:30 p.m. meeting with the "outlaws." [Petitioner] had drunk beer all day and may have taken amphetamines. As usual, [petitioner] was wearing glasses; Williams wore a cowboy hat.

While the three men were gone, Smith and Cram worked at their assignments; Coville sat and drank beer. After half an hour's absence, [petitioner] called out from the top of a levee that his group had returned. Four men walked single file down the trail to the camp. Williams was in the lead, followed in order by Madrigal, victim Burke, and [petitioner]. When the four were about halfway down the trail, [petitioner] suddenly grabbed Burke and pulled a knife. According to Smith, [petitioner] moved around to the front of Burke and stabbed him; Cram saw [petitioner] reach from behind to stab Burke in the chest. Burke protested, and a struggle ensued. Madrigal turned back to assist [petitioner]. Burke began to make gurgling sounds.

Cram became hysterical, so [petitioner] and Williams told Smith to take her to "Fag Beach" and wait.[3] Ten minutes later, [petitioner], Madrigal, Williams, and Coville arrived at the "Fag Beach" parking lot with the group's belongings. [Petitioner] gave Coville a car key, which Coville used to unlock the trunk of a car parked in the lot. The group loaded their possessions in the car, proceeded to Interstate 5, and drove all night toward Southern California. [Petitioner] indicated that they should eventually turn east, toward Missouri.

As they rode, Madrigal explained to Smith that "the man had died hard." Madrigal said Burke had managed to grab [petitioner's] knife and inflict a thigh wound on [petitioner] before Madrigal joined in to help [petitioner] "finish the job and get his knife back." Madrigal indicated that he himself had been slashed across the stomach by Burke during the struggle. Smith said that, at one point, he saw [petitioner] and Madrigal's knives in the car.

About 3:30 p.m. the next day, as [petitioner] was driving, an officer of the California Highway Patrol (CHP) stopped the group's car for speeding on Interstate 15 near Barstow. Investigation stemming from the traffic stop eventually led to the arrest of all six passengers, and to statements by Smith and Cram concerning the Burke homicide. (See discussion, *post.*) On September 8, Detective Burchett of the Sacramento Police Department took an in-custody statement from Cram which essentially conformed to her trial testimony.

Guided by Smith's directions, the police found Burke's body in its shallow riverbank grave on the morning of September 3. Burke's throat had been cut, and there were 24 other stab wounds, 8 in the rear of the body. The wounds could have been inflicted by more than one knife and more than one person. Burke's pants pocket was turned out, but his wallet had not been taken.

---

[3] "'Fag Beach' is the name by which Smith referred to the riverbank area at the foot of North 10th Street, directly below the parking lot where Burke's auto had been left. The record discloses no official name for the beach." Webster, 54 Cal. 3d at 425 n.2.

4

The car in which the group was arrested was registered to Ronnie Glover. Glover testified that on the evening of August 30, he loaned the car to his cousin Burke, with whom he was traveling. Burke then left the Shell station in the company of three men meeting the descriptions of [petitioner] (glasses), Madrigal, and Williams (cowboy hat). Glover never saw Burke or the car again.

When examined at the time of booking, Madrigal and [petitioner] both had fresh injuries. [Petitioner's] wound was on the knee. A bloodstained knife was found in the car taken from Glover and Burke.

B. Defense evidence

[Petitioner] testified in his own behalf. He denied any plan to kill the victim and steal his car. The camp residents had engaged in a drunken discussion about killing people, but [petitioner] insisted he merely taunted the others to show they were not as "tough" as they maintained. [Petitioner] did tell the "sniveling" Cram that "[t]his will be your first day of school," but the remark was intended only to "shut her up." He did not order anyone to dig a grave or break camp before he went to meet Glover and Burke.

Later, according to [petitioner], Burke handed him the car keys when they arrived at the "Fag Beach" parking lot. [Petitioner] was "fairly loaded" but not staggering drunk. As the four men walked from the car toward the camp, he and Burke were arguing over how to split the proceeds of drug sales and robberies planned for later in the evening. Burke wanted a larger share because he had furnished the car. Burke suddenly pulled a knife and slashed [petitioner] on the leg. [Petitioner] managed to get control of Burke's weapon and defended himself. Burke kept "charging" at [petitioner] and Madrigal, forcing them to continue stabbing him. Burke could have left had he wished to do so.

Only after Burke's death, [petitioner] said, did the group decide to take the car and flee. Attempts to dig a makeshift grave were unsuccessful, so they dragged Burke's body under a bush. They also threw knives belonging to [petitioner], Madrigal, Burke, and Smith into the river. [Petitioner] denied going through Burke's pockets. He could not name the owner of the knife found in the car but said it was not Madrigal's.

William Gaida, a Sacramento detective, testified about a statement taken from Cram on September 2, which differed in minor respects from Cram's trial testimony. Larry Moser testified that several years earlier, he was seriously injured in a barroom fight initiated by Burke.

Coville testified in his own defense. He denied participating in or overhearing a plan to kill Burke. Coville said he was drunk when [petitioner], Madrigal, and Williams returned to camp with Burke. Coville insisted he did not see the killing of Burke, but [petitioner] later told him "this guy [had] jumped on [petitioner] and stuck him with a knife" and [petitioner] thought the "guy" was

5

dead after a struggle.  Coville recited in some detail how the group reached Burke's car and left town.

A psychiatrist, Dr. Globus, testified that Coville was an alcoholic with brain damage and a history of "amnestic episodes." Coville told Dr. Globus he remembered little of the incident besides drinking and "partying."   Dr. Globus believed Coville and concluded he could not have formed the mental states necessary for malice, premeditation, lying in wait, or intent to kill.

Neither Williams nor Madrigal testified.  Madrigal's long history of behavioral and psychiatric problems and drug and alcohol abuse was detailed.  Dr. Mungas, a psychologist, testified that Madrigal had hazy memories of a fight but remembered no details. Dr. Mertz, a psychiatrist, testified that Williams told her he had been consuming beer and amphetamines continuously by the evening of August 30; he remembered going to the Shell station and returning with Burke; he heard a scuffle behind him and took Cram away.   Dr. Mertz concluded that because of drug and alcohol intoxication, Williams had diminished capacity to conspire, harbor malice, premeditate, or intend to kill.[4]

II. Penalty Trial

A. Prosecution evidence

The People presented evidence that in the early morning of August 31, 1981, the day after the Burke homicide, [petitioner], Madrigal, Smith, and Williams robbed a convenience store in Pacoima.  The prosecution presented a videotape of the robbery, along with the testimony of Smith and the store clerk, Eli Yitshaky. The evidence indicated that [petitioner] was the ringleader, that he and Madrigal brandished knives, and that Yitshaky was knocked unconscious after complying with the robbers' order to lie down on the floor.  The robbers took food, money from the cash register, and Yitshaky's personal property.   [Petitioner], who followed Smith from the store, told Smith he had "punched [Yitshaky] out" and had taken his wallet and watch.

The prosecution introduced evidence that on October 31, 1981, [petitioner] and Madrigal were convicted of armed robbery in the Pacoima case.   Two Washington State felony convictions against [petitioner] were also presented:  a 1977 conviction for second degree assault, and a 1974 conviction for second degree burglary.

/////

---

[4]  "The jury acquitted Coville and Williams of first degree murder, but found them guilty of robbery, second degree murder, grand theft of an auto and conspiracy to commit robbery and first degree murder.  Madrigal, like [petitioner], was found guilty of conspiracy, robbery, grand theft of an automobile and first degree murder with personal use of a dangerous and deadly weapon. As to Madrigal, a lying-in-wait special circumstance was found not true, but a robbery-murder special circumstance was found true.  [Petitioner] and Madrigal proceeded to a separate penalty trial."  Webster, 54 Cal. 3d at 427 n.3.

B. Defense evidence

Several members of [petitioner's] family testified in his behalf. According to his two sisters, the family was poor. Their father was unemployed and a cruel alcoholic who often beat the children and their mother. Still, [petitioner] was cooperative and hardworking until he returned from his two combat tours in Vietnam. Thereafter, his personality was completely changed; he was remote and bitter. He complained that television news about the war was inaccurate. While drinking in a bar with his sister Linda Moss, [petitioner] cried and said he had run over a Vietnamese child while driving his Army supply truck during maneuvers. [Petitioner's] mother confirmed her son's personality change after Vietnam and pleaded for his life.

[Petitioner] produced documentary evidence that he had received the Bronze Star for combat bravery in Vietnam. The citation for this medal indicated that [petitioner], disregarding his own safety, had leveled "devastating" machine-gun fire on an advancing enemy force to protect tanks that were taking on ammunition from his supply truck.

Finally, [petitioner] presented evidence about his efforts to learn a trade in the Washington State Penitentiary. A prison vocational counselor said [petitioner] approached him for assistance in entering auto-body and welding courses. According to his instructors, [petitioner's] performance in the auto-body class was average; his performance in a welding class was excellent.

Madrigal, who was jointly tried on the issue of penalty, also presented character and background evidence from relatives. Dr. Mertz expanded upon the guilt phase evidence of Madrigal's mental state. Dr. Mertz said Madrigal still had little recall of the Burke homicide and had expressed remorse. She reiterated that Madrigal was a chronic alcoholic and amphetamine abuser and diagnosed an "atypical pervasive developmental disorder" with antisocial features. These conditions, said Dr. Mertz, impaired Madrigal's capacity to appreciate the criminality of his conduct and to conform his behavior to law. The jury sentenced Madrigal to life imprisonment without parole.

**PROCEDURAL BACKGROUND**

I. State Proceedings

In 1983, petitioner was convicted, following his jury trial in the Sacramento County Superior Court, of first degree murder (California Penal Code §§ 187, 189[5]) for the death of William Burke; robbery (id. § 211); conspiracy to commit first degree murder and robbery (id. § 182(1)); and grand theft of an automobile (id. § 487(3)). The jury also found true an

_____

[5] Petitioner's crime occurred in 1981. All citations herein to the California Penal Code refer to the version of the statute in effect at that time.

7

1    enhancement allegation that petitioner had personally used a deadly and dangerous weapon.  (Id.

2    § 12022(b).)  As special circumstances making petitioner subject to the death penalty under

3    California's 1978 death penalty statute, the jury found petitioner had intentionally committed the

4    murder while lying in wait (id. § 190.2(a)(15)) and while engaged in the commission or attempted

5    commission of a robbery (id. § 190.2(a)(17)(i)).  Following the penalty phase of the trial, the

6    same jury determined that petitioner's penalty should be death.

7            On direct appeal, the California Supreme Court affirmed the judgment of conviction in its

8    entirety.  Webster, 54 Cal. 3d at 423.  In the same opinion, that court denied petitioner's first state

9    petition for writ of habeas corpus.  Id. at 456-60.

10           After filing an initial petition for writ of habeas corpus in this court, petitioner returned to

11   state court to exhaust additional claims in state court.  In this regard, petitioner filed a second

12   petition for writ of habeas corpus in the California Supreme Court on April 23, 1996.  That state

13   habeas petition was summarily denied on April 26, 1996.  (See Dkt. No. 73 at 2.)

14   II.  Federal Proceedings

15           Petitioner filed a petition for writ of habeas corpus in this court on November 23, 1994,

16   followed by a first amended petition on January 6, 1995.  (Dkt. Nos. 36 & 42.)   After his

17   exhaustion petition was ruled upon by the state courts, petitioner filed a second amended petition

18   for writ of habeas corpus in this court on September 19, 1996.  (Dkt. No. 73 (hereafter "Pet.").)

19   Respondent filed a preliminary answer to the petition on November 26, 1996.  (Dkt. No. 76.)  On

20   the same day, respondent filed a motion for summary judgment with respect to all of petitioner's

21   claims.  (Dkt. No. 77.)  On February 4, 1998, petitioner filed his opposition to summary judgment

22   and a cross-motion for partial summary judgment.  (Dkt. No. 141.)

23           On February 18, 1999, the undersigned recommended granting in part and denying in part

24   respondent's motion for summary judgment and denying petitioner's cross-motion for partial

25   summary judgment.[6]  (See Dkt. No. 176 at 141-43.)  The assigned District Judge adopted those

26

27   _____
     [6]  The hearing of the parties' summary judgment motions was significantly delayed in large part
28   due to the withdrawal of petitioner's original counsel and the appointment of new counsel on his
     behalf.  (See Dkt. No. 176 at 2-10 (detailing the extensive procedural history leading up to the
     June 9, 1998 hearing on the motions).)

8

1   findings and recommendations in all but two respects, granting summary judgment for petitioner

2   on claims that retrospective application of the two special circumstances violated petitioner's due

3   process rights.  (Dkt. No. 201.)  The district court entered partial judgment in petitioner's favor.

4   (Dkt. No. 232.)  On appeal, the Court of Appeals for the Ninth Circuit reversed the granting of

5   relief with respect to those two claims and the case was remanded to this court.  Webster v.

6   Woodford, 369 F.3d 1062 (9th Cir. 2004) (finding that the state supreme court's construction of

7   the two special circumstances was not so unforeseen or unexpected that it resulted in a

8   deprivation of petitioner's due process rights); (Dkt. No. 244).

9       On April 21, 2006, petitioner filed a motion for an evidentiary hearing.  (Dkt. No. 272.)

10   Petitioner requested, and the court granted, an evidentiary hearing on three claims:  (1) trial

11   counsel provided ineffective assistance by failing to investigate and present mitigation evidence

12   in the penalty phase of petitioner's trial; (2) petitioner was denied meaningful appellate review by

13   the California courts in violation of the Eighth Amendment; and (3) California's statutory scheme

14   fails to adequately narrow application of the death penalty.  (Dkt. No. 276.)  In its entirety, the

15   evidence with respect to these three issues was taken by way of declaration and deposition and

16   has been submitted to the court as exhibits.  The parties subsequently briefed each of these issues,

17   filing an index of evidence with respect to each issue.  (Dkt. Nos. 372, 373 (Evid. Index), 393,

18   396, 400 & 468 (briefing re: ineffective of assistance claim); 431, 432 (Evid. Index), 438 & 440

19   (briefing re: appellate process claim); and 472 (Evid. Index), 473, 476 & 479 (briefing re:

20   narrowing claim).)

21       On October 16, 2009, respondent filed an answer and memorandum of points and

22   authorities.  (Dkt. No. 427.)  On November 30, 2009 petitioner filed a traverse and separate

23   points and authorities addressing certain claims.  (Dkt. Nos. 433 & 434.)  These memoranda were

24   directed primarily at those claims that survived summary judgment but were not the subject of the

25   grant of the evidentiary hearing.  On these non-evidentiary claims, the parties also filed

26   supplemental memoranda of points and authorities.  (Dkt. Nos. 439 & 441.)

27       With the final remaining claims now fully briefed, for the reasons set forth below, the

28   undersigned recommends granting petitioner's claim of ineffective assistance of counsel at the

1     penalty phase and denying all other remaining claims.

2                         **APPLICABLE LEGAL STANDARDS**

3            The petition for writ of habeas corpus in this case was filed before the effective date of the

4     Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and thus is not subject to the

5     provisions of that Act.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); McMurtrey v. Ryan, 539

6     F.3d 1112, 1118 n.1 (9th Cir. 2008); Webster, 369 F.3d at 1066.

7            Under those pre-AEDPA standards, a writ of habeas corpus is available under 28 U.S.C. §

8     2254 only on the basis of some transgression of federal law binding on the state courts.  Peltier v.

9     Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.

10    1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197

11    (9th Cir. 1983)).  It is not available for alleged error in the interpretation or application of state

12    law.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal

13    habeas corpus relief does not lie for errors of state law.'") (citation omitted); Park v. California,

14    202 F.3d 1146, 1149 (9th Cir. 2000); Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens

15    v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).

16           However, "a claim of error based upon a right not specifically guaranteed by the

17    Constitution may nonetheless form a ground for federal habeas relief where its impact so infects

18    the entire trial that the resulting conviction violates the defendant's right to due process."  Hines

19    v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir.

20    1980)), abrogated on other grounds by Ross v. Oklahoma, 487 U.S. 81 (1988).  See also Lisenba

21    v. California, 314 U.S. 219, 236 (1941); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).

22    In order to raise such a claim in a federal habeas petition, "the error alleged must have resulted in

23    a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962).  See also

24    Henry, 197 F.3d at 1031; Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v.

25    Dickson, 280 F.2d 727, 736 (9th Cir. 1960).  Habeas corpus cannot be utilized to try state issues

26    de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972); see also Brecht v. Abrahamson, 507

27    U.S. 619, 633 (1993) ("Federal courts are not forums in which to relitigate state trials.")

28    //////

                                          10

1    Although less deference to state court factual findings is required under the pre-AEDPA

2    law, state court factual findings are entitled to a presumption of correctness unless one of eight

3    enumerated exceptions apply.  See 28 U.S.C. § 2254(d) (1994); McMurtrey, 539 F.3d at 1118;

4    Silva v. Woodford, 279 F.3d 825, 835 (9th Cir. 2002); Bean v. Calderon, 163 F.3d 1073, 1087

5    (9th Cir. 1998) (on habeas review, the factual findings of the state court are presumed to be

6    correct unless they are "not fairly supported by the record") (quoting 28 U.S.C. § 2254(d)(8)

7    (1996)).  The state courts' application of law to historical facts is reviewed by the federal habeas

8    court de novo as are mixed questions of law and fact.  Thompson v. Keohane, 516 U.S. 99, 110

9    (1995) (holding that under pre-AEDPA standards federal courts are not required to defer to state

10   court determinations of mixed questions of law and fact); Hoyle v. Ada County, 501 F.3d 1053,

11   1059 (9th Cir. 2007); Thompson v. Borg, 74 F.3d 1571, 1573 (9th Cir. 1996); Powell v. Gomez,

12   33 F.3d 39, 41 (9th Cir. 1994); Ben-Sholom v. Ayers, 566 F. Supp. 2d 1053, 1060 (E.D. Cal.

13   2008).

14   The federal habeas court also "need not defer to state court rulings on questions of law

15   'since the federal court is not formally reviewing a judgment, but is determining whether the

16   prisoner is "in custody in violation of the Constitution or laws or treaties of the United States."'"

17   McMurtrey, 539 F.3d at 1118 (quoting Lambrix v. Singletary, 520 U.S. 518, 523 (1997)).  The

18   federal habeas court is to "simply resolve the legal issue on the merits, under the ordinary rules."

19   Id. (quoting  Summerlin v. Schriro, 427 F.3d 623, 628 (9th Cir. 2005) (en banc).

20   The habeas petitioner bears the burden of "proving that [his] detention violates the

21   fundamental liberties of the person, safeguarded against state action by the Federal Constitution."

22   Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-

23   Reyes, 504 U.S. 1 (1992).  Accord Silva, 279 F.3d at 835 ("It is the petitioner's burden to prove

24   his custody is in violation of the Constitution, laws or treaties of the United States.") (quoting

25   Snook v. Wood, 89 F.3d 605, 609 (9th Cir. 1996)).  To prevail, the petitioner must "convince the

26   district court 'by a preponderance of evidence' of the facts underlying the alleged constitutional

27   error."  McKenzie v. McCormick, 27 F.3d 1415, 1418 (9th Cir. 1994) (quoting Johnson v. Zerbst,

28   304 U.S. 458, 469 (1938)), abrogated on other grounds by O'Dell v. Netherland, 521 U.S. 151

1   (1997).  See also Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004); Silva, 279 F.3d at 835.

2          The granting of federal habeas relief is appropriate "only if the alleged errors 'had

3   substantial and injurious effect or influence in determining the jury's verdict.'"  Hovey v. Ayers,

4   458 F.3d 892, 900 (9th Cir. 2006) (quoting Brecht, 507 U.S. at 637).

5          With these standards of review in mind, the undersigned will address each of petitioner's

6   remaining claims for federal habeas relief.  The court begins with those claims that were the

7   subject of the evidentiary hearing granted by this court.

8                                  **ANALYSIS**

9   I.  Evidentiary Hearing Claims

10          A.  Ineffective Assistance of Counsel at the Penalty Phase

11          In his Claim 22,  petitioner contends his death sentence is invalid under the Sixth

12   Amendment because he received ineffective assistance of counsel during the penalty phase of his

13   trial.  As noted above, after reviewing the parties' briefing and hearing their arguments, the court

14   granted an evidentiary hearing on this issue.  By agreement of the parties, and with the approval

15   of the court, the evidence on this claim was submitted via declarations and video-taped

16   depositions rather than by in-court testimony.  In this regard, petitioner has presented to the court:

17          (1) declarations comprising the testimony of 44 witnesses;

18          (2) depositions of 20 witnesses (both transcripts and videos);

19          (3) recordings and transcripts of interviews with 10 witnesses;

20          (4) the stipulated further testimony of 1 witness;

21          (5) exhibits, numbered from 1 to 102, submitted pursuant to Habeas Rule 7,

22          comprised of photographs, military records, maps, additional declarations, school

23          records, court records, medical records and other documents; and

24          (6) separate exhibits accompanying the 20 depositions.

25   (Index to Evidence Submitted Regarding Petitioner's Claim of Ineffective Assistance of Counsel

26   /////

27   /////

28   /////

1   (hereinafter "IAC Evid. Index") (Dkt. No. 373).)[7]

2        For the reasons explained below, this evidence compels the conclusion that petitioner's

3   trial counsel's failure to investigate and present a mitigation case to the sentencing jury deprived

4   petitioner of effective assistance of counsel with respect to the penalty phase of his trial.

5            1.  Factual Background

6        Because petitioner was indigent, attorney Vincent O'Brien was appointed to represent him

7   in the Sacramento County Municipal Court on November 20, 1981.  (CT 1841.)[8]  Attorney

8   O'Brien served as petitioner's counsel during his preliminary hearing in January of 1982 and was

9   reappointed to represent petitioner in the Sacramento County Superior Court on March 2, 1982.

10  (CT 13, 1036.)  O'Brien did not request the appointment of a second attorney, so-called "Keenan

11  counsel," on petitioner's behalf.  It was not until June 30, 1982, more than seven months after his

12  initial appointment, that attorney O'Brien finally hired Michael McCarthy as the investigator to

13  work on petitioner's case.  (McCarthy Decl., Decl. 37 (Dkt. No. 288-1 at consec. p. 152) at ¶ 2.)[9]

14  McCarthy was the only investigator to work on petitioner's case and had limited experience,

15  having worked as an investigator for less than three years at the time he signed on as the sole

16  investigator working on petitioner's case.  (Id. ¶ 5; McCarthy Depo., lodged herein Mar. 6, 2007

17  (see Dkt. No. 311), at 18, 24-25.)  More importantly, McCarthy had never conducted a mitigation

18  investigation in a capital case.  (Id. ¶ 5; McCarthy Depo., lodged herein Mar. 6, 2007 (see Dkt.

19

20  _____

[7]  Petitioner has requested that the court disregard one sealed document referenced by respondent
21  in his brief in opposition to the ineffective assistance of counsel at penalty phase claim (Dkt. No.
    395 – sealed) as well as respondent's argument based upon that document.  (Dkt. No. 400 –
22  sealed.)  The undersigned will deny petitioner's request because even considering the contested
    document and arguments, as well as petitioner's argument regarding its lack of persuasive weight,
23  the undersigned concludes that petitioner still prevails on the claim in question.

24  [8]  The state court record, lodged with the court, will be cited as follows:  "CT" refers to the
25  Clerk's Transcript on appeal; "RT" refers to the reporter's transcript on appeal; loose transcripts
    outside of the consecutively paginated RT are designated herein with a date, "RT (date)."

26
    [9]  Because many declarations are contained in some of the docket entries, for ease of reference the
27  court refers both to the consecutive page of that docket entry -- for example, here, Mr.
    McCarthy's statement appears at page 152 of the 159 pages of docket entry 288-1 -- as well as to
28  the relevant paragraph in the declaration.

1    No. 311.) at 18.) [10]  Investigator McCarthy met with petitioner alone only once or twice.

2    (McCarthy Depo., lodged herein Mar. 6, 2007 (see Dkt. No. 311), at 39-40.)  McCarthy testified

3    that petitioner was cooperative during these meetings, but appeared withdrawn and depressed.

4    (Id. at 48-51, 52-53.)

5          McCarthy's "investigator diary" and billing records are the best and most complete

6    chronology of what occurred during the defense's investigation of petitioner's case.  (Id. at 11-

7    19.)  These records, consisting of eight documents submitted as Exhibits B through I to

8    McCarthy's deposition, cover the period of time from late July 1982 through the return of the

9    jury's penalty phase verdict on April 14, 1983.  McCarthy's records reflect that no investigation

10   related to the penalty phase took place prior to the beginning of petitioner's trial and that no

11   penalty phase investigation at all was conducted until well after the guilt-phase evidence had been

12   submitted to petitioner's jury.

13         During the pretrial proceedings and guilt-phase portion of petitioner's trial, attorney

14   O'Brien had five or six conversations with attorney William Owen about petitioner's case.

15   (Owen Depo., lodged herein Nov. 9, 2007 (see Dkt. No. 363), at 25-26.)  In his declaration,

16   attorney Owen described his relationship with attorney O'Brien as follows:

17                 [O'Brien] would provide some information about the case or an
                   issue in the case and I would give him my impressions and
18                 recommend certain actions.  I advised him that he must assume the
                   case would go to a penalty trial, and urged him to conduct a
19                 thorough penalty-phase investigation.

20   (Owen 2007 Decl., Decl. 41 (Dkt. No. 316-1) ¶ 6.)  Owen would later learn that O'Brien had not

21   followed this recommendation.  (RT (Mar. 7, 1983) at 4.)

22         Just before his trial began, petitioner made a motion to have O'Brien relieved as his

23   counsel of record, complaining about his appointed counsel's lack of follow-through. [11]  The

24   request was denied.  (RT at 573-574.)  On October 21, 1982, jury selection began.  (CT at 1290.)

25   The evidentiary portion of the guilt of the trial began on November 29, 1982.  (CT at 1309.)  The

26   prosecution rested its case on December 14, 1982.  (CT at 1331.)  The presentation of petitioner's

27   _____

28   [10]  All deposition transcripts were lodged, and are maintained by this court, in paper.

     [11]  It would appear in retrospect that petitioner's concerns were well-founded.

                                        14

1   defense began on December 20, 1982, and relied upon the testimony of petitioner in support of a

2   self-defense theory.  (RT at 3668, 3682, 3701-3707, 3855-3856.)  In this regard, petitioner

3   admitted that he and Madrigal had stabbed the victim Burke.  (RT at 3830-3833.)  During his trial

4   testimony, evidence regarding petitioner's abuse of alcohol and drugs on the day of the homicide

5   was presented.  (RT at 3684-3686, 3764-3765, 3780-3785.)

6       The trial recessed for the holidays from December 23, 1982 to January 4, 1983. (CT at

7   1340-1341.)  As the other defendants presented their cases, investigator McCarthy, for the first

8   time, on January 18, 1983, attempted to obtain portions of petitioner's military file from the

9   government.  (Jan. 25, 1983 Trial Investigator Record, Ex. 61 (Dkt. No. 291-1 at consec. pp. 128-

10  129) at 3-4; McCarthy Depo., lodged herein Mar. 6, 2007 (see Dkt. No. 311), at 33-38.)  As

11  explained in more detail below, the defense did not receive those military records until well after

12  the conclusion of the guilt phase.

13      On January 31, 1983, the jury was scheduled to begin hearing the parties' final guilt-phase

14  arguments, but one of the co-defendants' counsel was ill, and the trial court continued the case for

15  a week.  (RT at 4712-4716; CT at 1352.)  On February 1, 1983, McCarthy had a meeting with

16  O'Brien "as to the information which will be needed if this trial goes to the penalty phase."  (Feb.

17  21, 1983 Trial Investigator Record, Ex. 62 (Dkt. No. 291-1 at consec. p. 132) at 1.)  Previous to

18  that meeting, other than the request for military records made just two weeks earlier, no penalty-

19  phase investigation had been conducted on behalf of petitioner.[12]  In February of 1983, McCarthy

20  began to collect documents and call individuals relating to petitioner's prior felony convictions

21  and incarceration in the State of Washington.  (Id. at 1-5.)  However, at that time no one

22  _____

23  [12] As explained in detail later in the undersigned's discussion of petitioner's claim of ineffective
    assistance of counsel at the guilt phase, attorney O'Brien did have petitioner examined by two
24  mental health professionals prior to the commencement of petitioner's guilt phase trial.  However,
    he did so for the purpose of determining whether to pursue a guilt-phase mental health defense,
25  such as diminished capacity, based on a possible post-traumatic stress disorder brought about as a
    result of petitioner's experiences in Vietnam.  (See O'Brien Decl., Ex. 1 to Inf. Resp. to First
26  State Petition.)  However, at that time, attorney O'Brien had not sought petitioner's military
    records or other background information to support the mental health professionals' work.
27  Nonetheless, those professionals rendered opinions that petitioner was not suffering from PTSD
    or any other mental defect that might support a guilt phase defense.  It is evident that O'Brien did
28  not further explore petitioner's mental health or substance abuse for purposes of developing
    mitigating evidence for the penalty phase of the trial.

15

1    attempted to contact petitioner's family or any mitigation witnesses relating to either petitioner's

2    childhood or military service.

3        The jurors returned their guilt-phase verdicts on Wednesday, February 23, 1983. (CT at

4    1597.) Petitioner was convicted of first degree murder, robbery, conspiracy, and automobile

5    theft. (RT at 5229-5243.) The two alleged special circumstances allegations were found by the

6    jury to be true. (RT at 5236-5238.) After the guilt phase verdicts were returned, the trial court

7    continued the matter, ordering the penalty phase trial to begin on March 8, 1983. (RT at 5280.)

8        The day after the guilt phase verdicts were rendered, McCarthy met with O'Brien

9    regarding the penalty phase. (Mar. 1, 1983 Trial Investigator Record, Ex. 63 (Dkt. No. 291-1 at

10   consec. p. 139) at 1.) On February 25, 1983, a subpoena was issued by the defense for

11   petitioner's military records and mailed to the repository in Missouri; subpoenas were also issued

12   for three witnesses who knew petitioner during his incarceration in the State of Washington

13   during the late 1970's. (Id.; Ex. J to McCarthy Depo., lodged herein Mar. 6, 2007 (see Dkt. No.

14   311).) At his deposition, attorney Owen described what occurred next:

15

> I got a call one morning from, I believe, Vince O'Brien's wife,
> asking me to speak to Vince. That he had what they thought was a

16

> heart attack, and that he couldn't continue in the case, and they
> wanted me to do the penalty phase.

17

18   (Owen Depo., lodged herein Nov. 9, 2007 (see Dkt. No. 363), at 25.) Owen believed that

19   O'Brien's health was in serious jeopardy and that "if Mr. O'Brien were to continue as Mr.

20   Webster's counsel it might have serious negative consequences for his health." (Owen 2007

21   Decl., Decl. 41 (Dkt. No. 316-1) at ¶ 4.) According to Owen, that "was the only reason I agreed

22   to take the appointment." (Id.)

23        On March 1, 1983, O'Brien filed a motion with the trial court asking to be relieved as

24   counsel of record for petitioner. (CT at 1600-1602.) O'Brien filed a declaration in support of his

25   request to be relieved, asserting that his cardiologist had recommended that he "not try the

26   penalty phase of this case." (CT at 1602.) He also stated that Owen was available to serve as

27   petitioner's appointed counsel for the penalty phase and that Owen was familiar with the case.

28   (CT at 1602.) At a hearing held that same day, the trial court granted the motion, relieved

1   O'Brien and appointed Owen as petitioner's counsel of record. (RT at 5282-5288.)

2          On March 3, 1983, investigator McCarthy and attorney Owen, who had just been

3   appointed two days earlier, met for the first time regarding the case. Owen had by that time had

4   an opportunity to preliminarily review petitioner's case file. He then discovered that virtually

5   nothing had been done with regard to defense preparation for the penalty phase of the trial.

6   Attorney Owen explained the predicament he found himself in:

> My consent to accept the appointment as Mr. Webster's attorney,
> after Mr. O'Brien moved to withdraw before the penalty phase, was
> based on his assurances that he had been taking reasonable steps in
> preparation for the penalty phase . . . . When I received the files
> and reviewed them after accepting the appointment, I discovered
> that virtually nothing had been done in preparation for the penalty
> phase. Mr. Webster's family had not been contacted. His military
> file had not been obtained. The preparation was inadequate. The
> case was simply not ready to be tried.

12  (Owen 2007 Decl., Decl. 41 (Dkt. No. 316-1) at ¶ 7 (footnote omitted).) Investigator McCarthy

13  had a similar recollection:

> I recall very clearly that first meeting with Mr. Owen on March 3,
> 1983. Mr. Owen was very concerned about the condition of the
> case. He wanted to know why certain things were not done. Since
> I had never conducted a penalty phase investigation before I did not
> know how to respond . . . . Mr. Owen told me to contact Larry
> Webster's family as soon as possible. Mr. O'Brien had never asked
> me to contact Mr. Webster's family. Mr. Owen also told me to
> follow up on the documents we had not received but subpoenaed
> via certified letters on February 25th. We still had not received Mr.
> Webster's military records.

20  (McCarthy Decl., Decl. 37 (Dkt. No. 288-1 at consec. p. 153) at ¶ 16.) At a trial readiness

21  appearance for the penalty phase held on March 7, 1983, the day before that phase of petitioner's

22  trial was scheduled to begin, Owen asked to meet with the trial judge ex parte to request a

23  continuance. (RT at 5303.) Attorney Owen advised the trial judge at that time that virtually

24  nothing had been done to prepare for the presentation of mitigating evidence on petitioner's

25  behalf at the penalty phase, that only three witnesses had been subpoenaed and that all three were

26  prison employees from the State of Washington, where petitioner had been incarcerated. (RT

27  (Mar. 7, 1983) at 3.) "And that's all," Owen said. (Id.) "That's all that's been prepared for the

28  penalty phase." (Id.) He also informed the trial court that petitioner's military records had not

1   been gathered and that attorney O'Brien had misled him about the extent and significance of

2   petitioner's military service.  (Id. at 4-5.)  O'Brien had told Owen that he was aware of no service

3   medals.  Upon discovering that petitioner had been awarded the Bronze Star and other service

4   medals, attorney Owen felt compelled to attempt to obtain petitioner's military records.  (Id. at 5.)

5          The trial court acknowledged that had attorney Owen been involved in petitioner's case

6   from the beginning, he "may very well have prepared [it] differently."  (Id. at 12.)  Nonetheless,

7   the trial judge expressed frustration that attorney Owen was seeking a continuance of the penalty

8   phase trial after telling the court at the time he replaced attorney O'Brien that he would be

9   prepared to proceed.  (Id. at 12-13.)  Attorney Owen indicated that when he informed the court

10  that he could replace attorney O'Brien in light of O'Brien's heart condition and would be ready to

11  proceed, he had assumed that attorney O'Brien had followed his (Owen's) advice about preparing

12  for the penalty phase.  (Id. at 3 ("I feel that I would have been ready to go and could have gone,

13  had the work that should have been done, had it been done."); and 13 ("I thought he [O'Brien]

14  had followed what I had indicated should be done[.]")  Attorney Owen asked for a five-week

15  continuance.  (Id. at 16-17.)  The trial court indicated that it would only grant a short continuance

16  for "a week or ten days," depending upon whether the prosecution and co-defendant's counsel

17  objected.  (Id. at 24.)  After an off-the-record consultation with the prosecutor and co-defendant's

18  counsel, the trial court announced that the penalty phase trial would be continued and would

19  commence four weeks later, on April 4, 1983.  (RT at 5308-5309.)

20         On the following day, March 8, 1983, the parties met again, this time with the jurors in

21  attendance.  Initially, the trial judge reduced the length of the continuance he had granted the day

22  before, indicating that the penalty phase of the trial would proceed on March 15, 1983 "rather

23  than the original date that we agreed on yesterday."  (RT at 5313.)  After discussions with the

24  jurors and yet another unreported conference with trial counsel (RT at 5316-5317), the trial court

25  announced the penalty phase portion of the trial would begin on April 11, 1983.

26         At his deposition in connection with this federal habeas action, attorney Owen recalled

27  asking for two continuances, and getting more time with each request.  (Owen Depo., lodged

28  herein Nov. 9, 2007 (see Dkt. No. 363), at 41.)  Still, Owen knew that the time he was being

given would be insufficient to prepare an adequate penalty phase defense:

> I realized that I needed more time to present a proper penalty-phase case, but I felt pressured by Judge Grossfeld to proceed in spite of the lack of full investigation. I did not move for an additional continuance, or move to withdraw, because I believed that Judge Grossfeld could have forced Mr. O'Brien to come back as counsel and represent Mr. Webster. I believed that Mr. O'Brien's health would have been seriously compromised had he been forced back into the case.

(Owen 2007 Decl., Decl. 41 (Dkt. No. 316-1) at ¶ 9.)  Ultimately, Owen testified in this habeas proceeding that even at the time he was presenting petitioner's penalty phase defense, he believed he was unable to give petitioner adequate representation. (Owen Depo., lodged herein Nov. 9, 2007 (see Dkt. No. 363), at 40-43.)[13]  In the end, attorney Owen, aided by investigator McCarthy, put together petitioner's penalty phase mitigation case in the one month allotted to them.

This abbreviated time to prepare the penalty phase defense was further hindered by the fact that petitioner's family was located in Michigan and Missouri. Investigator McCarthy managed to interview some close family members by telephone in March of 1983, including petitioner's mother and two sisters.[14]  Attorney Owen talked with a few doctors regarding

---

[13]  At his deposition, Owen was questioned repeatedly regarding the inadequate time he had for penalty-phase preparation and how it impacted his presentation of petitioner's case in mitigation to the jury. (Owen Depo. at 39 (counsel did not have adequate time to interview petitioner); 40 (the personal history developed was less than adequate and counsel was unable to find military related witnesses due to time constraints); 53 (counsel did the best job he could but didn't have enough time); 62 (inadequate time to gather petitioner's school records); 97-98 (inadequate time to prepare and interview petitioner's family member witnesses); 100 (the mitigation presentation at trial, compared with the much expanded testimony of the same witnesses in these habeas proceedings, was insufficient because of "[t]ime. Ability of the witness to express it. The ability of us to get it. The ability to know other witnesses that would express to us what was going on. Things of that nature."); and 153-155 (inadequate time to find military witnesses and develop the case in mitigation).)  Attorney Owen then opined that it would have taken at least months, possibly years, to investigate, prepare and present a full and complete penalty phase case on behalf of petitioner. (Id. at 77-78; Owen Decl., Decl. 41 (Dkt. No. 316-1) at ¶ 10.)

[14]  McCarthy's records reflect that he interviewed, by telephone, six of petitioner's family members and only one of his teachers:  Patricia Libla (sister); Carroll Moss (brother-in-law); Linda Moss (sister); Roy Crutchfield (step-father); Maggie Crutchfield (mother); Dale Webster (brother); and Geraldine Rogers (childhood teacher). (Mar. 17, 1983 Trial Investigator Record, Ex. 64 (Dkt. No. 291-1 at consec. pp. 154-162) at 11-19; Apr. 18, 1983 Trial Investigator Record, Ex. 65 (Dkt. No. 291-1 at consec. p. 169) at 3.)  Only petitioner's two sisters and mother were brought out to California to testify at the penalty phase of the trial, however.  Reflective of the lack of preparation, the trial transcript of their entire collective testimony spans only eleven pages

1   petitioner's mental state, but he decided not to use them in presenting the penalty phase defense.

2   (Id. at 30, 61, 150.)  The defense did not receive petitioner's military records until March 15,

3   1983.  (Mar. 17, 1983 Trial Investigator Record, Ex. 64 (Dkt. No. 291-1 at consec. pp. 163-164)

4   at 20-21.)  Given the limited time available, McCarthy was unable to locate any fellow soldiers

5   who had served with petitioner in time to present them as witnesses in the penalty phase.

6   Similarly, Owen was not able to locate and enlist any expert witnesses to address the Vietnam

7   conflict and petitioner's military service there.  As investigator McCarthy testified in these

8   proceedings:

9           If Mr. O'Brien had directed me to contact family members or
10          Vietnam vets earlier in the case, I believe I could have located
            additional witnesses.   We did not have enough time to find
11          witnesses.  It wasn't until I finally reviewed Mr. Webster's military
            records on March 15th that I tried to locate names of people in his
12          battalion we might contact with regard to Mr. Webster's Vietnam
            service.  But I could not locate and contact them before the trial was
13          over.  We just ran out of time.

14  (McCarthy Decl., Decl. 37 (Dkt. No. 288-1 at consec. p. 154) at ¶ 19.)  Attorney Owen expressed

15  the same frustration:

16          Working with the investigator on the case, Michael McCarthy, I
17          was able to gather some evidence, present some family witnesses
            and obtain Mr. Webster's military records.  I did not, however, have
18          time to conduct or supervise a proper penalty-phase investigation to
            support and present a full penalty-phase case.

19  (Owen Decl., Decl. 41 (Dkt. No. 316-1) at ¶ 10.)  Owen's only meeting with the three Webster

20  family members who came out to California to testify at the penalty phase occurred just before

21  their brief testimony was presented.  (Apr.18, 1983 Trial Investigator Record, Ex. 65 (Dkt. No.

22  291-1 at consec. p. 178-179) at 12-13; Owen Depo. at 50.)

23          Inadequately prepared, the penalty-phase presentation on behalf of petitioner was

24  exceedingly short.  The entire transcript of the penalty phase mitigation case occupies a mere

25  twenty-two pages of the trial transcript.  (RT at 5411-5432.)  Given the lack of defense

26  investigation and preparation it is not surprising that attorney Owen made a very brief opening

27  statement to the jury; it takes up only one page of the trial transcript.  (RT at 5410.)  The three

28

in length.  (RT at 5422-5432.)

witnesses from Washington State Prison (whom defense investigator McCarthy had not even contacted until February of 1983) testified during the penalty phase of the trial that, while incarcerated in Washington, petitioner had enrolled in a welding class and an auto body class and was an "average" student.  (RT at 5411-5416.)  Certificates reflecting that petitioner had been awarded a Bronze Star for Valor as well an Army Commendation Medal were introduced only as documentary exhibits by petitioner's counsel without any witness testimony whatsoever and without elaboration, explanation or corroboration.  (RT at 5420-5421.)  As noted above, petitioner's two sisters and mother then testified in a much abbreviated fashion.  (RT at 5422-5432.)  The direct examination of petitioner's mother consisted of merely four questions.  (RT at 5432.)[15]  On the heels of that truncated testimony, petitioner's counsel abruptly rested the penalty phase defense.[16]

/////

---

[15]  The penalty phase testimony of petitioner's mother in its entirety was as follows:

> Q  Mrs. Crutchfield, you are Larry Webster's mother, are you not?
>
> A  Yes, I am.
>
> Q  Are you asking this jury to spare Mr. Webster's life?
>
> A  Yes, I am.
>
> Q  Larry went to Vietnam.   Did you see any change in his personality after Viet Nam?
>
> A  Yes.  There was a complete change in him when he come back.
>
> Q  In what way?
>
> A  He wasn't the same boy he was when he went in there.

(RT at 5432.)  Not surprisingly, given that brief testimony, the prosecutor saw no need to cross-examine.  (Id.)

[16]  Even the trial judge appears to have perhaps been taken somewhat aback by the defense presentation.  When petitioner's counsel rested the penalty phase defense, the trial judge called counsel to approach for a bench conference.  Thereafter, he advised the jury:  "Ladies and gentlemen, again we're in a situation of not having any further witnesses available at this time . . . . I thought we had it coordinated better than we do, but evidently we don't."  (RT at 5433.)  The jury was then sent home for the remainder of the day after hearing only this very brief testimony.  (Id.)

1   In arguing to the jury that imposition of the death penalty in petitioner's case was called

2   for, the prosecutor took full advantage of this abbreviated and anemic defense penalty phase

3   presentation by denigrating the mitigation case.  The prosecutor sarcastically suggested that he

4   had heard the Vietnam War blamed for "everything from murder to measles."  (RT at 5490.)  The

5   prosecutor rhetorically asked the jury why no one other than a family member had testified to say

6   "something good" about petitioner.  (RT at 5492.)  The prosecutor also pointed out to the jury that

7   no one "from the mainstream of life" had testified on behalf of petitioner:  "Wouldn't you think

8   that there'd be somebody in this world other than a family member that could come in and say

9   yeah, he worked for me, he was a good employee, or I knew him, he was a good guy or

10  something?"  (RT at 5492.)  Because so little evidence was presented by the defense in the

11  penalty phase trial, in his closing argument attorney Owen was reduced to little more than asking

12  the jury to show mercy to petitioner.  (RT 5494-5508.)

13  Predictably, in light of the crime of conviction and the paucity - indeed the near absence -

14  of mitigation evidence presented by the defense, the jury returned a death verdict with respect to

15  petitioner the following day, April 14, 1983.  (RT at 5554-5556).[17]

16  2.  Legal Standards

17  "The Sixth Amendment right to counsel in a criminal trial includes 'the right to the

18  effective assistance of counsel.'"  Summerlin, 427 F.3d at 629 (quoting McMann v. Richardson,

19  397 U.S. 759, 771 n. 14 (1970)).  The Sixth Amendment standard for analyzing an ineffective

20  assistance of counsel claim is well established.  In order to prevail on a claim of ineffective

21  assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an

22  objective standard of reasonableness" and that "there is a reasonable probability that, but for

23  counsel's unprofessional errors, the result of the proceeding would have been different."

24  Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

25  a.  Deficient Performance

26  Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

27  failed to meet an objective standard of reasonableness.  Strickland, 466 U.S. at 687; Wiggins v.

28  _____

[17]  Petitioner's co-defendant Madrigal, whose counsel presented an expert psychologist as part of his mitigation case, was sentenced to life without parole.

1  *Smith*, 539 U.S. 510, 521 (2003).  There is "a 'strong presumption' that counsel's representation

2  was within the 'wide range' of reasonable professional assistance."  *Harrington v. Richter*,

3  ___U.S.___, ___, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689.)  Thus, a

4  petitioner must rebut this presumption by demonstrating that his counsel's performance was

5  unreasonable under prevailing professional norms and was not the product of sound trial strategy.

6  *Strickland*, 466 U.S. at 688-89.  Judicial scrutiny of counsel's performance is highly deferential,

7  and thus the court must evaluate counsel's conduct from his perspective at the time it occurred,

8  without the benefit of hindsight.  *Id.* at 689.

9        The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

10  conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains

11  simply reasonableness under prevailing professional norms.'"  *Wiggins*, 539 U.S. at 521 (quoting

12  *Strickland*, 466 U.S. at 688).  However, "general principles have emerged regarding the duties of

13  criminal defense attorneys that inform [a court's] view as to the 'objective standard of

14  reasonableness' by which [a court must] assess attorney performance, particularly with respect to

15  the duty to investigate."  *Summerlin*, 427 F.3d at 629.  For instance, "strategic choices made after

16  thorough investigation of [the relevant] law and facts relevant to plausible options are virtually

17  unchallengeable."  *Strickland*, 466 U.S. at 690.  However, as the Supreme Court has explained:

18              [S]trategic choices made after less than complete investigation are
              reasonable precisely to the extent that reasonable professional
19              judgments support the limitations on investigation.  In other words,
              counsel has a duty to make reasonable investigations or to make a
20              reasonable decision that makes particular investigations
              unnecessary.  In any ineffectiveness case, a particular decision not
21              to investigate must be directly assessed for reasonableness in all the
              circumstances.
22

23  *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91).  *See also Sanders v. Ratelle*,

24  21 F.3d 1446, 1457 (9th Cir. 1994).  Similarly, a decision not to present a particular defense or

25  not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue

26  sufficiently to discover the facts that might be relevant to making an informed decision.  *Wiggins*,

27  539 U.S. at 522-23.  *See also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (defense

28  counsel's decision not to call a witness can only be considered tactical if counsel had "sufficient

1    information with which to make an informed decision"), cert. denied, ___U.S.___, 133 S. Ct.

2    1239 (2013); Correll v. Ryan, 539 F.3d 938, 949 (9th Cir. 2008) ("An uninformed strategy is not

3    a strategy.  It is, in fact, no strategy at all."); Reynoso v. Giurbino, 462 F.3d 1099, 1112–15 (9th

4    Cir. 2006) (counsel's failure to cross-examine a witnesses about the witness's knowledge of

5    reward money cannot be considered strategic where counsel did not investigate that avenue of

6    impeachment); Stankewitz v. Woodford, 365 F.3d 706, 719 (9th Cir. 2004) ("[T]here is no record

7    evidence that [counsel] ever hired an investigator or interviewed Stankewitz's teachers, foster

8    parents, psychiatrists, psychologists or anyone else who may have examined or spent significant

9    time with him during his childhood and youth."); Jennings v. Woodford, 290 F.3d 1006, 1016

10   (9th Cir. 2002) (counsel's choice of presenting an alibi defense and rejecting a mental health

11   defense was not a reasonable strategy where counsel failed to investigate the possible mental

12   defenses).

13          "[P]retrial investigation and preparation are the keys to effective representation of

14   counsel." United States v. Tucker, 716 F.2d 576, 581 (9th Cir. 1983). See also Daniels v.

15   Woodford, 428 F.3d 1181, 1203 (9th Cir. 2005) ("We have found counsel 'ineffective where he

16   neither conducted a reasonable investigation nor made a showing of strategic reasons for failing

17   to do so.'") (quoting Hendricks v. Vasquez, 974 F.2d 1099, 1109 (9th Cir. 1992)).  This duty on

18   the part of defense counsel to investigate begins prior to trial.  It is well-recognized that

19   competent strategy decisions cannot be made regarding presentation of mitigating evidence

20   without a foundation of knowledge based upon a thorough defense investigation that was

21   completed long before jury selection begins.  Williams v. Taylor, 529 U.S. 362, 395 (2000)

22   (holding that the petitioner received ineffective assistance in connection with the penalty phase of

23   his trial and noting the record established "that counsel did not begin to prepare for that phase of

24   the proceeding until a week before the trial"); Earp v. Ornoski, 431 F.3d 1158, 1175 (9th Cir.

25   2005) ("The Supreme Court has conveyed a clear, and repeated, message about counsel's

26   sacrosanct duty to conduct a full and complete mitigation investigation before making tactical

27   decisions . . . [.]").

28   /////

The Sixth Amendment right to effective assistance of counsel "extends to 'all critical stages of the criminal process,' including capital sentencing."  Correll, 539 F.3d at 942 (citations omitted).  Indeed, it has been recognized that "'[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.'"  Stanley v. Schriro, 598 F.3d 612, 624 (9th Cir. 2010) (quoting Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1998)).  See also Brown v. Ornoski, 503 F.3d 1006, 1013 (9th Cir. 2007) ("In numerous cases, this court and the Supreme Court have explained and reiterated this high standard for investigation in capital cases.") (and cases cited therein).  As explained by the Ninth Circuit, counsel in a capital case has an affirmative duty to unearth all relevant mitigating information because

> [t]he determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts.  The statutory factors give the jury broad latitude to consider amorphous human factors, to weigh the worth of one's life against his culpability.

Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999).  Therefore, specifically in the capital case context, the Ninth Circuit has held that "'[t]o perform effectively . . . counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ]' the significance of all the available [mitigating] evidence.'"  Allen v. Woodford, 395 F.3d 979, 1000 (9th Cir.) (citing Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (en banc)).  See also Wiggins, 539 U.S. at 524 (Defense counsel should attempt to discover "'all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor'") (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") 11.4.1(c), p. 93 (1989)); Correll, 539 F.3d at 942 (discussing a capital defense attorney's duty to conduct a prompt investigation with respect to both the guilt and penalty phases as guided by the ABA standards); Summerlin, 427 F.3d at 630 (with respect to counsel's role in presenting penalty phase mitigating evidence, "[t]he duty to investigate is critically important"); Douglas v. Woodford, 316 F.3d 1079, 1088 (9th Cir. 2003).

/////

25

1    Accordingly, "[c]ounsel has a duty at penalty phase 'to conduct a thorough investigation

2    of the defendant's background.'" Correll, 539 F.3d at 942 (quoting Williams, 529 U.S. at 396).

3    See also Mayfield, 270 F.3d at 927 (same).  Mitigating evidence that counsel should consider

4    includes "medical history, educational history, employment and training history, family and

5    social history, prior adult and juvenile correctional experience, and religious and cultural

6    influences." Wiggins, 539 U.S. at 524 (citing ABA Guidelines 11.8.6, p. 133).  See also Correll,

7    539 F.3d at 943; Summerlin, 427 F.3d at 630 (defense counsel in a capital case have a "'duty to

8    investigate and present mitigating evidence of mental impairment' . . . includ[ing] examination of

9    mental health records") (quoting Bean, 163 F.3d at 1080).  Furthermore, "counsel has an

10   affirmative duty to provide mental health experts with information needed to develop an accurate

11   profile of the defendant's mental health." Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir.

12   2002). See also Summerlin, 427 F.3d at 630 ("The defendant's history of drug and alcohol abuse

13   should also be investigated." ) (citing Jennings, 290 F.3d at 1016-17).  Where the record

14   "suggest[s] that certain mitigating evidence may be available, those leads must be pursued."

15   Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007).  See also Stankewitz v. Woodford,

16   365 F.3d at 706 (finding ineffective assistance where counsel failed to thoroughly investigate the

17   defendant's childhood, history of drug abuse, and mental health condition notwithstanding the

18   fact that counsel was on notice that such an investigation might yield mitigating evidence);

19   Summerlin, 427 F.3d at 632 (finding ineffective assistance where counsel failed to obtain readily

20   available evidence concerning possible mental state mitigation and his client's prior attorney told

21   counsel there were indications that the defendant suffered from a mental illness); Mayfield, 270

22   F.3d at 928 (finding ineffective assistance where counsel did not consult with appropriate medical

23   experts nor collect the relevant records after "his investigator's limited efforts revealed evidence

24   of diabetes and substance abuse" and failed to explain to the jury the relevance of the evidence

25   that was presented).

26        Finally, in addition to conducting an investigation to discover all mitigating evidence,

27   defense counsel in a capital case "also has an obligation to present and explain to the jury all

28   available mitigating evidence." Hamilton v. Ayers, 583 F.3d 1100, 1113 (9th Cir. 2009) (citing

1   Correll, 539 F.3d at 946).  See also Rompilla v. Beard, 545 U.S. 374, 385-90 (2005) (holding that

2   defense counsel rendered ineffective assistance where she obtained the petitioner's prior

3   conviction file but failed to adequately review it prior to the petitioner's sentencing hearing);

4   Stankewitz v. Wong, 698 F.3d 1163, 1172 (9th Cir. 2012) ("[E]ven if we were to assume that

5   Goodwin was aware of all of the mitigating evidence in Sciandra's files, he was still deficient for

6   failing to present the evidence with no tactical basis for doing so.")

7                               b.  Prejudice

8          Even where counsel's performance is found to be deficient, in order to prevail on such a

9   claim a petitioner is required to show that counsel's conduct prejudiced him.  Strickland, 466 U.S.

10  at 691-92.  To establish prejudice, a petitioner must demonstrate that there is "a reasonable

11  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

12  been different."  Id. at 694.  A reasonable probability is one "'sufficient to undermine confidence

13  in the outcome'" but is "less than the preponderance more-likely-than-not standard."  Summerlin,

14  427 F.3d at 640, 643 (quoting Strickland, 466 U.S. at 693-94).  Nonetheless, "[t]he likelihood of a

15  different result must be substantial, not just conceivable."  Richter, 131 S. Ct. at 792.

16         Accordingly, "[i]n establishing prejudice under Strickland, it is not necessary for the

17  habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily

18  overcome the aggravating circumstances."  Correll, 539 F.3d at 951-52 (citing Williams, 529 U.S.

19  at 398).  See also Rompilla, 545 U.S. at 393 ("[A]lthough we suppose it is possible that [the

20  sentencer] could have heard it all and still have decided on the death penalty, that is not the

21  test.").  Instead, in evaluating prejudice, the court must "compare the evidence that actually was

22  presented to the jury with the evidence that might have been presented had counsel acted

23  differently,"  Bonin v. Calderon, 59 F.3d 815, 834 (9th Cir. 1995), and evaluate whether the

24  difference between what was presented and what could have been presented is sufficient to

25  "undermine confidence in the outcome" of the proceeding, Strickland, 466 U.S. at 694.  See also

26  Stanley, 598 F.3d at 625.  Prejudice is established if "there is a reasonable probability that at least

27  one juror would have struck a different balance" between life and death.  Wiggins, 539 U.S. at

28  /////

                                          27

537.[18]

When examining the effect of defense counsel's failure to unearth and present mitigating evidence at the penalty phase of a capital case, the Supreme Court has emphasized the relevance of evidence of a petitioner's abusive childhood and mental health problems. This is because there is a general "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Boyde v. California, 494 U.S. 370, 382 (1990) (quotation and emphasis omitted). The Ninth Circuit recently described the Supreme Court's consideration of evidence of such deficient performance on the part of defense counsel:

> In Wiggins . . . a capital habeas petitioner's defense counsel failed to introduce social history mitigation evidence during the penalty phase, including evidence that "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother[, and that h]e suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care." Wiggins, 539 U.S. at 535. The Court pointed out that this is the type of evidence that is "relevant to assessing a defendant's moral culpability," id., and held that the failure to introduce this evidence at the penalty phase was prejudicial: "[H]ad the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." Id. at 536.

Stankewitz v. Wong, 698 F.3d at 1175 (alterations in original).

3. Analysis

a. Deficient Performance

Petitioner's counsel clearly fell below an objective standard of reasonableness under prevailing professional norms by failing to conduct pretrial investigation for potential mitigating evidence and in their hurried and abbreviated penalty phase presentation on petitioner's behalf. It is clear that a proper investigation to unearth all available mitigating evidence on behalf of

---

[18] The Ninth Circuit has recognized that "[t]he bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases." Cox v. Ayers, 613 F.3d 883, 897 (9th Cir. 2010) (citing Silva v. Woodford, 279 F.3d 825, 847 (9th Cir. 2002) (stating that "we must be especially cautious in protecting a defendant's right to effective counsel at a capital sentencing hearing"). See also Stanley v. Schriro, 598 F.3d 612, 624 (9th Cir. 2010) (although trial counsel's lack of effectiveness was not prejudicial at the guilt phase, during sentencing, 'where mitigation evidence may well be the key to avoiding the death penalty,' our analysis differs") (quoting Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999)).

1   petitioner was never conducted in this case.  Instead, counsel who substituted into the case on

2   petitioner's behalf just before the penalty phase trial began[19] conducted an insufficient and

3   inadequate last-minute scramble for mitigation evidence.  That hurried and incomplete effort

4   resulted in a defense presentation at the penalty phase that spanned a mere twenty-two pages of

5   the trial transcript - a tiny fraction of the important and compelling mitigation evidence that was

6   obviously available and should have been presented on petitioner's behalf.

7       A last-minute effort to put on an adequate mitigation case is, in a case like this one,

8   doomed from the start.  It is simply not possible to conduct a proper penalty-phase investigation

9   in a mere month.  A thorough penalty phase investigation should have commenced months before

10  the guilt phase trial commenced.[20]  Petitioner's counsel was well aware that petitioner had no

11  roots in California.  Petitioner had grown up in Missouri, Arkansas and Michigan and his family

12  was located over a thousand miles away from Sacramento.  Petitioner had served his country in

13  the Vietnam War with men who had been dispersed all over the country after their military

14  service ended.  From 1972 on, petitioner had lived the life of a transient, moving throughout the

15  country and eventually ending up incarcerated in the state of Washington in the late 1970's.

16      As petitioner's Strickland expert has attested in this habeas proceeding, and as the relevant

17  case law makes crystal clear, the minimally necessary tasks of a competent penalty phase

18  investigation - gathering government, school, military, medical and employment records;

19  interviewing family members; identifying, locating and interviewing witnesses; corroborating

20  facts and assessing and cultivating experts - require more than a few weeks under any

21  circumstances.  (Nolan Decl., Decl. 45 (Dkt. No. 359-1) at ¶ 31.)  There was no strategic or

22  tactical reason for withholding mitigating evidence or failing to conduct a full background

23  investigation in this case.  (Id. at ¶ 40.)  As discussed above, the testimony of attorney Owen and

24

25  [19]   As to attorney Owen, the deficient performance was in large part attributable to the
    circumstances he faced upon his late, emergency entry into the case on petitioner's behalf.
26  Nonetheless, the result was the same – ineffective assistance of defense counsel with respect to
    the penalty phase of petitioner's trial.
27

28  [20]   This is what attorney Owen was led to believe had occurred, as he had recommended, by
    attorney O'Brien.  Obviously, such was not the case.  It now appears clear that essentially no
    penalty phase investigation had been conducted prior to Owen's substitution into the case.

1    defense investigator McCarthy makes clear the futility of putting together an adequate mitigation

2    case where no penalty-phase investigation has been conducted until the guilt phase of the trial is

3    concluded.  Both testified, and the undersigned finds fully credible, that there is simply not

4    sufficient time to conduct a full investigation and gather the necessary information and witnesses

5    at that point.  (McCarthy Decl., Decl. 37 (Dkt. No. 288-1 at consec. p. 154) at ¶ 19 (indicating

6    that the defense investigator was unable to search for members of petitioner's army battalion until

7    the military records were belatedly received by the defense on March 15, 1983, and that by then,

8    the defense lacked sufficient time to locate anyone)); (Owen Depo., lodged herein Nov. 9, 2007

9    (see Dkt. No. 363), at 40, 48 (describing counsel's desire to locate men who had served with

10    petitioner in Vietnam as well as experts who could discuss the soldier's Vietnam experience to

11    testify as part of the defense penalty phase case but inability to do so because of insufficient

12    time).)[21]

13          Ultimately, attorney Owen testified that, had he been able to properly prepare for

14    petitioner's penalty phase trial, he would have submitted to the jury the mitigating evidence,

15    including the evidence relating to petitioner's military service and the circumstances in which it

16    was rendered, that has been uncovered and presented by petitioner's habeas counsel in these

17    proceedings.  (Owen 2007 Decl., Decl. 41 (Dkt. No. 316-1) at ¶ 11.)

18          Trial counsel's failure to begin the investigation for penalty-phase mitigating evidence

19    until after the guilt phase trial had concluded, the consequent superficial and incomplete penalty

20    phase investigation and the inadequate presentation of the mitigation case, fell far below a

21    reasonable level of professional conduct.  Under circumstances similar to those presented in this

22    case, courts have consistently found deficient performance on the part of defense counsel:

23                Karis' counsel presented mitigation evidence for only 48 minutes.
                In that short time, counsel called witnesses, eliciting that Karis had

24    _____

25    [21]  Contrary to respondent's argument, the record before this court reflects that various witnesses
      of this type could have been located with even a little timely preparation and a modicum of
26    diligence on the part of defense counsel.  Indeed, the names of a number of such witnesses
      located by petitioner's habeas counsel and presented in these proceedings were specifically
27    mentioned in petitioner's military records.  Other such witnesses have described in these
      proceedings how they maintained regular contact with other members of petitioner's battalion.
28    Those easily obtained leads could have been identified and pursued by minimally diligent trial
      counsel, just as petitioner's habeas counsel did in these proceedings.

1
2
3
4
5

> exhibited artistic and academic talent, that his mother had been divorced and that he had saved his brother from drowning when he was a child. While defense counsel offered this meager presentation, the district court findings are replete with evidence of abuse that should have been uncovered and presented by counsel upon any reasonable investigation and representation. Counsel's failure to present such substantial mitigating evidence was woefully inadequate and kept crucial information from the jury faced with sentencing Karis to life or death.

Karis v. Calderon, 283 F.3d 1117, 1135 (9th Cir. 2002).  See also, Wiggins, 539 U.S. at 524-25 (finding that the petitioner was denied effective assistance of counsel because his trial counsel failed to conduct an investigation that would have revealed a background of sexual and physical abuse, borderline mental retardation and troubling experiences in the foster care system); Stankewitz v. Wong, 698 F.3d at 1173 ("It is simply untenable that [counsel's] decision to forgo powerful mitigating evidence and instead put on his paltry penalty phase presentation was made 'in the exercise of reasonable professional judgment.'") (quoting Cullen v. Pinholster, ___U.S.___,___,131 S. Ct. 1388, 1403 (2011)); Daniels, 428 F.3d at 1203-05 (finding that counsel's decision to delay his investigation and preparation for the penalty phase trial until it was essentially too late to permit the development, and therefore introduction, of meaningful mitigation evidence was without explanation or justification); Allen, 395 F.3d at 1001 ("Counsel's untimely, hasty, and incomplete investigation of potential mitigation evidence for the penalty phase fell outside the 'range of reasonable professional assistance.'").

### b.  Prejudice

In determining whether counsel's deficient performance prejudiced the outcome of petitioner's trial, the court "must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately."  Thomas, 678 F.3d at 1102 (quoting Karis, 283 F.3d at 1133).  See also Cannedy v. Adams, 706 F.3d 1148, 1161 (9th Cir. 2013) (same), cert. denied ___U.S.___, 134 S. Ct. 1001 (2014); Bonin, 59 F.3d at 834.

Here, other than the underlying crime of conviction, the prosecution introduced as aggravation evidence three relatively minor prior convictions:  (1) a 1974 second degree burglary conviction (stipulated to by counsel without testimony or details); (2) a 1977 second degree assault conviction (stipulated to by counsel without testimony or details); and (3) a robbery that

1    occurred in Pacoima, California, the day after the homicide (presented via the testimony of the

2    victim and corroborated by the testimony of the co-perpetrator Bruce Smith and a videotape).

3    (RT at 5352-5390.)  As described above, the mitigation presentation on behalf of petitioner

4    during the penalty phase trial was exceedingly brief, as if "the penalty phase was a 'strange blip'

5    at the end of the trial, not substantially different from the off-the-rack sentencing hearing."

6    Hendricks v. Calderon, 70 F.3d 1032, 1043 (9th Cir. 1995).  In contrast, the mitigation evidence

7    that *could* have been presented had petitioner's counsel conducted an adequate investigation and

8    properly developed the evidence was, as has now been established, quite substantial and

9    persuasive.

10           At the evidentiary hearing granted by this court with respect to his claim that he received

11   ineffective assistance of counsel at the penalty phase of his trial, petitioner has presented the

12   testimony of numerous witnesses.  Those witnesses have testified in this habeas proceeding about

13   petitioner's personal history of instability, brutality and alcoholism in his family; petitioner's

14   impoverished and destitute childhood; the particular effects of Ozark culture on petitioner's

15   personality and development; petitioner's helpful and quiet nature prior to his military service;

16   petitioner's heroism and bravery under terrifying combat conditions experienced during the

17   Vietnam War; the devastating impact on petitioner's life caused by his combat experience in

18   Vietnam; his sad and failed attempts to adjust to state-side life after returning from Vietnam; and

19   petitioner's predisposition toward, and subsequent fall into, drug and alcohol dependence.  Those

20   witnesses included petitioner's close family members, extended family members on both his

21   paternal and maternal lines, neighbors and childhood friends from his formative years, teachers,

22   friends and employers who knew him during his adolescence in Michigan, comrades-in-arms who

23   served in his battalion in Vietnam, his commanding officer in Vietnam, his platoon squad leader

24   in Vietnam, the officer who witnessed his unraveling after Vietnam, and three experts.[22]  Added

25   _____

26   [22]  Military historian and Vietnam War expert Professor Eric M. Bergerud, PhD of Lincoln
     University provided a detailed description of the conditions and context of the 25th Division
     combat soldier's Vietnam experience, including the dangerous landscape, constant anxiety, sleep
27   deprivation, onerous climate and lack of safe zones encountered.  (Bergerud Decl., Decl. 43 (Dkt.
     No. 327-1 at consec. pp. 50-68).)  Psychiatrist Pablo Stewart, M.D., an expert in the area of
28   substance abuse and related psychiatric and psychological disorders as well as treatment thereof,
     provided testimony describing the nature of addiction, the genetic, social and psychological

1    to this testimony was demonstrative evidence in the form of contemporaneous photographs,

2    military orders and citations, articles from the Tropic Lightning News (the newsletter of the 25th

3    Infantry Division during the Vietnam War), corroborating medical and social history records and

4    informative maps.  (See generally, Exs. 10-23 (Dkt. No. 290-1 at consec. pp. 19-64).)

5            The court summarizes this mitigation evidence, which was available but never developed

6    and presented by petitioner's trial counsel, below.

7                            i.  Petitioner's Family History of Instability, Brutality and

8                               Alcoholism[23]

9            Petitioner was born in 1948 into an impoverished, unstable family living in the foothills of

10   the Ozark Mountains in northeastern Arkansas, a few miles from the Missouri border.   He was

11   the middle child of five and the eldest boy, with two older sisters and two younger brothers.  His

12   early childhood was characterized by instability, brutality, poverty and the detrimental and violent

13   effects of his father's alcoholism.

14           The maternal side of petitioner's family had roots in rural Missouri; his maternal

15   grandmother was part Cherokee.  (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at consec. p. 2) at ¶¶

16   2-3.)  His mother's parents were squatters living in a crude "single box" house in a small valley

17   referred to as the "Fawbush Holler," in Wayne County, Missouri, a few miles from the general

18   store and post office that comprised the "town" of Shook.  (Id. at ¶ 6.)  Dementia, illiteracy and

19   mental retardation ran in the family.  (Id. at ¶ 5.)  Maggie Williams, petitioner's mother, went to

20   school at the Yokem school, the same rural one-room, multi-class schoolhouse where she would

21   later send her own children.  (Id. at ¶ 11.)

22   _____

23   aspects of addiction and the way in which petitioner was particularly vulnerable to the lure of
     substance abuse and addiction.  (Stewart Decl., Decl. 44 (Dkt. No. 327-1 at consec. pp. 70-104).)

24   Lastly, licensed Marriage and Family Therapist Marilyn P. Cornell, a family dynamics expert,
     provided a detailed explanation of the effect of petitioner's family structure, childhood and

25   background on his character and personality.  (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec.
     pp. 1-48).)

26
     [23]  The witnesses who provided testimony regarding this portion of petitioner's background

27   included:  Virginia Webster Beaulieu, Marna Faye Bosek, Marilyn Cornell, Maggie Crutchfield,
     Patsy Helm Dillon, Marvin Jones, Pauline Jones, Patricia Libla, Lavern Marler, Leon Marler,

28   Lenora Mitchell, Betty Shoemaker, Webster Smith, James O. Webster, Dale Webster, Linda
     Webster and Lindell Webster.

1      On his paternal side, petitioner's father Fred Webster was one of ten children born to a

2  farmer/tavern keeper living near Success, Arkansas, roughly thirty miles south of Poplar Bluff,

3  Missouri.  (Mitchell Decl., Decl. 5 (Dkt. No. 286-1 at consec. p. 57) at ¶ 2.)  Fred Webster was

4  one of six brothers, all of whom had problems with alcohol and violence.  (James Webster Decl.,

5  Decl. 8 (Dkt. No. 286-1 at consec. p. 87-89) at ¶¶ 31-36.)  After a period of "hoboing" around the

6  country and a brief, failed marriage, Fred Webster was inducted into the Army in 1941.  (Id. at ¶¶

7  15, 19-21.)

8      The instability and anxiety that characterized the relationship between petitioner's parents

9  was readily evident even before petitioner's birth.  Fred Webster married Maggie Williams, who

10  was already pregnant, while on a short leave from the Army in 1944.  (Crutchfield Decl., Decl. 1

11  (Dkt. No. 286-1 at consec. p. 4) at ¶ 17.)  Less than six months later, their first child, Linda, was

12  born.  (Id. at ¶ 18.)  From the time Fred Webster returned from Europe in 1945 until Maggie left

13  him for the final time in 1953, the relationship was one of instability, drunkenness and brutality,

14  characterized by arguments that, in later years, flared into physical violence.  (Lindell Webster

15  Decl., Decl. 9 (Dkt. No. 286-1 at consec. p. 97-98) at ¶¶ 13-14.)   Fred Webster was unable to

16  hold a job, would spend any money he had on alcohol, and would frequently go on multi-day

17  benders, drinking himself into unconsciousness.  (Beaulieu Decl., Decl. 6 (Dkt. No. 286-1 at

18  consec. p. 68) at ¶ 28.)

19      In the three years leading up to petitioner's birth, his parents had a second child,

20  relocated to California, separated due to their constant arguing and Fred's drunkenness, returned

21  separately to the mid-west and tentatively reconciled.  (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at

22  consec. p. 14) at ¶¶ 41-42, 45.)  For the first few years of petitioner's life, he lived in a converted

23  corn crib - tar-paper shack with a tin roof, outside of Success, Arkansas.  (Lindell Webster Decl.,

24  Decl. 9 (Dkt. No. 286-1 at consec. p. 97) at ¶ 12.)  The shack had cracks on the floor and rats

25  would come up inside, on one occasion biting petitioner's sister.  (Patricia Libla Decl., Decl. 3

26  (Dkt. No. 286-1 at consec. p. 33) at ¶ 5.)  Fred's sister Virginia described this time in the family's

27  life:

28              Everybody around that area of Arkansas was pretty poor at that
              time, but no one was as poor as Fred and Maggie.  They were living

> on almost nothing. Fred might have been doing some farm work
> and I think they might have been receiving some type of welfare,
> but Fred was pretty much drinking it all away. Fred would go on
> drinking binges and be gone . . . [.]

(Beaulieu Decl., Decl. 6 (Dkt. No. 286-1 at consec. p. 68) at ¶ 28.)

Maggie, forced to work picking and chopping cotton and at other tasks to scrape by, had little time for her five children. (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at consec. p 10) at ¶¶ 53, 55.) The children essentially were left to fend for themselves. Petitioner's father continued to deteriorate into drunkenness and brutalized both Maggie and the children. As petitioner's mother explained in her declaration:

> Not long after Larry was born Fred beat me for the first time. The
> beating continued the rest of the time we were together. I was
> kicked and knocked, mostly when I was pregnant, and I was
> pregnant every two years. If I said anything Fred didn't like, he'd
> smack me . . . I think Fred took out on me the things that were
> bothering him. He'd hit me just about every time he'd come home
> drunk . . . . The kids saw Fred hit me. When he'd start yelling,
> they'd try to get out of the way. If the kids came in when Fred and
> I were fighting, Fred would smack them and tell them to get out.
> He'd only do this when he was drunk; he never hit them when he
> was sober.

(Id. at ¶ 38.) According to accounts, Fred also whipped petitioner's sister Linda, as well as petitioner and his younger brother Dale. Cousin James O. Webster described one incident he witnessed in late 1951:

> One day while I was at my grandmother's house, Maggie stopped
> by with her kids . . . . Fred drove up a little bit later and was very
> drunk. Fred started waving around a shotgun . . . . It was a pretty
> big gun. Fred was hollering for Maggie, who stayed inside the
> house with her kids . . . . I tried talking to Fred from behind the
> door. I was trying to calm him down since he was acting pretty
> crazy. After a while, Fred got back in the car and left.

(James Webster Decl., Decl. 8 (Dkt. No. 286-1 at consec. p. 90) at ¶ 38.) As petitioner's sister Linda grew older, she was sexually molested by her father. (Linda Webster Decl., Decl. 2 (Dkt. No. 286-1 at consec. p. 23) at ¶ 14.)

In early 1953, Fred was released from jail after the third in a series of drunk-driving convictions and moved the family to St. Louis, where he and Maggie got factory jobs.

1   (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at consec. p. 9) at ¶ 46.)  Fred's drinking got worse,

2   and petitioner and his siblings were again left largely to fend for themselves.  (Id. at ¶¶ 47-49.)

3   After a particularly egregious drunken episode during which Fred fell upon and injured the

4   family's youngest child Danny, Maggie gathered the children, fled St. Louis and traveled back to

5   her parents' home in the Fawbush Holler in southeastern Missouri.  (Id. at ¶¶ 50-51.)  Except for

6   one aborted attempt at a visit in "the holler," the children never saw their father again.  (Id. at ¶

7   59.)

8          Petitioner has four siblings:  older sisters Linda (born 1944) and Patricia (born 1946), and

9   younger brothers Dale (born 1950) and Daniel (born 1952).  (Id. at ¶¶ 18, 25, 43, 46.)  All of his

10  siblings suffer from the repercussions of their traumatic upbringing.  Linda had difficulties in

11  school, suffered from depression, spent time in the state mental hospital and experienced horrible

12  nightmares about her father for years.  (Linda Webster Decl., Decl. 2 (Dkt. No. 286-1 at consec.

13  p. 28) at ¶¶ 35, 36.)  Patricia suffers from depression as well.  (Patricia Libla Decl., Decl. 3 (Dkt.

14  No. 286-1 at consec. p. 44) at ¶ 40.)  Dale has long dealt with his own drinking problem, would

15  get irrationally angry, and is currently on medication to calm his nervous anxiety.  (Dale Webster

16  Decl., Decl. 4 (Dkt. No. 286-1 at consec. p. 53) at ¶ 25.)  Danny is very reclusive and avoids any

17  social interaction to an extreme degree.  (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at consec. pp.

18  12, 16) at ¶¶ 65, 89.)

19                    ii.  Petitioner's Childhood of Poverty and Hardship[24]

20          As noted above, during petitioner's early years in Arkansas his family was exceptionally

21  poor, living in a converted corn crib that they did not own.  (Beaulieu Decl., Decl. 6 (Dkt. No.

22  286-1 at consec p. 68) at ¶ 27.)  In the summer of 1953, when petitioner was just short of five

23  years old, Maggie Webster and the five children left Fred Webster.  (Crutchfield Decl., Decl. 1

24  (Dkt. No. 286-1 at consec. p. 10) at ¶ 51.)  Nonetheless, their financial situation did not improve;

25  if anything, it got worse.  (Id. at ¶¶ 53-55, 60.)

26

27  _____

28  [24]  The witnesses who provided testimony addressing this portion of petitioner's background
    included:  Delmer Barks, Maggie Crutchfield, Patsy Helm Dillon, John Henry Helm, Jimmy
    Jones, Marvin Jones, Pauline Jones, Patricia Libla, David Libla, Lavern Marler, Leon Marler,
    Lucinda Reutzel, Geraldine Rogers, Dale Webster, Linda Webster and Albert Williams.

1    For the remainder of petitioner's childhood, his broken family lived a life of abject and

2  isolated rural poverty, without electricity, decent heating, medical care, telephone or plumbing,

3  with little to eat, homemade or gifted clothes, and virtually no material possessions.  (Crutchfield

4  Decl., Decl. 1 (Dkt. No. 286-1 at consec. pp. 10-11) at ¶¶ 52, 60.)  Patsy Helm Dillon, the nearest

5  neighbor to the Fawbush Holler, described their situation:

6
> They had nothing.  It was pitiful how poor they were.  They were
> different.   They wore homemade clothes and were barefoot most of
7
> the time . . . .   Maggie always had to fight with the world.

8  (Dillon Decl., Decl. 18 (Dkt. No. 287-1 at consec. p. 2) at ¶ 5.)  At first, Maggie and the children

9  lived in the McCollum cabin, a previously abandoned one-room log cabin on stone blocks.  (Id. at

10  ¶ 7.)  Later, Maggie's father and brother built a rough, small shack for them in the Fawbush

11  Holler near the Williams home.  (Id. at ¶ 8.)  The structure was "thrown together with sawmill

12  lumber," with no plumbing or electricity.  (Id.)  Water was carried to the shack from a spring a

13  quarter of a mile away.  (Id.)  In the shack, they shared three beds among the six family members.

14  (Linda Webster Decl., Decl. 2 (Dkt. No. 286-1 at consec. p. 26) at ¶ 25.)  They had no vehicle and

15  walked everywhere except when they could hitch rides or use the horse-drawn wagon owned by

16  Maggie's parents.  (Helm Decl., Decl. 19 (Dkt. No. 288-1 at consec. pp. 3-4) at ¶ 7.)

17    In an area known for its poverty and lack of economic development, petitioner's family

18  was unique in its destitution.  They were the poorest family in the area or, as one witness phrased

19  it, "poorer than poor."  (David Libla Decl., Decl. 21 (Dkt. No. 288-1 at consec. p. 28) at ¶ 4.)

20  Many of those living in this community remarked on how difficult and unusual it was to have a

21  single woman raising a large family by herself there.  (Barks Decl., Decl. 20 (Dkt. No. 288-1 at

22  consec. p. 22) at ¶ 19; Rogers Decl., Decl. 39 (Dkt. No. 300-1 at consec. p. 2) at ¶ 4.)  Maggie

23  brought in some money in the fall picking cotton, collected some welfare and latched onto some

24  temporary jobs when she could.  (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at consec. p. 11) at ¶

25  55.)  When she was away, the children tended themselves, with the oldest daughter, Linda,

26  attempting to care for her younger siblings.  (Linda Webster Decl., Decl. 2 (Dkt. No. 286-1 at

27  consec. p. 21) at ¶ 3.)  Petitioner's mother did the best she could under these circumstances, and

28  fought to protect her children from outsiders.  Neighbor Patsy Helm Dillon noted her "fight-for-

1    survival attitude that the world was out to get her." (Dillon Decl., Decl. 18 (Dkt. No. 287-1 at

2    consec. p. 2) at ¶ 4.)  However, one result of her difficulties was a certain lack of emotional

3    connection to her children.  "In this environment, Maggie Webster could do little to nurture her

4    children or help them grow into fulfilled adults; her main task was sheer survival." (Cornell

5    Decl., Decl. 42 (Dkt. No. 327-1 at consec. p. 34) at ¶ 91.)

6          Petitioner attended the one-room Yokem school, a two mile walk through the woods from

7    the Fawbush Holler.  (Rogers Decl., Decl. 39 (Dkt. No. 300-1 at consec. p. 1) at ¶ 1; Helm Decl.,

8    Decl. 19 (Dkt. No. 288-1 at consec. p. 8) at ¶ 16.)  At the Yokem school, one teacher had to teach

9    as many as 25 students in grades one through eight.  (Marler Decl., Decl. 13 (Dkt. No. 286-1 at

10    consec. p. 121) at ¶ 8.)  Expert witness Marilyn Cornell commented in these habeas proceedings

11    on the schooling of the Webster children as follows:

12
13
14
15
16
> The one-room country school of [petitioner's] childhood may sometimes be viewed in a soft light of nostalgia, but it was an primitive institution at best, and provided little opportunity or significant education.  Teachers, forced to simultaneously instruct eight different grades, were ill-prepared and under-trained.  There were no adjunct student services to meet the needs of children, no extra help or specialization.  Nor were there extracurricular activities, social programs or opportunities available to help develop social and problem-solving skills.

17    (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec. p. 34) at ¶ 91.)

18         In the early 1960's, when petitioner was 12 or 13, his mother and her children left the

19    holler and moved to "the old Warren place," an abandoned farmhouse.  (Crutchfield Decl., Decl.

20    1 (Dkt. No. 286-1 at consec. p. 13) at ¶ 68.)  The farmhouse had no plumbing, and was cold and

21    run-down, but it was a step up from the shack they had come from, if only because it had

22    electricity.  (Id.)  Maggie and her children were allowed to live there rent-free, though she did

23    have to pay for electricity and propane gas.  (Id.)  About this same time, the Yokem school closed

24    and, from their farmhouse, petitioner and his siblings had to walk about a mile to the road, where

25    they would catch a bus to attend school in Greenville.  (Id. at ¶ 71.)  Petitioner could never

26    participate in after-school activities, such as sports teams, because he had to catch the bus back to

27    the Shook area immediately after school.  (Id.)

28    /////

1          iii.  Petitioner's Unique Cultural Background[25]

2          As noted, petitioner grew up in the Ozark area, a region that was, at the time, isolated,

3   remote, insular and "populated by 'the most deliberately unprogressive people in the United

4   States.'"  (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec. p. 31) at ¶ 83.)  Teacher Delmer

5   Barks noted that Wayne County, where the Fawbush Holler is located, "is a hill county, very poor

6   county . . . where people tried to congregate in the creek valleys or river valleys in order to

7   produce enough food to survive on." (Barks Depo., lodged herein Dec. 19, 2006 (see Dkt. No.

8   296), at 7, 9.)  There were few roads and little mobility, and everyone knew everyone else.

9   (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec. p. 33) at ¶ 86.)  Most families were poor,

10  scraping out a living from subsistence farming.  (Id. at ¶¶ 84-86.)  Because of the small

11  population and unproductive soil, most families lived in remote locations, miles from their closest

12  neighbors.  (Id.)  People there were generally self-sufficient, independent, honest and distrustful

13  of outsiders.  (Id.  at ¶ 83.)

14          Growing up in such isolation, it was natural to be both uncomfortable around strangers

15  and fiercely independent.  Witnesses raised in the area around this time, including Delmer Barks,

16  described how uncomfortable they were in cities like St Louis and how they eventually moved

17  back to the Ozark region to avoid "the hustle and bustle."  (Barks Decl., Decl. 20 (Dkt. No. 288-1

18  at consec. p. 19) at ¶ 8.)  Expert witness Marilyn Cornell summarized the impact of this cultural

19  background on petitioner:

20              Of great significance and one of the earliest influences that shaped
                Larry Webster's life is the cultural background in which Larry was
21              raised.  It had a profound effect on the formation of his personality
                and later behavior.   Wayne County, Missouri, and Randolph
22              County, Arkansas, constitute a section of the Ozark region . . . .  In
                the 1950's, when Larry Webster was a child, the people of this area
23              were secretive, sensitive, impoverished, insular, and suspicious of
                outsiders.  A 1966 report written for the United States Department
24              of Agriculture noted:

25                  Because of the isolated nature of the early settlements, the
                    people in the heart of the Ozark Region have retained
26                  much of their folk culture.  Value systems tend to be
                    particularistic, and self-sufficiency of the local community

27  _____

28  [25]  The witnesses who provided testimony addressing this aspect of petitioner's background
    included:  Delmer Barks, expert witness Marilyn Cornell, Wendell Crutchfield, John Henry
    Helm, Jimmy Jones, Leon Marler and Hassie Johnson.

                                    39

has bred distrust for values from outside the community. Personal ingenuity in meeting social, economic, and family problems is a cultural trait derived from this orientation.   With this social background, people of the region have been slow to assimilate urban values and ways of living, and economic changes have lagged behind those in most of the Nation.

* * *

The Webster, Fawbush, and Williams families certainly shared these characteristics as they suffered from the poverty, isolation, and lack of assimilation characteristic of the population of this region.  Larry Webster's family, on both his mother and father's sides, lacked sophistication and adaptability, and they did not have any viable social systems beyond the family, the one-room school and the immediate neighbors.  They were rural, uneducated people, scraping out an existence in a difficult place under oppressive conditions without any resources.

(Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec. p 31-32) at ¶¶ 83, 86 (footnotes and citations omitted)).

According to family dynamics expert Cornell, these local Ozark characteristics explain why Larry Webster was ill-prepared to adjust to his later military experience, why he would steadfastly  avoid asking for help despite his circumstances and why he would feel isolated and alone even when among groups of people.  (Id. at ¶ 99.)

iv.  Petitioner's Quiet, Generous and Hard-Working Nature[26]

Despite the onerous conditions of his childhood, witnesses have testified in these habeas proceedings that petitioner showed the strength and goodness of his character from an early age. As his Uncle Albert noted,

Larry had to work all of his life.  Larry did anything that had to be done on the farm.  After he'd get back from school, Larry would help out with feeding the animals, ploughing, and gardening . . . . When Larry was 8 or 9 years old, he began coming with us to pick cotton . . . .  As soon as Larry was big enough to work, he did.

(Williams Decl., Decl. 12 (Dkt. No. 286-1 at consec. p. 116) at ¶ 22.)  As a child, petitioner participated in trips during the "cotton vacations" from school where families would journey to

---

[26]  The witnesses who provided testimony regarding this portion of petitioner's background included: Delmer Barks, Larry Cole, Maggie Crutchfield, Wendell Crutchfield, Pat Hartmann, John Henry Helm, Hassie Johnson, Marvin Jones, Pauline Jones, David Libla, Leon Marler, Loyd Morgan, Geraldine Rogers, Dale Webster, James O. Webster, Darlene Wickham and Albert Williams.

the area southeast of Wayne County to pick cotton.  (Id. at ¶¶ 24-25.)  Picking cotton at this time was difficult, exhausting work, frequently in very cold conditions, for very little pay.  (Id. at ¶ 19.)

Petitioner was protective of his siblings and he was viewed as quieter than most kids.  His teacher Delmer Barks described Larry's general character at the time as follows:  a "quiet, polite, laid back kid who was not going to do anything wrong or give you any trouble."  (Barks Decl., Decl. 20 (Dkt. No. 288-1 at consec. p. 18) at ¶ 1.)  Another teacher, Geraldine Rogers described petitioner in this way:

> I remember Larry Webster as a good kid.  Larry was a boy of average height with dark hair and dark eyes.  He was a quiet boy and obedient in the classroom.  Larry never gave me any trouble. Larry listened and was well-behaved.

(Rogers Decl., Decl. 39 (Dkt. No. 300-1 at consec. p. 2) at ¶ 2.)  Children who grew up with petitioner remembered him as "a lot of fun to be around," "typical" and "easy-going."  (Cole Decl., Decl. 26 (Dkt. No. 288-1 at consec. p. 57) at ¶ 8; Morgan Decl., Decl. 27 (Dkt. No. 288-1 at consec. p. 66) at ¶ 14; Jones Decl., Decl. 23 (Dkt. No. 288-1 at consec. p. 42) at ¶ 4.)

In 1965, when petitioner was 16 years old, his mother married Roy Crutchfield. (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at consec. p. 14) at ¶ 73.)  Mr. Crutchfield moved petitioner's mother, Maggie, and the three boys out of Missouri to western Michigan near the towns of Bangor and South Haven, where they lived in a worker house on a fruit farm.  (Williams Decl., Decl. 12 (Dkt. No. 286-1 at consec. p. 117) at ¶ 28.)  As in Missouri, petitioner earned money to help the family.  He dropped out of school to pick fruit and then began working at a nearby metal factory.  (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at consec. p. 15) at ¶ 79.)  One of the fruit farmers, Pat Hartmann, remembered Larry from that period as a "hard worker," "on the shy side," with a ready smile, who played with Hartmann's children.  (Hartmann Decl., Decl. 24 (Dkt. No. 288-1 at consec. p. 48) at ¶ 2.)  In Michigan, petitioner socialized with fellow teenagers Loyd Morgan, Larry Cole and Darlene Wickham.  They described him as easy-going and somewhat shy and passive, friendly to everyone but more comfortable in a small group than in a crowd.  (Wickham Decl., Decl. 25 (Dkt. No. 288-1 at consec. p. 53) at ¶ 10.)  They also

1   reported that petitioner then had a good sense of humor and liked to laugh, and was a generous,

2   kind and good person.  (Cole Decl., Decl. 26 (Dkt. No. 288-1 at consec. p. 57) at ¶ 8.)

3                          v.  Petitioner's Experiences in Vietnam[27]

4        Petitioner served two tours of duty with the United States Army in Vietnam, during the

5   height of the war, from July of 1968 until March of 1970, a period of more than 19 months.

6   (Bergerud Decl., Decl. 43 (Dkt. No. 327-1 at consec. p. 51) at ¶ 7.)  Most of that time he was in

7   combat with the 2nd Battalion, 34th Armor of the 25th Infantry Division west and northwest of

8   Saigon.  (Id. at ¶ 9.)  Among other awards, petitioner received a Bronze Star for Valor, the

9   Vietnamese Cross of Gallantry, the Combat Infantryman Badge and the Army Commendation

10  Medal.  (Bergerud Decl., Decl. 43 (Dkt. No. 327-1 at consec. pp. 51-52) at ¶¶ 7-9.)

11       Petitioner enlisted in the United States Army with his friend Larry Cole in February of

12  1968.  (Cole Decl., Decl. 26 (Dkt. No. 288-1 at consec. pp. 57-58) at ¶¶ 10, 11.)  Petitioner was

13  19 years old at the time.  Although they joined under a "buddy" system that supposedly allowed

14  them to serve together, the two were immediately separated during basic training.  (Id.)

15       After basic training, petitioner arrived in Vietnam in July of 1968, and was assigned to a

16  combat infantry division.  (Bergerud Decl., Decl. 43 (Dkt. No. 327-1 at consec. p. 51) at ¶ 7.)

17  The 25th Infantry Division, often called "Tropic Lightning" and perceived to be one of the

18  greatest combat units in the Army at the time, operated in a stronghold of the enemy and suffered

19  extremely high casualty rates.  (Id. at ¶ 10.)  During the years 1968-1970, the 25th Division's area

20  of operations was north and west of Saigon running up to the Cambodian border, described by

21  petitioner's military expert in these habeas proceedings as "the doorstep of the most heavily

22  fortified enemy stronghold in the Saigon area."  (Id. at ¶¶ 17, 18.)  The 25th Division fought

23  against both the North Vietnamese Army and the Viet Cong.  (Id.)  In effect, petitioner served on

24

_____

25  [27]  In these habeas proceedings petitioner's counsel has presented the testimony of seven soldiers
    from petitioner's Army battalion (Freddie DeVera, Terry Bronson, Joe West, Allen Rozier, John

26  McGeehan, Thomas Boling, and Joseph Clock), including his company commander and platoon
    leader, the officer who witnessed petitioner's unraveling after Vietnam (Larry Vaught), three

27  childhood friends who also served in Vietnam (John Henry Helm, Wendell Crutchfield and Larry
    Cole), and a Vietnam War expert (Professor Eric Bergerud).  These witnesses vividly related in

28  their testimony the context of petitioner's military experience, the terrifying conditions that he
    faced and the bravery and sacrifice that he demonstrated during his service.

1   the "spear-point" during "an exceptionally difficult and bloody period" in the Vietnam War.  (Id.

2   at ¶¶ 26, 7.)

3          Petitioner was assigned to the Headquarters Company of the 2nd Battalion, 34th Armor, an

4   "armored" battalion - nicknamed the "Dreadnaughts" - that utilized Armored Cavalry Assault

5   Vehicles, a type of armored personnel carrier, commonly called "tracks." (Id. at ¶¶ 13, 14.)

6   Captain Thomas Boling, who assumed command of Headquarters Company on July 4, 1969,

7   explained that there were three platoons: mortar, tanks and scouts.  The scout platoon, in which

8   petitioner served, had approximately seventy soldiers and ten tracks.  (Boling Decl., Decl. 31

9   (Dkt. No. 288-1 at consec. pp. 106-107) at ¶¶ 21-22.)  The most common operation conducted by

10  Headquarters Company was a "search and destroy" mission.  (Id. at ¶ 28; Clock Decl., Decl. 29

11  (Dkt. No. 288-1 at consec. p. 84) at ¶ 25.)  In carrying out such operations Captain Boling

12  described that he routinely employed a so-called "hammer and anvil" technique which involved

13  having soldiers going to a location, dismounting from the tracks and conducting a foot patrol over

14  the terrain before linking up with the tracks.  (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec.

15  pp. 108-109) at ¶ 28.)  Joseph Clock, a soldier in petitioner's Army battalion at the time,

16  described his view of such missions:

17              [W]e drove our ACAVs into the jungle and sought out the enemy.
                We acted like bait, trying to draw the enemy out.  In the Army's
18              opinion, a successful search-and-destroy mission meant that we
                drew fire from the enemy, which made each mission especially
19              stressful and dangerous . . .  you had a shorter life expectancy than
                anyone else.
20

21  (Clock Decl., Decl. 29 (Dkt. No. 288-1 at consec. p. 84) at ¶ 25.)  The danger and stress of such

22  operations were heightened by the use of booby traps and mines by the enemy.  Medic Freddie

23  DeVera explained:  "they made so many booby traps and land mines that you were always

24  expecting something to happen . . . .  Everywhere we went and everything we saw was a potential

25  booby trap or land mine." (DeVera Decl., Decl. 33 (Dkt. No. 288-1 at consec. p. 123) at ¶ 15.)

26  Similarly, Dr. Bergerud, petitioner's Vietnam War expert, has described the circumstances

27  encountered by petitioner and others as follows:

28              [D]anger could come from any direction. Mines and booby traps
                were continuous plagues to every combat element of the Tropic

43

> Lightning Division, killing and maiming many soldiers. A terrifying and lethal havoc would ensue when an American unit stumbled into an area filled with these nasty devices. Even apart from the men actually wounded or killed, the indirect effect of booby traps on infantry movement was serious. Such devices slowed troops down, forced them to traverse ugly terrain, and added immensely to the already heavy psychological strain of living in a war zone[.]

(Bergerud Decl., Decl. 43 (Dkt. No. 327-1 at consec. p. 60) at ¶ 32.)  In addition to the booby traps and land mines, the Viet Cong would set up their own ambushes, the most frequently employed being a "close ambush" with a small force.  Captain Boling testified that:

> [t]hey would try to get in close to the route that you'd be moving over, and establish well dug in, well-concealed, well-prepared fighting positions. And they would wait until you got into what they refer to as a 'kill zone,' and then they would try to knock out the lead element and the trail element, and trapping you in the kill zone, and then try to kill you all.

(Boling Depo., lodged herein Mar. 2, 2007 (see Dkt. No. 308), at 38.)  Such lightning exchanges could happen almost anywhere in the 25th Division's area of operations, and caused "terrible grief."  (Bergerud Decl., Decl. 43 (Dkt. No. 327-1 at consec. p. 58) at ¶ 27.)

Nor was there any letup for Headquarters Company at night according to the testimony presented here.  During 1969, the company usually operated out of "fire bases" rather than permanent camps.  (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. p. 108) at ¶ 25.)  A fire base was a temporary encampment formed by placing the tracks or tanks in a circle and setting up a perimeter of dirt berms, chain link and concertina barbed wire.  (Id. at ¶ 23.)  Such a temporary encampment, however, provided little protection from ambush or artillery.  (Id.)

In 1969, much of the Dreadnaughts' operations were comprised of carrying out sweeps and ambushes around Nui Ba Den.  In this regard, Captain Boling testified that the area in which his troops operated during that period "was almost solid granite, and it had a lot of caves and fissures and places where . . . they could conceal themselves, and it gave them excellent fortification.  And every time we ventured on Nui Ban Den, we got waxed . . . [.]" (Boling Depo., lodged herein Mar. 2, 2007 (see Dkt. No. 308), at 25.)

/////

44

1    In addition to the stress that naturally accompanied this type of warfare and the horror of

2    seeing fellow soldiers maimed and killed, petitioner and the rest of Headquarters Company

3    frequently had to carry out body counts.  (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. p.

4    109) at ¶ 30.)  Captain Boling remembered one particularly gruesome incident when they

5    discovered a mass grave of decomposing North Vietnamese and had to "inventory" the bodies.

6    (Id. at ¶ 31.)

7    In February 1969, petitioner was awarded the Combat Infantryman's Badge.  (Cornell

8    Decl., Decl. 42 (Dkt. No. 327-1 at consec. p. 31) at ¶ 81.)  Petitioner was also awarded the Army

9    Commendation Medal a few months later.  (Id.)  In late July of 1969, petitioner volunteered for

10   even more hazardous duty with a combined reconnaissance and intelligence platoon ("CRIP")

11   team.  (Bergerud Decl., Decl. 43 (Dkt. No. 327-1 at consec. p. 61) at ¶ 34.)  CRIP units would

12   collect intelligence by day and go out at night to carry out dangerous and terrifying ambushes.

13   (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. p. 105) at ¶ 18.)  Just prior to petitioner's

14   joining, the CRIP unit was essentially wiped out by a bunker explosion which killed all but a

15   handful of the unit's soldiers.  (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. p. 106) at ¶ 19;

16   Clock Decl., Decl. 29 (Dkt. No. 288-1 at consec. p. 89) at ¶ 43.)  In late August, the CRIP unit

17   was decommissioned and petitioner was reassigned to the Headquarters Company scout platoon.

18   On November 25, 1969, Headquarters Company engaged in a particularly fierce battle

19   near Nui Ba Den.  (Clock Decl., Decl. 29 (Dkt. No. 288-1 at consec. p. 79) at ¶ 3.)  During that

20   battle Capt. Boling was called to assist an infantry unit that had been ambushed on the north side

21   of the mountain where the enemy had "waited until the infantry got well into the depression and

22   opened up on them, pinned them down, the entire company."  (Boling Depo, lodged herein Mar.

23   2, 2007 (see Dkt. No. 308), at 30.)  Because of the softness of the ground, tanks were useless.

24   (Id.)  Captain Boling sent four tracks from his scout platoon to extract the wounded and other

25   survivors.  (Id. at 30-31.)  The tracks were under intense fire from North Vietnamese machine

26   guns.  (Id. at 32.)  Joseph Clock was the sergeant in charge of the operation, and petitioner was

27   one of 15 men under his command.  Sgt. Clock described the combat of November 25, 1969:

28
> [I]t was a living hell. The North Vietnamese were firing mortars
> and .51 caliber machine guns at us.  Larry stood up and returned

1
2

> enemy fire with an M-60 machine gun.  He more or less went toward the North Vietnamese while everyone else was hugging the ground.  Larry put down suppressing fire to protect the other men.  Then he ran back and got more ammo under enemy fire.

3
4

> The fight went on for about four hours and we faced a non-stop flurry of fire from the enemy . . . .

5    (Clock Decl., Decl. 29 (Dkt. No. 288-1 at consec. p. 79-80) at ¶¶ 6, 7.)  In his deposition, Sgt.

6    Clock testified regarding that battle:  "I don't see how he escaped from getting killed . . . Larry

7    saved lives that day.  He saved lives.  There's no doubt in my mind."  (Clock Depo., lodged

8    herein Mar. 2, 2007 (see Dkt. No. 308), at 30.)  Petitioner was awarded the Bronze Star for Valor

9    for his performance under fire at that battle.  (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. p.

10   111) at ¶ 39; Clock Decl., Decl. 29 (Dkt. No. 288-1 at consec. p. 80) at ¶ 10.)

11           A few weeks before this battle, Captain Boling had issued a reprimand to petitioner.

12   (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. pp. 111-112) at ¶ 40.)  Petitioner had gone into

13   Saigon, missed his transportation back, been arrested by MP's, slipped away from the MP's and

14   hiked back to his unit.  (Boling Depo., lodged herein Mar. 2, 2007 (see Dkt. No. 308), at 33.)  As

15   a result, he was charged with being AWOL for ten days and Captain Boling issued him an Article

16   15 citation.  (Id. at 33-34.)  However, Captain Boling did not regard this infraction as serious.  "I

17   recall thinking that I had to issue some form of reprimand . . . .  The Bronze Star incident, which

18   occurred only days later in November 1969, confirmed my belief that Larry was a valuable and

19   courageous soldier."  (Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. pp. 111-112) at ¶ 40.)[28]

20

21   _____

[28]   To Captain Boling, petitioner's character as a soldier was demonstrated by  another memorable episode that took place after the battle at Nui Ba Den:

22
23
24
25
26

> I was checking the perimeter of the fire base, and as I passed his position, he invited me to look at the battle scars on his ACAV. . . and he was upbeat and positive and enthusiastic . . . .  When a high-projectile machine-gun type bullet strikes a piece of armor, it leaves a scar.  It leaves a gouge, it leaves a scratch.  And he had a number of these on the front and up around the driver's and the [track] commander's positions on his vehicle.  And they were new . . . shiny, obviously recent battle scars, we call them.
> Q:  And he wanted to show those to you?
> A:  Yes.
> Q:  And he was proud of those?
> A:  Yes.

27
28

(Boling Depo., lodged herein Mar. 2, 2007 (see Dkt. No. 308), at 57, 59-60.)

1   Petitioner continued to serve in the United States Army with distinction in Vietnam until

2   March 15, 1970.  (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec. p. 31) at ¶ 81.)

3   vi.  Petitioner's Addiction to Alcohol and Drugs[29]

4   While in Vietnam petitioner was initiated into drug use.  By all accounts, marijuana,

5   "uppers," "downers" and heroin were commonly available to and used by many American

6   soldiers in Vietnam.  (Devera Decl., Decl. 33 (Dkt. No. 288-1 at consec. pp. 126-127) at ¶¶ 25-

7   26; Bronson Decl., Decl. 32 (Dkt. No. 288-1 at consec. pp. 116-117) at ¶ 4.)  Even apart from the

8   pressures of combat, petitioner's youth, family history of alcoholism and lack of sophistication

9   made him especially susceptible to addiction and dependence.  (Cornell Decl., Decl. 42 (Dkt. No.

10   327-1 at consec. p. 40) at ¶ 106.)

11   Witnesses such as petitioner's cousin Lavern Marler and his neighbor John Henry Helm

12   testified that drugs such as marijuana were unheard of in the rural Ozark region where petitioner

13   was raised.  (Marler Decl., Decl. 13 (Dkt. No. 286-1 at consec. p. 124) at ¶ 18; Helm Decl., Decl.

14   19 (Dkt. No. 288-1 at consec. pp. 10-11) at ¶ 27.)  Nor were drugs prevalent among the teenagers

15   in western Michigan when petitioner lived on the fruit farm.  (Cole Decl., Decl. 26 (Dkt. No. 288-

16   1 at consec. p. 57) at ¶ 7.)  Petitioner's only real exposure to intoxicants before Vietnam was the

17   weekend beer he drank in Michigan with his buddies.  (Wickham Decl., Decl. 25 (Dkt. No. 288-1

18   at consec. p. 53) at ¶ 8.)

19   Petitioner's family suffered from a history of alcoholism, especially on his father's side.

20   According to expert opinion introduced in these proceedings, petitioner's family history suggests

21   that he was born with a genetic predisposition to alcoholism and drug addiction.  (Stewart Decl.,

22   Decl. 44 (Dkt. No. 327-1 at consec. p. 77) at ¶ 20.)  In Vietnam, especially at the base camps,

23   drugs were prevalent.  At the central base of the 25th Division, Cu Chi, drug use has been

24   described as rampant, especially towards the later stages of the Vietnam War.  (Bronson Decl.,

25   Decl. 32 (Dkt. No. 288-1 at consec. pp. 116-117) at ¶ 4.)  While use of marijuana or other drugs

26

27   [29]  The witnesses who provided testimony regarding this aspect of petitioner's background

28   included:  Thomas Boling, Terry Bronson, Joseph Clock, Larry Cole, Maggie Crutchfield, Freddie DeVera, John Henry Helm, Lavern Marler, Loyd Morgan, Larry Vaught, Dale Webster and Darlene Wickham.

that cloud a soldier's reactions was generally discouraged in the field, excessive use of both drugs

and alcohol to deaden the emotions and relieve stress at base camps was commonplace.  (Devera

Decl., Decl. 33 (Dkt. No. 288-1 at consec. p. 126) at ¶ 26.)  Petitioner's fellow soldier reported:

"At Cu Chi, there was marijuana, heroin, methedrine in glass ampules . . . , morphine in kits to be

given to the wounded. The marijuana and heroin were supplied by villagers."  (Bronson Decl.,

Decl. 32 (Dkt. No. 288-1 at consec. p. 116) at ¶ 4.)  One of petitioner's fellow soldiers has

described the setting:

> It seemed almost everywhere we went, Vietnamese villagers came
> up to us offering beer, drugs, or women . . . .  Some guys, like
> myself, took every opportunity to mellow out, so you had a lot of
> marijuana smoking and taking of downers . . . .  A lot of soldiers
> got hooked on drugs while they were in Vietnam.  Everything was
> so available and cheap that it was hard to avoid it.  More
> importantly, drugs were probably the best way of coping for some
> guys . . . .  Staying drunk or high was usually the easiest way for
> guys to get through it all.

(DeVera Decl., Decl. 33 (Dkt. No. 288-1 at consec. pp. 126-127) at ¶¶ 25, 26.)  As another

childhood friend of petitioner's who served as a soldier in Vietnam stated:  "Drugs were all over

the place. . . .  For many soldiers in Vietnam, drinking and taking drugs were a way to get through

the experience."  (Helm Decl., Decl. 19 (Dkt. No. 288-1 at consec. p. 10) at ¶ 27.)

Petitioner fell to this temptation.  Petitioner's expert witness Dr. Stewart explained:

> Given Mr. Webster's social history, his reported discomfort of
> being around large groups of people, and the overwhelming stress
> of his Vietnam service, the temptation to use the alcohol and drugs
> to calm himself and aid in facilitating interaction with his peers
> made it highly unlikely, if not impossible, for him to resist.  As he
> experienced combat, the use of drugs and alcohol helped him cope
> with the trauma and fear he saw daily.

(Stewart Decl., Decl. 44 (Dkt. No. 327-1 at consec. p. 78) at ¶ 23.)  While petitioner did not use

drugs or alcohol while on patrol, he began drinking beer and using marijuana, opium and speed

during his first tour of duty while in base camp and started using heroin during his second tour.

(Id. at ¶¶ 24, 25.)  By the time petitioner returned state-side to Fort Carson, near Colorado

Springs, Colorado, in 1970, he was a habitual drug user.  (Id. at ¶ 28.)  Captain Larry Vaught

testified that the community surrounding Fort Carson had a very relaxed attitude toward

marijuana and that the marijuana use among soldiers returning from Vietnam was particularly

1   widespread.  (Vaught Decl., Decl. 34 (Dkt. No. 288-1 at consec. p. 135) at ¶ 11.)

2           After an incident involving marijuana, petitioner was given a general discharge, under

3   honorable conditions, and released from the United States Army on November 4, 1970.  (Id. at ¶

4   16.)  Family and friends testified that petitioner returned to this country from Vietnam dependent

5   on drugs and alcohol.  In this regard, his friend Loyd Morgan described petitioner as essentially

6   being drunk every time Loyd saw him:  "he couldn't stay out of the bottle.  He was in the bottle

7   continuously."  (Morgan Depo., lodged herein Feb. 6, 2007 (see Dkt. No. 306), at 54.)  Multiple

8   family witnesses described petitioner as losing his struggles with drugs and alcohol.  (Linda

9   Webster Decl., Decl. 2 (Dkt. No. 286-1 at consec. p. 29) at ¶ 40; Crutchfield Decl., Decl. 1 (Dkt.

10  No. 286-1 at consec. pp. 16-17) at ¶¶ 90-94.)  According to expert opinion introduced in these

11  proceedings, in the years following his return from Vietnam, petitioner became "a chronic user of

12  alcohol and drugs unable to control his use," descending into "pathological use" and suffering

13  "serious adverse consequences."  (Stewart Decl., Decl. 44 (Dkt. No. 327-1 at consec. p. 80) at ¶

14  29.)  Within a few years of his return from Vietnam, petitioner had been rendered homeless and

15  destitute, alcoholic and addicted.

16                        vii.  Difficulty Adjusting after Vietnam[30]

17          After his honorable discharge from the Army in late 1970, petitioner was dependent upon

18  alcohol and drugs.  In short, he attempted to reintegrate into society, but ultimately was overcome

19  by his problems and inability to cope.  Petitioner's counsel in these habeas proceedings has

20  presented a variety of witnesses who were available at the time of petitioner's trial and who have

21  now described how fundamentally changed petitioner was upon his return from war and how he

22  was unable to resume anything approximating a normal life thereafter.  The court recounts this

23  evidence below.

24          Petitioner returned to western Michigan in late 1970 and stayed for a short time with his

25  mother and stepfather in the South Haven area.  (Crutchfield Decl., Decl. 1 (Dkt. No. 286-1 at

26

27  _____

    [30]  The witnesses who provided testimony addressing this period of petitioner's background
28  included:  Thomas Boling, Terry Bronson, Joseph Clock, Marilyn Cornell, Maggie Crutchfield,
    Freddie DeVera, John Henry Helm, Patricia Libla, David Libla, John McGeehan, Loyd Morgan,
    Dale Webster and Joe West.

consec. p. 16) at ¶ 89.)  His mother was disturbed by the change in petitioner's behavior ("he was

a million miles away") and drug use, noting that he was "ashamed."  (Id. at ¶ 92.)  In fact, his

mother described one day finding him simply "crying uncontrollably."  (Id. at ¶ 94.)  Petitioner's

uncle Albert Williams, who had moved to Michigan in 1970, described that following his return

to the area petitioner was anxious and nervous all the time.  (Williams Decl., Decl. 12 (Dkt. No.

286-1 at consec. p. 117) at ¶ 31.)  Darlene Wickham, who had been petitioner's girlfriend before

he left for Vietnam, saw him on the streets of South Haven one day.  She described him as

completely changed, "absolutely detached."  (Wickham Decl., Decl. 25 (Dkt. No. 288-1 at

consec. p. 54) at ¶ 13.)  She explained, "it was as if Larry was in the car with someone he didn't

even know."  (Id.)  Petitioner's brother, Dale Webster, witnessed petitioner's heightened startle

response and strange behavior.  (Dale Webster Decl., Decl. 4 (Dkt. No. 286-1 at consec. p. 54) at

¶ 27.)  Loyd Morgan, who had been one of petitioner's closest friends, had married and was

living in a house in South Haven when petitioner returned.  (Morgan Decl., Decl. 27 (Dkt. No.

288-1 at consec. p. 67) at ¶ 18.)  Loyd described that petitioner, carrying all his possessions in a

brown bag, would stay with Loyd periodically, sleeping on the couch.  (Id.)  Loyd stated that

petitioner had terrible nightmares, screaming out in his sleep, sweating and was so terrified that

Loyd would have to comfort him in the middle of the night.  (Id. at ¶ 20.)  In his testimony in

these proceedings Loyd described one night when he and petitioner went camping and petitioner

fell apart:

> It was after midnight. And Larry started in on one of his screaming spells.  He had been drinking . . . he just kept screaming.  And finally he just took off out of the tent and went running into the woods . . . .  [I] caught him out in the woods and he was beating on a tree, and his hands were raw, because he had been beating the tree so hard . . . he was just so upset . . . .  We sat down there beside that tree.  And we talked for over an hour . . . .  [I told him] Vietnam is behind you.  You don't have to go back there, you know.  Those kinds of things . . . he was very hard to calm down.

(Morgan Depo., lodged herein on Feb. 6, 2007 (see Dkt. No. 306), at 58-59.)

Despite these problems and issues, petitioner apparently made attempts to reintegrate

himself into society after his military service.  He found work at a factory for a while.  (Morgan

Decl., Decl. 27 (Dkt. No. 288-1 at consec. p. 71) at ¶ 30.)  Petitioner married a woman he hardly

1   knew with whom he had a child before she left him, took the baby and moved to Arkansas.  (Dale

2   Webster Decl., Decl. 4 (Dkt. No 286-1 at consec. p. 54) at ¶ 29.)

3        Petitioner later left Michigan and began to wander.  In 1971, he stayed for a time with his

4   sister Patricia and her husband David Libla in Missouri.  His sister Patricia reported:  "It was

5   wonderful to see him but he looked like a stranger.  He had gone into his own little self . . . he

6   was drinking a lot."  (Patricia Libla Decl., Decl. 3 (Dkt. No. 286-1 at consec. p. 45) at ¶ 43.)  His

7   brother-in-law David Libla gave petitioner a job, but they soon quarreled over the way Libla was

8   treating petitioner's sister, and Libla told petitioner he was no longer welcome there.  (Id. at ¶ 46.)

9        In 1972, petitioner stayed with his sister Linda and her husband Carroll Moss.  In her

10  declaration Linda described this period in her brother's life:

11  > He was not the same person . . . he was no longer calm, but restless
12  > and on the move.  His eyes - they'd be glassy looking.  Even though
    > he'd carry on a conversation with you, it was like he was
13  > somewhere else.  He'd look at you like he didn't see you.

14  (Linda Webster Decl., Decl. 2 (Dkt. No. 286-1 at consec. p. 29) at ¶ 41.)  Petitioner continued

15  having nightmares.  (Id.)  He later left his sister Linda's house in September of 1972 without even

16  telling her where he was going.  (Id.)

17       Marilyn Cornell, a marriage and family therapist and one of petitioner's experts in these

18  proceedings, has explained:

19  > It is not surprising that Larry Webster would fail to adjust when he
    > re-entered civilian life after his military service.  In his family, the
20  > pattern was clear and deep-set:  one did not ask for help.  Men did
    > not readily identify or deal with psychological symptoms such as
21  > anxiety or depression.  Men in the Webster family went to war and
    > typically returned scarred and traumatized.  There simply was no
22  > successful readjustment.  Instead, there was depression, anxiety,
    > addiction and rootlessness[.]
23
24  > Larry had little, if any, insight into the problems he faced.  He
    > adapted as he did as a child by avoiding others, accepting problems
25  > and self medicating with alcohol and drugs.  He did not grasp the
    > nature and extent of his problems and was extremely reluctant to
26  > seek help for stress, addiction, or increasing anxiety.  The trauma of
    > combat was heaped upon the earlier traumatic experiences of
27  > childhood.  He had never received any treatment for his abusive
    > childhood and had no skills with which to deal with this compound
28  > trauma.  He was particularly vulnerable to, and at risk for suffering
    > from, the psychological impact of his combat experience.

51

1    (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec. pp. 39-40) at ¶¶ 103, 106.)

2           The various Vietnam veterans who testified in these habeas proceedings, particularly

3    those who served beside petitioner in his battalion, have also explained their own comparable

4    post-Vietnam struggles with depression, anxiety, alienation, alcohol abuse and psychological

5    problems.  (Clock Decl., Decl. 29 (Dkt. No. 288-1 at consec. p. 92) at ¶ 50; McGeehan Decl.,

6    Decl. 30 (Dkt. No. 288-1 at consec. p. 101) at ¶¶ 20-22; West Decl., Decl. 35 (Dkt. No. 288-1 at

7    consec. p. 141) at ¶ 20; Boling Decl., Decl. 31 (Dkt. No. 288-1 at consec. p. 113) at ¶¶ 45-47.)

8                              viii.  Conclusion Regarding Prejudice

9           The foregoing discussion of the substantial evidence presented in these habeas

10   proceedings makes clear that the jury that sat in judgment at the penalty phase of petitioner's trial

11   was obviously presented with neither a full nor an accurate picture of petitioner's childhood,

12   background, character and war record.   Instead, the jury heard only an abrupt and halting penalty

13   phase defense presentation that was truly paltry.   It was grossly insufficient and ineffective.

14          As the Supreme Court has concluded under similar circumstances "had the jury been

15   confronted with this considerable mitigating evidence, there is a reasonable probability that it

16   would have returned with a different sentence."  Wiggins, 539 U.S. at 536.  ("This evidence adds

17   up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before

18   the jury, and although we suppose it is possible that a jury could have heard it all and still have

19   decided on the death penalty, that is not the test."  Rompilla, 545 U.S. at 393).  See also

20   Hamilton, 583 F.3d at 1134 ("Given the compelling evidence of Hamilton's 'excruciating life

21   history' that could have been placed 'on the mitigating side of the scale,' [citation omitted], we

22   conclude that 'there is a reasonable probability that at least one juror would have struck a

23   different balance between life and death.'").  The mitigating evidence presented by petitioner's

24   counsel in this habeas proceeding is substantial, powerful and persuasive and establishes the

25   unreliability of the penalty verdict.

26          The mitigating evidence regarding petitioner's "troubled history," including the

27   deprivation, hardship, poverty, alcoholism and violence that characterized his early years, is

28   precisely the type of evidence that has been found vital to the assessment of a capital defendant's

1   "moral culpability."  Stankewitz v. Wong, 698 F.3d at 1175 (quoting Wiggins, 539 U.S. at 535).

2   "Evidence regarding social background and mental health is significant, as there is a 'belief, long

3   held by society that defendants who commit criminal acts that are attributable to a disadvantaged

4   background or to emotional or mental problems, may be less culpable than defendants who have

5   no such excuse.'"  Douglas v. Woodford, 316 F.3d 1079, 1088, 1090 (9th Cir. 2003) (quoting

6   Boyde v. California, 494 U.S. 370, 382 (1990)).  See also Libberton v. Ryan, 583 F.3d 1147,

7   1172-73 (9th Cir. 2009).  A history of "abuse and privation" is important mitigation evidence,

8   extremely relevant to a "jury's appraisal" of a defendant's "moral culpability" and in turn the

9   appropriate punishment.  Williams, 529 U.S. at 398.  This is true whether or not the evidence

10  concerns the actual crime or is related to the issue of the defendant's future dangerousness.  Id.

11      Respondent maintains that the characterization of petitioner's childhood as "impoverished

12  and destitute" is incorrect because there is evidence that his life improved when petitioner's

13  mother left his father and brought the family to her home in Missouri.  There, respondent asserts

14  petitioner's life was relatively normal with a "close loving family."  While it appears to be fair to

15  characterize petitioner's situation as having improved in 1953 when his mother took the five

16  children and returned to the Fawbush Holler, the evidence presented in this habeas proceeding

17  establishes that petitioner's family still remained impoverished and was barely able to scrape by

18  even during this time.  Indeed, as alluded to above, neighbors described the houses petitioner's

19  family lived in during this time as "terrible" and to their situation as "pitiful."[31]  Nonetheless, the

20  evidence paints a picture of petitioner's mother, Maggie Webster, persevering under onerous

21  circumstances, raising five children without a husband, in a shack on government land without

22

---

23  [31]  In particular, Lucinda Reutzel, a friend and schoolmate, stayed at the shack in the holler only
24  once, attesting:  "I remember thinking when we got there that this can't be where they live.  It was
    just a shack.  Instead of having a foundation, the floor was up on rocks . . . .  It was dark and
25  dreary in there.  I don't remember what they had for supper, but it wasn't much." (Reutzel Decl.,
    Decl. 40 (Dkt. No. 300-1 at consec. p. 8) at ¶ 3.)  Both of the witnesses who taught petitioner,
26  Geraldine Rogers and Delmer Barks, as well as other witnesses, noted that the Websters were the
    poorest family in the area during this time.  (Rogers Decl., Decl. 39 (Dkt. No. 300-1 at consec. p.
27  2) at ¶ 4; Barks Decl., Decl. 20 (Dkt. No. 288-1 at consec. p. 24) at ¶ 30.)  A neighbor described
    the family as "poorer than poor."   (David Libla Decl., Decl. 21 (Dkt. No. 288-1 at consec. p. 28)
28  at ¶ 4.)  Patsy Helm Dillon stated:  "It breaks my heart to think of how the Websters lived."
    (Dillon Decl., Decl. 18 (Dkt. No. 287-1 at consec. p. 2) at ¶ 8.)

1   electricity, plumbing, medical or dental care, a consistent food supply or consistent employment.

2   Respondent's attempt to dismiss the evidence as depicting instead a somewhat  idyllic "close

3   loving family" rather than compelling mitigating circumstances is both unduly  simplistic and

4   unsupported.

5          Witnesses in these proceedings have described petitioner's mother as "overly protective,"

6   "defensive," "detached" and "not really a homemaker."  (Dillon Decl., Decl. 18 (Dkt. No. 287-1

7   at consec. p. 3) at ¶ 6.)  Petitioner's expert witness noted:  "Maggie Webster could do little to

8   nurture her children or help them grow into fulfilled adults; her main task was sheer survival."

9   (Cornell Decl., Decl. 42 (Dkt. No. 327-1 at consec. p. 35) at ¶ 90.)  Similarly, petitioner's

10  brother-in-law David Libla stated:  "Maggie never showed much emotion or care for anybody,

11  especially her children.  Even though Maggie raised her children all by herself, there always

12  seemed to be a lack of an emotional bond between them."  (David Libla Decl., Decl. 21 (Dkt. No.

13  288-1 at consec. p. 30) at ¶ 10.)  Like all childhoods, petitioner's included both joy and sadness,

14  but the evidence presented here persuasively establishes that petitioner's family suffered

15  enormous hardships and that all of the children were damaged to some extent as a result.

16         At bottom, respondent's argument boils down to a simple truism:  petitioner's childhood

17  could have been worse.  Respondent fails to acknowledge, however, that the strength of this

18  evidence, and its value as mitigation, rests not merely on its sympathetic aspects but on its

19  narrative heft:  it explains petitioner's life and would have given the jury an understanding of and

20  an insight into his character - an understanding they utterly lacked in the virtual absence of a

21  defense penalty phase presentation.  Like the cultural evidence, the evidence that petitioner was

22  raised in a small crude shack in a remote and isolated area by a fiercely independent but

23  emotionally distant mother helps explain why he was totally unprepared emotionally and

24  psychologically for what happened to him while serving his country in Vietnam.  Attempting to

25  minimize the extensive amount of evidence presented by petitioner, respondent glosses over

26  many of the compelling mitigating aspects of the evidence unearthed in these habeas proceedings

27  regarding the early years of petitioner and his family dynamic:  the evidence of a pre-disposition

28  toward alcoholism, the family tradition of serving our country in wartime (see Webster Smith

1  Depo., lodged herein Dec. 19, 2006 (see Dkt. No. 296), at 10-11, 16.), the mental illness and

2  dysfunction in the family tree.  It is difficult not to conclude that the reason respondent glosses

3  over such evidence is that, in light of the case law on what usually qualifies as required mitigation

4  evidence, he has no real response to these aspects of the mitigation case that could have and

5  should have been presented on petitioner's behalf at the penalty phase of his trial.

6        Respondent also appears to be of the view that the evidence indicating petitioner was a

7  normal, shy, good boy who had friends and interacted relatively well with his peers and

8  community at school and church simply does not qualify as potential penalty phase mitigating

9  evidence at all.  The court does not agree.  To the contrary, the undersigned finds that this

10  evidence showing that petitioner was dutiful, helpful and reasonably assimilated despite the

11  hardships he and his family endured easily constitutes evidence that could have aided in

12  persuading a jury to spare his life.  Such evidence is not only of significant independent

13  mitigating value, it also fairly depicts the devastating changes petitioner underwent during and

14  after he fought in the Vietnam War, including his descent into alcohol and drug dependence,

15  which in and of itself was compelling mitigating evidence.  Numerous friends, family members

16  and experts testified to the dramatic and crushing effect of petitioner's war experiences –

17  evidence that only increases in probity if contrasted to petitioner's character before the war.  The

18  absence of such evidence from the penalty phase presentation by petitioner's counsel, especially

19  in combination with the failure to present the other mitigating evidence, undercuts the reliability

20  of the jury's death verdict in this case.  A reasonable jury exposed to the compelling evidence that

21  was not presented in the penalty phase at petitioner's trial could well have been convinced that

22  petitioner was, despite his crime, a human being of some worth who should not be sentenced to

23  death.

24        In addition to the evidence of petitioner's family history and childhood, the evidence of

25  petitioner's Vietnam experiences would have been substantially mitigating in showing his

26  character and as an explanation for his difficulties after the war.  The extensive evidence

27  presented in these habeas proceedings, of ten Vietnam veterans, one expert on the Vietnam War

28  and a variety of documentary and photographic exhibits, is undeniably and self-evidently

1    powerful.  Respondent's characterization of that evidence as merely "redundant" and

2    "cumulative" of the evidence introduced at trial is completely unpersuasive.  To suggest, as

3    respondent does, that a brief summary description of one battle on petitioner's commendation,

4    read into the record by counsel at the penalty phase of petitioner's trial, is the equivalent of the

5    detailed description of petitioner's complete Vietnam War experience through the eyes of those

6    fellow soldiers who were present in Vietnam with him, is quite frankly absurd.  The extensive

7    mitigating evidence presented in these habeas proceedings goes far beyond one day of the battle

8    on Nui Ba Den and instead shows in a compelling manner the seminal events that stretched over

9    nineteen months, through petitioner's two tours of duty:  the day-to-day conditions of anxiety,

10   exhaustion and terror, the psychological toll inflicted by those circumstances, the presence of

11   drugs and other aspects of his Vietnam War service.  This previously un-presented evidence

12   concerned far more than petitioner's heroism in a single battle.  The witnesses who testified in

13   these habeas proceedings regarding Vietnam were neither redundant nor cumulative.  Cf., People

14   v. Goad, 938 S.W.2d 363, 371 (Tenn. 1996) (reversing the petitioner's death sentence where trial

15   counsel had merely presented at the penalty phase of trial testimony from family members who

16   noted that the petitioner had "returned from Vietnam with an addiction to drugs and a changed

17   personality," but failed to present any soldier or expert testimony regarding the petitioner's

18   Vietnam service, leaving open "the question of exactly what transpired in Vietnam

19   and how the events affected Goad").[32]

20        Respondent also argues that the testimony of some of these witnesses regarding the

21   Vietnam War and petitioner's experiences would have been excluded from admission at his trial,

22

23   [32]  Instead, the jury heard precious little about petitioner's background during the penalty phase of
     the trial.  As reflected in the twenty-two pages of the trial transcript comprising the entire defense
24   mitigation case, petitioner's two sisters mentioned the poverty of their childhood, the cruelty of
     their father and how petitioner changed after Vietnam.  (RT at 5423, 5428-5429, 5432.)  Without
25   any context or supporting testimony, defense counsel merely introduce into evidence certificates
     relating to petitioner's receipts of the Bronze Star and Army Commendation Medal.  (RT at 5420-
26   5421.)  This meager and incomplete presentation was clearly inadequate to allow the jury to
     understand and assess the appropriate sentence to be imposed in petitioner's case.  This is
27   especially true in light of the significant and substantial mitigating evidence that was readily
     available had adequate investigation and preparation been undertaken in a timely manner by
28   petitioner's counsel and which has been described above.

1    if offered, as irrelevant.  However, the general test for relevancy in California is whether the

2    evidence tends logically and by reasonable inference to prove or disprove any disputed fact that is

3    of consequence to the determination of the action.  Cal. Evid. Code § 210.  In the capital case

4    context, the California Supreme Court has stated:

5                In People v. Easley (1983) 34 Cal.3d 858, 196 Cal. Rptr. 309, 671
             P.2d 813, we said the jury should consider any " 'aspect of [the]
6            defendant's character or record . . . that the defendant proffers as a
             basis for a sentence less than death.' " (P. 878, fn. 10, 196 Cal.
7            Rptr. 309, 671 P.2d 813, quoting Lockett v. Ohio (1978) 438 U.S.
             586, 604, 98 S. Ct. 2954, 2964, 57 L.Ed.2d 973.) Later cases
8            confirm that a defendant is entitled to introduce evidence of any
             aspect of his character or record he offers as a basis for mitigation.
9

10   People v. Daniels, 52 Cal. 3d 815, 877 (1991).  See also People v. Hajek, 58 Cal.4th 1144, ___,

11   2014 WL 1759579, at *69 (May 5, 2014) (observing that the standard instruction in a capital case

12   directs the jury "that it may consider in mitigation 'any other circumstance which extenuates the

13   gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or

14   other aspect of the defendant's character or record that the defendant offers as a basis for a

15   sentence less than death, whether or not related to the offense for which he is on trial,' [and]

16   adequately conveys the full range of mitigating evidence that may be considered by the jury.")

17   (quoting People v. Catlin, 26 Cal. 4th 81, 173-74 (2001)).  Here, there was no better way of

18   establishing the facts surrounding petitioner's Vietnam experience and how it shaped his

19   character than through testimony of observations by the soldiers who served there with him.

20           Moreover, with regard to the penalty phase of a capital case trial, the admission of

21   mitigating evidence is of constitutional dimension.  See Skipper v. South Carolina, 476 U.S. 1, 4-

22   8 (1986) (holding that proffered testimony regarding the defendant's good conduct in jail while

23   awaiting trial was erroneously excluded from the penalty phase trial and noting that there was no

24   disputing that the Supreme Court has required "that in capital cases that 'the sentencer . . . not be

25   precluded from considering, as a mitigating factor, any aspect of a defendant's character or record

26   and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

27   less than death.'") (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) and Eddings v. Oklahoma,

28   455 U.S. 104, 110 (1982)).  See also People v. Edwards, 57 Cal. 4th 658, 759 (2013) ("The

Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded

from considering any relevant mitigating evidence, that is, evidence regarding 'any aspect of a

defendant's character or record and any of the circumstances of the offense that the defendant

proffers as a basis for a sentence less than death.'") (quoting  People v. Frye, 18 Cal.4th 894,

1015 (1998)).

As the Ninth Circuit has stated in response to an argument similar to respondent's here:

> The district court clearly erred in relying on the State's argument
> that the mitigating evidence could not have made a difference in the
> outcome of the penalty phase because the crime Hamilton
> committed was not "attributable to" his disadvantaged background
> or mental health problems.  As a matter of law, the trial court could
> not have excluded the mitigating evidence on this ground.  Doing
> so would have directly violated the Supreme Court's longstanding
> instruction that "a State cannot preclude the sentencer from
> considering any relevant mitigating evidence that the defendant
> proffers in support of a sentence less than death," as "virtually no
> limits are placed on the relevant mitigating evidence a capital
> defendant may introduce concerning his own circumstances."
> Payne v. Tennessee, 501 U.S. 808, 822, 111 S. Ct. 2597, 111
> L.Ed.2d 720 (1991) (internal quotation marks omitted); see Tennard
> v. Dretke, 542 U.S. 274, 285–88, 124 S. Ct. 2562, 159 L.Ed.2d 384
> (2004) (holding that evidence of impaired mental functioning is
> inherently mitigating, and that a defendant need not demonstrate a
> "nexus" between his mental capacity and the crime committed).

Hamilton, 583 F.3d at 1132.

Also instructive in this regard is the case of People v. Lucero, 44 Cal.3d 1006 (1988) in

which the California Supreme Court affirmed the judgment as to guilt but reversed and remanded

for a new penalty phase because the trial court erroneously excluded, among other pieces of

mitigating evidence,  a defense expert's opinion that the defendant might be suffering from

posttraumatic stress syndrome as a result of his service in Vietnam.  In so holding the court

concluded:

> [T]he exclusion of mitigating evidence in the case before us would
> require reversal of the penalty verdict. This case is one in which the
> jury might have found the death penalty inappropriate. Defendant
> offered a substantial showing in mitigation:  the absence of any
> prior acts of criminal violence, the absence of any prior felony
> convictions, a deprived and harrowing childhood, a traumatic
> military experience, and a serious mental illness.

44 Cal. 3d at 1032.  See also People v. Smith, 35 Cal. 4th 334, 367 (2005) ("Here the relevance of

1  Janice Foster's testimony to defendant's character and personality is clear, because Foster's

2  opinion was based on her familiarity with defendant's emotional and social immaturity, a

3  recognized mitigating consideration.")  Here, there can be little question that the testimony of

4  petitioner's fellow soldiers would have been properly admitted as relevant mitigating evidence at

5  the penalty phase of his trial had his counsel offered that testimony.[33]

6         As for the admissibility of the testimony of the Vietnam War expert presented in this

7  habeas proceeding, California Evidence Code § 720, in effect at the time of petitioner's trial,

8  stated that a person is "qualified to testify as an expert if he has special knowledge, skill,

9  experience, training, or education sufficient to qualify him as an expert on the subject."  Professor

10  Bergerud certainly has special knowledge sufficient to qualify under this definition.  Moreover,

11  his description of the Vietnam conflict, the structure of the combat units and the conditions of

12  combat are insightful and helpful.  Finally, the Ninth Circuit has recognized that the presentation

13  of expert testimony to a sentencing jury in a capital case is a crucial aspect of the proper and

14  effective mitigation presentation.  Hamilton, 583 F.3d at 1132 ("Counsel's failure to retain an

15  expert to explain the mitigating value of Hamilton's traumatic childhood was all the more

16  prejudicial because obtaining the evidence and calling an expert to explain its relationship to

17  Hamilton's murder of his wife -- as opposed to a random act of violence aimed at society in

18  general -- could very well have altered the outcome.");  Douglas, 316 F.3d at 1090 ("Although we

19  did not find that [counsel's] failure to discover Dr. Broussard impacted the outcome of the guilt

20  phase, the same cannot be said of the penalty phase.  Even if the testimony were not enough to

21  negate an element of underlying offense, it could have invoked sympathy from at least one

22  member of the jury at the penalty phase, particularly when considered in connection with

23  additional sociological history evidence discussed above.");  Jackson v. Calderon, 211 F.3d 1148,

24  1163 (9th Cir. 2000) (finding ineffective assistance in connection with a penalty phase in part

25

26  [33] All of that evidence was available to petitioner's counsel and is properly considered by this
   federal habeas court.  See Lang v. Cullen, 725 F. Supp. 2d 925, 945 (C.D. Cal. 2010)

27  ("[P]etitioner's life history and background testimony will be admissible in the second phase of
   bifurcated proceedings concerning penalty phase ineffective assistance, since the testimony is

28  unquestionably relevant in assessing whether trial counsel's failure to investigate and present
   mitigation evidence prejudiced petitioner.")

1    because "nothing was done and the penalty phase was left without any expert evidence at all

2    concerning one of the most important factors in mitigation-Jackson's clearly impaired mental

3    condition at the time of the crime.").

4         In his final argument attempting to diminish the power of the mitigating evidence related

5    to petitioner's service during the Vietnam War, respondent asserts that the disclosure of "negative

6    evidence of misconduct" -- petitioner's citation for briefly being AWOL in Vietnam and the

7    difficulties he experienced at Fort Carson when he returned from the war -- "would have

8    completely undermined" the value of any mitigating evidence with respect to petitioner's

9    Vietnam service.  Again, the undersigned simply cannot agree.

10        The AWOL citation petitioner received in early November of 1969 was not for a serious

11   act of misconduct and was even characterized in these proceedings by petitioner's  commanding

12   officer as a minor infraction deserving, in his opinion, of only a "wrist slap."  (Boling Decl., Decl.

13   31 (Dkt. No. 288-1 at consec. p. 111) at ¶ 40; Boling Depo., lodged herein Mar. 2, 2007 (see Dkt.

14   No. 308), at 32-34, 49, 60-61.)  This incident, coming only a few days before petitioner's

15   exhibition of heroism at the battle on Nui Ba Den, which won him the Bronze Star, was

16   inconsequential and exploration into it at the penalty phase would not have likely damaged

17   petitioner in the jury's eyes particularly in light of the testimony regarding his Vietnam service as

18   a whole.  In any event, it would have been for the jury to weigh as part of petitioner's extensive

19   military record – a part of his history about which they heard vanishingly little.

20        As for petitioner's problems encountered at Fort Carson, his inability to adjust to state-

21   side military service, his addiction to drugs, and his discharge from the army thereafter are all part

22   and parcel of the defense mitigation case that was never presented.  The available evidence

23   suggests that petitioner was unable to integrate back into regimented, peacetime military service.

24   Adding to the problem, treatment services for soldiers suffering the psychological effects of

25   combat were virtually non-existent in the early 1970's.  (Cornell Depo., lodged herein Nov. 13,

26   2007 (see Dkt. No. 365), at 119-120.)  Larry Vaught, the officer who signed petitioner's

27   discharge papers, testified that many soldiers returning from Vietnam tours to wait out the last

28   few months of their enlistment term had similar problems, stating:

1
2

> A number of men returning from Vietnam did not perform as very
> good soldiers while at Fort Carson . . . .  [I]t was very tough for
> many of the guys coming back from Vietnam . . . .

3  (Vaught Decl., Decl. 34 (Dkt. No. 288-1 at consec. p. 135) at ¶ 10.)   Captain Vaught also

4  testified that, unfortunately, many soldiers coming home from combat in Vietnam to Fort Carson

5  encountered difficulties because they were not given a new assignment and instead were simply

6  left to wait out a few months to discharge in an environment where bad advice and drug use were

7  rampant.  (Vaught Depo., lodged herein Mar. 2, 2007 (see Dkt. No. 308), at 12-13, 15-17.)

8  Therefore, the undersigned is persuaded that evidence of petitioner's discharge from the United

9  States Army, does not detract from the potential case in mitigation, but more likely serves to aid

10  in demonstrating the impact of petitioner's Vietnam experience and corrosive effects of his

11  introduction, and eventual immersion, into the numbing effects of drug and alcohol abuse.  Far

12  from countering the mitigating evidence, the Fort Carson episode added to a complete, credible,

13  and potentially mitigating portrait of petitioner's character and the events that shaped his life.

14       Indeed, the evidence of petitioner's experience in Vietnam was critically important to a

15  full understanding of his drug and alcohol dependence which arose thereafter.  Evidence of drug

16  dependency and addiction can be compelling mitigation evidence.  See, e.g., Correll, 539 F.3d at

17  952; Lambright, 490 F.3d at 1124 (ineffective assistance of counsel at the penalty phase found in

18  part because "significant evidence related to Lambright's long-term drug addiction and its effect

19  upon him was available but was not presented to or urged upon the sentencing court"); Frierson v.

20  Woodford, 463 F.3d 982, 989 (9th Cir. 2006) ("We have held that a failure to investigate and

21  present, at the penalty phase of a capital trial, evidence of organic brain damage or other mental

22  impairments, drug abuse, and a dysfunctional family or social environment may constitute

23  ineffective assistance of counsel."); Ainsworth v. Woodford, 268 F.3d 868, 875 (9th Cir. 2001)

24  (finding the petitioner's regular and long term abuse of a variety of drugs was "information [that]

25  would have been extremely important to the jury in its effort to decide whether to impose the

26  death penalty").

27       Respondent argues nonetheless that such "evidence of habitual substance abuse is 'at best

28  a two-edged sword'" and that the evidence concerning petitioner's alcohol and drug dependency

1   and his genetic, familial predisposition to substance abuse consequently would have carried little

2   mitigating weight.  The flaw in respondent's argument on this point is that the potentially

3   aggravating aspects of drug and alcohol use were already before petitioner's jury:  numerous

4   witnesses, including the prosecution's main witness, Bruce Smith, had testified during the guilt

5   phase of petitioner's trial that the group of people camping by the American River was

6   consuming drugs and alcohol and financing this consumption through thefts, robberies and drug

7   sales.  Penalty phase mitigation evidence explaining the circumstances by which petitioner

8   became a habitual user of drugs could only have been mitigating under these circumstances where

9   the other side of the sword had been wielded against him already.

10       Contrary to respondent's assertions, Dr. Stewart's testimony regarding chemical

11   dependency and the factors in petitioner's background that made him particularly susceptible to

12   that dependence would likely have been admissible in mitigation at the penalty phase of the trial.

13   Dr. Stewart's testimony here included an explanation of the dynamics of substance use and abuse,

14   brain chemistry and addiction, subjects well within his special expertise.  Such testimony would

15   have been admissible at the penalty phase of petitioner's trial.  See Cal. Evid. Code §§ 801,

16   802.[34]  Dr. Stewart's based his testimony regarding petitioner upon the additional  foundation of

17   his interview of petitioner, a review of petitioner's court records, military records and prison

18   records, a review of a number of sworn declarations and transcripts of testimony provided under

19   oath.  Dr. Stewart's expert opinions were therefore amply supported and potentially persuasive

20   and would have been properly admitted into evidence at the penalty phase of petitioner's trial.

21   See Hamilton, 583 F.3d at 1132; Lucero, 44 Cal. 3d 1032.

22                    ix.  Case Law Supports the Find of Prejudice Here

23       Many prior decisions guide the court in assessing this record to determine whether

24   petitioner was prejudiced by his counsel's ineffective assistance at the penalty phase of his trial.

---

25   [34] California Evidence Code § 801 provides that an expert witness may give opinion testimony if
26   the opinion is "[r]elated to a subject that is sufficiently beyond common experience that the
    opinion of an expert would assist the trier of fact."  Section 802 provides that "[a] witness
27   testifying in the form of an opinion may state on direct examination the reasons for his opinion
    and the matter (including, in the case of an expert, his special knowledge, skill, experience,
28   training, and education) upon which it is based, unless he is precluded by law from using such
    reasons or matter as a basis for his opinion."

1    In Williams v. Taylor, one of the Supreme Court's seminal cases  on this subject, trial counsel

2    offered merely the testimony of the defendant's "mother, two neighbors and a taped excerpt from

3    a statement by a psychiatrist."  529 U.S. at 369.  The Court concluded that, in light of the

4    available mitigating evidence involving the defendant's background and mental deficits, the jury

5    was deprived of crucial sentencing information such that there was a reasonable probability the

6    result of the sentencing proceeding would have been different had counsel "presented and

7    explained the significance of all the available evidence."  Id. at 399.  See also Sears v. Upton, 561

8    U.S. 945, ___, 130 S. Ct. 3259, 3266 (2010) ("We certainly have never held that counsel's effort

9    to present some mitigation evidence should foreclose an inquiry into whether a facially deficient

10   mitigation investigation might have prejudiced the defendant.")

11          Similarly, the Ninth Circuit has found prejudice in cases where trial counsel presented

12   mitigating social history evidence "in a cursory manner that was not particularly useful or

13   compelling" after neglecting to investigate and develop a complete presentation of the available

14   mitigating evidence.  Douglas, 316 F.3d at 1090.  See also Hamilton, 583 F.3d at 1131 ("Both the

15   Supreme Court and we have found the failure to investigate and present similar -- and even less

16   compelling -- evidence to be highly prejudicial.") (gathering cases finding prejudice); Karis, 283

17   F.3d at 1140-1141 ("With proper investigation, Karis' counsel could have put before the jury

18   evidence contrary to the prosecution's piercing argument."); Silva, 279 F.3d at 847-48 (gathering

19   cases finding prejudice flowing from ineffective assistance at the penalty phase).  "While it is true

20   that the testimony touched upon general areas of mitigation, counsel's cursory examination of the

21   witnesses failed to adduce any substantive evidence in mitigation."  Ainsworth, 268 F.3d at 874.

22   Indeed, presenting only "the bare facts" of the defendant's "troubled past . . . without further

23   investigation and presentation of contextual evidence and argument . . . [may only] demonize" the

24   defendant "rather than to mitigate the appropriateness of imposing the death penalty for his

25   actions."  Correll, 539 F.3d at 953 n. 8.  Such was the case here.

26          Even if some references to petitioner's difficult childhood and abusive father were made

27   in the cursory testimony presented at the penalty phase of his trial, there was absolutely no

28   testimony at all presented by his counsel regarding petitioner's Vietnam service.  Instead, his

1   decorations and medals were submitted to the jury in an evidentiary vacuum.  Nor was there any

2   explanation provided to the jury regarding the effect of the Ozark culture on his makeup.  Such

3   evidence explains his fundamental vulnerability and his reluctance to seek help.[35]  Nor was there

4   *any* explanation provided to the jury about petitioner's drug and alcohol addiction.  Significantly,

5   *no* expert witnesses of any kind were called to testify in the defense mitigation case.

6          In juxtaposition, the aggravation evidence presented at petitioner's trial was not strong.

7   Petitioner's three prior felony convictions were relatively inconsequential and two of the three

8   were submitted via stipulation.  Petitioner's underlying capital crime was a brutal, planned

9   murder.  Nonetheless, as the Ninth Circuit has recognized:

> Prejudice is especially likely where, as here, "this is not a case in
> which a death sentence was inevitable because of the enormity of
> the aggravating circumstances." Bean, 163 F.3d at 1081. In fact, in
> this case the State argued that only one aggravating factor existed.
> Although the offense in this case certainly was brutal and sadistic,
> the Supreme Court in Williams recently noted that "[m]itigating
> evidence unrelated to dangerousness may alter the jury's selection
> of penalty, even if it does not undermine or rebut the prosecution's
> death-eligibility case." Williams, 120 S. Ct. at 1516.

15  Lambright v. Stewart, 241 F.3d 1201, 1208 (9th Cir. 2001).  See also Lambright v. Schriro, 490

16  F.3d at 1127 ("Indeed, we have held consistently that even in cases involving particularly heinous

17  murders, a defendant can be prejudiced by an attorney's failure to investigate and present

18  mitigating evidence."); Hovey, 458 F.3d at 930-31 (prejudice found even though the petitioner

19  had been sentenced to death for the brutal kidnapping and murder of an eight year-old girl and the

20  jury that imposed the death penalty heard evidence in aggravation including petitioner's prior

21  conviction for kidnapping another young girl); Summerlin, 427 F.3d at 640-42; Stankewitz v.

22  Woodford, 365 F.3d at 723-725 ("Although the prosecution presented a strong case, we conclude

23  that there was a reasonable probability that the jury would not have sentenced Stankewitz to death

24

_____

25  [35]  The Ninth Circuit has recognized that it is important, in the penalty phase of a capital case, to
    "present evidence necessary to bridge a cultural gap." Caro v. Calderon, 165 F.3d 1223, 1226 (9th
26  Cir. 1999); Siripongs v. Calderon, 35 F.3d 1308, 1316 (9th Cir. 1994). The qualities characteristic
    of Ozark culture that petitioner learned as a child -- stoicism, distrust of authority, disinclination
27  to ask for help, anxiety in large groups, wariness with strangers -- led in part to the difficulties he
    experienced as an adult, including his drug and alcohol dependency, his failure to readjust after
28  combat, and his disinclination to seek help from others. This was important evidence that could
    have impacted the jury's assessment of petitioner's character.

1   had it been presented with the evidence of the numerous deprivations and abuses Stankewitz

2   alleges that he suffered for most of the 19 years he lived prior to the killing."); Douglas, 316 F.3d

3   at 1091 (finding that "[t]he gruesome nature of the killing did not necessarily mean that the death

4   penalty was unavoidable"); Hendricks, 70 F.3d at 1044 (concluding that "despite . . . substantial

5   evidence of aggravation, . . . the failure . . . to present mitigating evidence rendered the sentencing

6   hearing neither fair nor reliable")

7        In assessing the likelihood of whether a proper penalty phase presentation would have

8   rendered a different result, the court must assess petitioner's crime and his responsibility in the

9   context of the evidence adduced in the guilt phase.  Petitioner's co-defendant Madrigal had also

10  stabbed the victim, and the evidence introduced at trial left it unclear as to who ultimately

11  delivered the fatal wound to the victim's throat.  (RT at 3350-3353.)  Moreover, while there was

12  trial testimony from prosecution witnesses that petitioner was the leader of the group, there was

13  competing testimony suggesting that his leadership of those involved was not total.  (RT at 3325,

14  4365.)  Further, all six participants -- including Michelle Cram and Bruce Smith, both of whom

15  received significantly reduced sentences -- agreed to the plan to kill the victim.  (RT at 2980,

16  3320-3326.)  Finally, there was evidence that Robert Coville originally volunteered to commit the

17  murder and was, according to the group's alleged plan, assigned to do the actual killing.  (RT at

18  3027, 3323, 3326.)

19       The prosecutor's argument to the jury at the conclusion of the penalty phase further

20  demonstrates how petitioner was prejudiced by his counsel's ineffective performance.  In his

21  summation the prosecutor scoffed at the defense's presentation of petitioner's service in

22  Vietnam:[36]

23             The only thing they say is in essence . . . that after he came back
              from Viet Nam, he was changed.  Is that so unexpected? Who isn't
24            changed by war?  I may live long enough to stop hearing the Viet
              Nam war blamed for everything from murder to measles.  I don't
25            know.  But is that really an excuse for what Mr. Webster did to
              Charles Burke?  And that's why it's offered.  It's offered as a

26

27   [36]  As noted, that defense penalty phase presentation consisted merely of the conclusory and

28   undeveloped testimony of petitioner's mother and sister that petitioner had "changed" after he
     returned from Vietnam and the unadorned submission into evidence of the certificates reflecting
     petitioner's Bronze Star and Army Commendation Medal.

1                  mitigating factor so that he will not suffer the ultimate penalty.  So
                 that you will not impose the death penalty on him.  And I submit to

2                   you that that's not sufficient.

3  (RT at 5490.)  The undersigned harbors no doubt that the prosecutor would not have made such a

4  denigrating argument had his closing argument followed testimony from Joseph Clock, Thomas

5  Boling, Allen Rozier, Freddie DeVera, Joe West, John Henry Helm and the other Vietnam

6  veterans who were available to testify in the penalty phase as to exactly how they, and petitioner,

7  had been effected by their experiences during the war in Vietnam.

8        With regard to the rest of the exceedingly brief mitigation case presented by petitioner's

9  counsel, the prosecutor argued to the jury as follows:

10                 And then he brings in three family members, his two sisters and his
                 mother. They haven't seen him for eleven years . . . .  They don't

11                 know anything about his life style.  They don't know anything
                 about his friends, they don't know whether or not he's worked

12                 anywhere.  We don't know whether he's ever worked anywhere.

13                                  * * *

14                 I think the significant thing, however, is the fact that both Mr.
                 Webster and Mr. Madrigal in their attempts to put before you

15                 mitigating factors, or people that will come in and say nice things
                 about them, who have they got?  Webster's got three prison

16                 employees and three family members . . . .  Wouldn't you think
                 between them that they'd have somebody from the mainstream of

17                 life that could come in here and say something good about them?
                 Wouldn't you think that there'd be somebody in this world other

18                 than a family member that could come in and say, yeah, he worked
                 for me, he was a good employee, or I knew him, he was a good guy

19                 or something?

20 (RT at 5491-92.)   Again, the undersigned has serious doubt that the prosecution would have

21 made such an argument to a jury that had just heard testimony from Delmer Barks, Geraldine

22 Rogers, Pat Hartmann, Darlene Wickham, Larry Cole, Loyd Morgan, Patsy Helm Dillon,

23 Wendell Crutchfield, or the numerous other witnesses who were not members of petitioner's

24 family, all of whom were available, willing and able to testify that petitioner was once "a good

25 guy" and much more.

26       Here, an adequate mitigation case would have presented the jury with a full social history

27 of petitioner.  Such a presentation would have explained to the jury why petitioner, raised in

28 isolating poverty, was particularly vulnerable to the effects of combat and predisposed to drug

1    and alcohol dependence.  An adequate defense penalty phase presentation would have likely

2    lessened petitioner's moral culpability in the eyes of the jury by explaining to them who he was

3    and how he came to be homeless, desperate and destitute on the banks of the American River.

4         In short, the jury that voted for petitioner to be sentenced to death did so without an

5    adequate understanding of the nature of his life up to the point of the murder for which they had

6    convicted him and without exposure to the substantial mitigating evidence that may well have

7    caused them to reach a different penalty phase verdict.  The evidence of prejudice stemming from

8    trial counsel's ineffective assistance in connection with the penalty phase trial that has been

9    submitted to this court is therefore sufficient to "undermine confidence" in the jury's verdict.  The

10   aggravating evidence presented was not so great as to sweep aside the compelling mitigating

11   evidence, nor was it so great as to compel the conclusion that a jury would not have sentenced

12   petitioner to life without the possibility of parole had they been presented with the available

13   mitigation evidence.  For these reasons the undersigned finds that "[h]ad the jury been able to

14   place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable

15   probability that at least one juror would have struck a different balance." Wiggins, 539 U.S. at

16   537.  See also Stankewitz v. Wong, 698 F.3d at 1175 (quoting Wiggins); Hamilton, 583 F.3d at

17   1134; Karis, 283 F.3d at 1140 ("A 'reasonable probability' exists that a jury would find this

18   information important in understanding the root of [petitioner's] criminal behavior and his

19   culpability.")

20        Accordingly, the undersigned will recommend that petitioner be granted federal habeas

21   relief with respect to his claim that he was denied the effective assistance of counsel at the penalty

22   phase of his trial in violation of his rights under the Sixth Amendment.

23        B.  Denial of Meaningful Appellate Review in Violation of the Eighth Amendment

24        In his Claim 7, petitioner argues that when his conviction and sentence became final in

25   1992,[37] a majority of the justices on the California Supreme Court were so predisposed to affirm

26

27   _____

[37]  The California Supreme Court handed down its decision on petitioner's direct appeal on
August 30, 1991, and denied his motion for rehearing on November 20, 1991.  Petitioner's
28   judgment of conviction and sentence became final when the United States Supreme Court denied
the petition for writ of certiorari on April 27, 1992.  See Webster v. California, 503 U.S. 1009
(1992); see also In re Pine, 66 Cal. App. 3d 593, 595 (1977) (holding "[t]he finality of a judgment

1   death sentences that he was deprived of "meaningful appellate review" with respect to his

2   conviction and sentence.  He contends that California's judicial retention election of 1986, which

3   occurred while his appeal was pending, "dramatically change[d] the way that death penalty cases

4   were decided."  (Pet. Brief re Claim 7 (Dkt. No. 431) at 13.)  Petitioner asserts that "[i]n the

5   aftermath of the judicial retention election . . . the California Supreme Court failed in its statutory

6   and constitutional duty to review capital appeals, and petitioner was therefore denied this

7   necessary element of a death penalty system [that complies] with the Eighth Amendment."  (Id. at

8   25.)

9          In support of his claim, petitioner provides a short history of the political environment that

10  he says "conspired to create a high court in California that produced affirmances in death penalty

11  cases without a proper, careful, appellate review of the errors alleged."  (Id. at 26.)  What follows

12  is petitioner's characterization of events and the court makes no finding and expresses no opinion

13  as to its accuracy but does take judicial notice of the reports from that era that support petitioner's

14  historical premise.  Specifically, petitioner argues as follows.  The California Supreme Court

15  under former Chief Justice Rose Bird – "the Bird Court" – was considered by pro-capital

16  punishment advocates to harbor a "pronounced antipathy toward the death penalty."[38]  (Id. at

17  10.)  Those in favor of capital punishment formulated a state-wide political "strategy. . . not just

18  to remove the justices who had supposedly refused to implement the death penalty, but to also

19  replace them with justices who would."  (Id.)  Governor George Deukmejian, who was running

20  for re-election in 1986, allied himself with the pro-capital punishment movement.  He

21  campaigned for the "restoration of the death penalty" and "attack[ed]" the justices who were

22  _____

23  has been defined as that point at which the courts can no longer provide a remedy on direct
    review.  This includes the time within which to petition the United State Supreme Court for writ
24  of certiorari").

25  [38]  This description appeared in a "White Paper" issued by the California District Attorneys'
    Association (CDAA) in 1985.  (See Pet. Brief re Claim 7 (Dkt. No. 431) at 10.)  Petitioner
26  represents that "[t]he District Attorney of Sacramento County, the government entity that had
    successfully convinced a jury to sentence Mr. Webster to death, was on the Board of Directors for
27  the CDAA."  (Id.)  Later in his argument, petitioner notes that "this is the same entity . . . that
    sought to win the appeal that was [at the time of the election] pending before the California
28  Supreme Court."  (Id. at 12.)

1    perceived as opposing it.  (Id. at 9.)  In the end, three justices on the Bird Court, including Chief

2    Justice Bird, were defeated at the polls in November 1986.  Governor Deukmejian was re-elected,

3    giving him the responsibility – and the prerogative – of immediately replacing the three outgoing

4    judges.[39]  He also elevated Justice Malcolm Lucas, who was perceived as a pro-capital

5    punishment justice and had retained his position on the court in the election, to Chief Justice, thus

6    creating the new "Lucas Court."  (Id. at 13.)

7           Petitioner contends that the Lucas Court reviewed capital cases very differently than did

8    the Bird Court.  "A [California Supreme Court] which had scrutinized capital judgments and

9    reversed almost every death sentence that came before it was altered completely to a court which

10   adopted a review process that resulted in an extremely high affirmance rate based upon a much

11   more forgiving attitude toward trial-court error."[40]  (Id.)  This new approach, argues petitioner,

12   violated the already existing mandate that a state's capital sentencing system, to be constitutional,

13   must narrow the category of cases in which the death penalty is appropriate and provide for

14   "special" scrutiny of death sentences through "meaningful appellate review."  (Id. at 26.)  By the

15   time his appeal was submitted for decision to the Lucas Court, petitioner says,

16                  there was no special appellate review, no attempt to use the
                    appellate review process to assure a rational, non-arbitrary death
17                  penalty system, no allegiance to Eighth Amendment requirements
                    to reduce the risk of capriciousness.  Like the state court in Parker
18                  v. Dugger, [498 U.S. 308 (1991),] "there is a sense in which the
                    court did not review [petitioner's] sentence at all."
19

20   (Id.)

21                        1.  Whether this claim is barred under Teague v. Lane

22           Respondent counters this claim first by asserting that "there is no free-standing Eighth

23   Amendment right to 'meaningful appellate review' as Petitioner implies."  (Respondent's Opp'n

24   _____

25   [39] "The initial three replacement justices served for only two to three years before they were
     replaced themselves by three more Governor Deukmejian appointees[.]"  (Id. at 13.)

26

27   [40] In his second amended petition filed with this court, petitioner cites the following statistics on
     the Lucas Court's affirmance rates in appeals from death sentences, as reported by the California
     Appellate Project:  "Between July 1987 and December 1994, the California Supreme Court
28   affirmed 84% of death penalty cases.  Between 1990 and 1994 the affirmance rate was 94%.  In
     [1995 and 1996] it has affirmed 100% of the death judgments before it."  (Dkt. No. 73 at 52.)

1    re Claim 7 (Dkt. No. 438) at 17.)   Respondent also invokes the holding in Teague v. Lane, 489

2    U.S. 288 (1989), to argue that even if this court recognizes "meaningful appellate review" as a

3    constitutional requirement in capital cases, that finding would create a new rule of criminal

4    procedure that cannot be retroactively applied to this habeas petition.  In short, respondent argues

5    that petitioner's claim that he was denied meaningful appellate review is Teague-barred.

6         Under Teague, "'old' rules of criminal procedure apply 'both on direct and collateral

7    review, but a new rule is generally applicable only to cases that are still on direct review.'"

8    Butler v. Curry, 528 F.3d 624, 633 (9th Cir.) (quoting Whorton v. Bockting, 549 U.S. 406, 416

9    (2007)).  "A holding constitutes a 'new rule' within the meaning of Teague if it 'breaks new

10   ground,' 'imposes a new obligation on the States or the Federal Government,' or was not

11   'dictated by precedent existing at the time the defendant's conviction became final.'"  Graham v.

12   Collins, 506 U.S. 461, 467 (1993) (quoting Teague, 489 U.S. at 301).  See also Butler v.

13   McKellar, 494 U.S. 407, 412 (1990).  Any "new" rule that emerges after a prisoner's conviction

14   is final cannot be retroactively applied on collateral review unless that rule was already dictated

15   by precedent as of the date the conviction became final.  Teague, 489 U.S. at 301

16        "When a State raises the issue of retroactivity, 'federal habeas courts must apply Teague

17   before considering the merits' of the claim."  Butler, 528 F.3d at 633 (quoting Beard v. Banks,

18   542 U.S. 406, 412 (2004)).  "[T]he Teague non-retroactivity principle is . . . an affirmative

19   defense that must be raised by the state."  Thompson v. Runnels, 705 F.3d 1089, 1099 (9th Cir.)

20   (citing Caspari v. Bohlen, 510 U.S. 383, 389 (1994)), cert. denied, ___U.S.___, 134 S. Ct. 234

21   (2013.  See also Divens v. Giurbino, No. CV 06-786 GAF (FFM), 2009 WL 3208673, at *4 n.4

22   (C.D. Cal. Oct. 4, 2009) ("The Teague-bar is an affirmative defense.  As with any affirmative

23   defense, the party seeking to invoke it bears the burden of proving that it applies to their case.")

24   (citing Schiro v. Farley, 510 U.S. 222, 228 (1994)).  Applying Teague requires three steps:

25             First, the court must ascertain the date on which the defendant's
          conviction and sentence became final for Teague purposes.
26        Second, the court must "[s]urvey the legal landscape as it then
          existed" and "determine whether a state court considering [the
27        defendant's] claim at the time his conviction became final would
          have felt compelled by existing precedent to conclude that the rule
28        [he] seeks was required by the Constitution."  Finally, even if the
          court determines that the defendant seeks the benefit of a new rule,

70

the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle.

Caspari, 510 U.S. at 390 (citations omitted).[41]

Petitioner's judgment of conviction and death sentence became final when the U.S. Supreme Court denied his petition for writ of certiorari on April 27, 1992. See fn. 37, above. By that time, the Supreme Court had used the recognizable language of its Eighth Amendment death penalty jurisprudence to affirm – and reaffirm – the indispensable role of "meaningful appellate review" in capital cases. In 1991, the Supreme Court said it had "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." Parker v. Dugger, 498 U.S. 308, 321 (1991) (citing Clemons v. Mississippi, 494 U.S. 738, 749 (1990) and Gregg v. Georgia, 428 U.S. 153 (1976)). Two years earlier, the Supreme Court contrasted the lack of any due process guarantee to appeal a non-capital criminal conviction[42] with

> [t]he unique nature of the death penalty[, which] not only necessitates additional protections during pretrial, guilt, and sentencing phases, but also enhances the importance of the appellate process. Generally there is no constitutional right to appeal a conviction. "[M]eaningful appellate review" in capital cases, however, "serves as a check against the random or arbitrary imposition of the death penalty." It is therefore an integral component of a State's "constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."

Murray v. Giarratano, 492 U.S. 1, 22-23 (1989) (quoting Gregg, 428 U.S. at 195 (opinion of Stewart, Powell and Stevens, JJ.) and Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (citation omitted)). The difference explained in Murray is, among other things, categorical: the Eighth

---

[41] The two exceptions to Teague's non-retroactivity principle are: (1) when the new rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," Teague v. Lane, 489 U.S. 288, 290 (1989); or (2) when the new rule represents a "watershed . . . of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Whorton v. Bockting, 549 U.S. 406, 416 (2007). Petitioner does not argue that either applies here. Therefore, the court need not address them.

[42] See, e.g., Halbert v. Michigan, 545 U.S. 605, 610 (2005) ("The Federal Constitution imposes on the States no obligation to provide appellate review of criminal convictions.") (citing McKane v. Durston, 153 U.S. 684, 687 (1894)).

71

1    Amendment's prohibition against arbitrary and capricious executions, and not just the Fourteenth

2    Amendment's Due Process Clause, is at stake when a criminal defendant is sentenced to death.

3    Under the Eighth Amendment, "some form of meaningful appellate review is constitutionally

4    required" in a capital case.  Pulley v. Harris, 465 U.S. 37, 54 (1984) (Stevens, J., concurring).

5    See also Zant v. Stephens, 462 U.S. 862, 890 (1983) (explaining that "[o]ur decision in this case

6    depends in part on an important procedural safeguard, the mandatory appellate review of each

7    death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure

8    proportionality"); Barclay v. Florida, 463 U.S. 939, 953-54 (1983) (upholding Florida's capital

9    punishment statutory scheme in part because "meaningful appellate review of each such sentence

10   is made possible"); Clemons, 494 U.S. at 749 (stating in 1990 that "this court has repeatedly

11   emphasized that meaningful appellate review of death sentences promotes reliability and

12   consistency").

13         By April 27, 1992, the legal landscape clearly included meaningful appellate review as an

14   "integral," Murray, 492 U.S. at 23, and "crucial," Parker, 498 U.S. at 321, feature of a

15   constitutional capital sentencing regime.  To the extent, therefore, that respondent contends

16   petitioner's claim is Teague-barred because he seeks the retroactive benefit of a newly announced

17   Eighth Amendment requirement calling for "meaningful appellate review," that contention is

18   wrong, as a matter of law.  That requirement was well established by decisions rendered in capital

19   cases by the time petitioner's death sentence became final.  Petitioner's Claim 7 is therefore not

20   Teague-barred.

21                     a.  Whether petitioner's claim over-extends "meaningful appellate review"

22         Respondent argues alternatively that even if meaningful appellate review was required

23   under the Eighth Amendment when petitioner was convicted, granting relief on this claim would

24   so extend the meaning of "meaningful appellate review" that it would, in effect, create a new

25   constitutional rule that cannot be retroactively enforced under Teague.  Respondent's argument

26   correctly recognizes that the central question under Teague remains claim-specific.  That is, even

27   though it is clear that meaningful appellate review had already been established as a constitutional

28   requirement by the time petitioner was convicted, "it is necessary to inquire whether granting the

72

1    relief sought would create a new rule because the prior decision [would be] applied in a novel

2    setting, thereby extending the precedent."  Stringer v. Black, 503 U.S. 222, 228 (1992).  See also

3    Wright v. West, 505 U.S. 277, 307 (1992).  The burden of being specific is, as usual, on the party

4    pleading the claim.  It is true enough to say, as petitioner does, that "[t]he purpose of meaningful

5    appellate review is to guard against arbitrariness and irrationality in the administration of the

6    death penalty" and that "[b]y so doing, meaningful appellate review promotes 'reliability and

7    consistency.'" (Pet. Reply (Dkt. No. 440) at 5.)  However, that only repeats the standards by

8    which the particulars of any capital punishment system are assessed under the Eighth

9    Amendment.  Petitioner cannot rest on the pre-existence of those broad purposes in "meaningful

10    appellate review," assert that he did not receive meaningful review and leave it at that.  On the

11    other hand, petitioner need not show that every conceivable implication of his claim had already

12    been adjudicated in other cases before his judgment of conviction became final.  This is because

13    "Teague does not . . . require a habeas petitioner to show that the Supreme Court has decided a

14    case involving identical facts, circumstances and legal issues."  Butler, 528 F.3d at 634.

15        This inquiry is particularly problematic here because the contours of "meaningful

16    appellate review" have not, even now, been fully defined by the courts and because petitioner is

17    somewhat imprecise in identifying just how the appellate review that he received was not

18    meaningful.  To the former point, petitioner contends that the constitutional necessity of

19    meaningful appellate review in capital cases "means that the appellate process must be careful,

20    measured and special, an important and necessary tool in minimizing the risk of irrational

21    imposition of the death penalty."  (Pet. Brief re Claim 7 (Dkt. No. 431) at 26.)  Respondent

22    objects to petitioner's inclusion of the term "special" into the definition of "meaningful appellate

23    review,"  insisting that "appellate review need not take any particular form; it is enough that

24    'some sort of prompt and automatic appellate review' be available."  (Opp'n (Dkt. No. 438) at 18

25    (quoting Pulley, 465 U.S. at 50-51)).  Respondent also objects that no legal precedent allows

26    petitioner to insert the politics of capital punishment and the California Supreme Court's

27    supposed response to popular will as the basis of an Eighth Amendment claim.  Respondent

28    contends that "it [cannot] be said that the state court would have felt 'compelled by existing

1    precedent to conclude' that the Constitution required it to find that it was inconsistent with the

2    Eighth Amendment for California Supreme Court justices to be accountable to the voters and

3    subject to retention at the voters' will." (Id. at 19) (citation omitted). Respondent argues that

4    these two objectionable elements sit at the core of petitioner's claim and render it Teague-barred

5    because, in order to prevail, "[p]etitioner must persuade this Court to rule (1) that meaningful

6    appellate review is not possible if judges are subject to political influence, and (2) that the Eighth

7    Amendment required 'special' review." (Id. at 17.)

8         The undersigned does not read petitioner's claim as seeking a broad declaration that all

9    appellate judges who are "subject to political influence" – i.e., elected or subject to retention

10   elections – are incapable of providing meaningful appellate review in a capital case. That is an

11   overbroad characterization of petitioner's claim, but it is not an unreasonable one:  petitioner

12   clearly takes the position that the pro-death penalty environment of the 1986 retention election

13   created a politicized California Supreme Court that "abandoned the use of appellate review as a

14   way of achieving reliable death sentences." (Pet. Brief re Claim 7 (Dkt. No. 431) at 25.)

15   Petitioner adds that this "abandonment" was borne not of the Lucas Court's restrictive

16   interpretation of the Eighth Amendment but of the collective self-interest of a majority of the

17   justices. He alleges that "[a]s the retention election of 1986 proved, for a California Supreme

18   Court justice to keep his or her job, death sentences must be affirmed." (Pet. (Dkt. No. 73) at 54.)

19   Taken alone, petitioner's bald statement that "[t]he political system simply does not permit [the

20   California Supreme Court] to be fair and impartial" (id.) would seem to implicate and seek to

21   invalidate the longstanding practice of electing state court judges in California. However, taken

22   in the context of his entire argument, it is clear that petitioner means to focus only on the

23   California Supreme Court that decided his case in 1992. Despite the grievance against the alleged

24   influence of state politics on judicial decision-making that permeates petitioner's argument, he

25   stops short of demanding that this court accept that grievance as the basis of a constitutional

26   violation. Instead, petitioner asserts that

27              whether or not the Lucas Court was biased against capital
             defendants is not the essence of this issue . . . . [W]hatever the
28           motivation, the Eighth Amendment violation lies in the appellate
             court's treatment of petitioner's appeal as no different than the way

74

1    an intermediate appellate court treats a regular appeal.

2  (Pet. Brief re Claim 7 (Dkt. No. 431) at 26.)[43]

3       Still, petitioner's complaint that he received only the review that a non-capital defendant

4  in an intermediate appellate court might have received does not guide this federal habeas court to

5  the specific legal ruling and factual finding that petitioner needs in order to win relief on this

6  claim.  Petitioner's employment of the word "special" does not aid in the inquiry:  it adds nothing

7  to the standard that the Supreme Court had already articulated when petitioner's conviction

8  became final – that is,

9
10
> meaningful appellate review requires that the appellate court
> consider the defendant's actual record.  "What is important ... is an
> individualized determination on the basis of the character of the
> individual and the circumstances of the crime."

11

12  Parker, 498 U.S. at 321 (quoting Zant, 462 U.S. at 879).

13       The vagueness of the term "special" as used by petitioner in this claim does not mean that

14  claim for relief fails, however.  The gravamen of his claim lies in the only specific description of

15  the Lucas Court's allegedly unconstitutional practice in deciding appeals in capital cases, i.e., its

16  supposedly "'extraordinary tolerance for error' in the penalty phase" in which, according to

17  petitioner, "the Lucas Court relied excessively and repetitively on the harmless error doctrine to

18  avoid reversing death sentences."  (Pet. Brief re Claim 7 (Dkt. No. 431) at 25.)[44]

19       Indeed, most of petitioner's expert evidence analyzing the Lucas Court's record in capital

20  appeals directly informs his articulation of his claim that the Lucas Court violated the Eighth

21  Amendment by misusing the harmless error doctrine in its allegedly "result driven" method of

22  reviewing capital cases.  These experts better explain what petitioner means in arguing that "the

---

23  [43]  By discounting the "motivation" of the Lucas Court as "the essence of this issue," petitioner
24  also dissociates his "meaningful appellate review" claim from his petition's initial assertion that,
following the 1986 retention election, California Supreme Court justices have a "financial
25  interest" in ruling against death row appellants because doing so helps those justices stay in
office.  (Pet. (Dkt. No. 73) at 54.)

26
27  [44]  Petitioner adopts the phrase "extraordinary tolerance for error" verbatim from one of his
experts' reports, a study performed by Professor John W. Poulos (see Poulos Decl., Ex. 47 (Dkt.
28  No. 377-1) at 16), on which petitioner relies to declare that "[t]he use of the harmless error
doctrine to affirm cases was rampant in the Lucas Court['s] first year opinions."  (Pet. Brief re
Claim 7 (Dkt. No. 431) at 15.)

Eighth Amendment violation lies in the appellate court's treatment of petitioner's appeal as no different than the way an intermediate appellate court treats a regular appeal." (Pet. Brief re Claim 7 (Dkt. No. 421) at 26.)  For example, petitioner cites a law review article by Professor Gerald Uelmen, who, two years after the Lucas Court was seated -- and thus before it decided petitioner's appeal -- contended that the new California Supreme Court

> approaches the review of death penalty cases very much like intermediate appellate courts approach the review of ordinary criminal cases.  The process closely matches the process described in a classic study of criminal appeals[:]  "The court approached its work from a perspective that is noninterventionist, nonsupervisory, and conflict avoiding.  Its decision process accentuates the value of finality and is strongly inclined toward affirmance."  That study noted that a high rate of affirmance in criminal appeals reflected basic institutional norms and perspectives.

(Uelmen Article, Ex. 129 (Dkt. No. 368-4) at 3.)[45]  Professor Uelmen's study concludes that "[i]n the Lucas Court, the basic norms of appellate review [became] norms of affirmance."  (Id. at 56.) Furthermore, an article by C. Elliot Kessler submitted by petitioner pointedly finds that the Lucas Court employed the harmless error doctrine for the unconstitutional purpose of "recogniz[ing] no distinction between the weighing of aggravating and mitigating circumstances in a capital case[.]" (Kessler Article, Ex. 130 (Dkt. 368-5) at 45.)[46]  And the most exhaustive report included within the evidence submitted by petitioner, Professor Sam Kamin's study of the Lucas Court's entire nine years of deciding capital case appeals, expressly confirms Professor Uelmen's "intermediate court" analogy.  (Kamin Decl., Ex. 46 (Dkt. No. 367-2) at 52-53.)  As petitioner explains it:

> Professor Kamin concluded that the Lucas Court used the harmless error doctrine as its primary technique to affirm capital appeals . . . . [T]he Lucas Court avoided rule making – trying to define the dimensions of Constitutional law – and instead emphasized its role in capital appeals as simply a search for prejudicial error.  And with the threshold for error impossibly high, this approach was "designed to facilitate the affirmance of death sentences rather than the supervision of trial courts."

---

[45]  Gerald F. Uelmen, Review of Death Penalty Judgments by the Supreme Courts of California: A Tale of Two Courts, 23 Loy. L. Rev. 237 (1989) (quoting Thomas Y. Davies, "Affirmed: A Study of Criminal Appeals and Decision-Making Norms in California Courts of Appeal," 1982 Am.B. Found. Res.J. 543, 612 (1982)).

[46]  C. Elliot Kessler, Death and Harmlessness: Application of the Harmless Error Rule by the Bird and Lucas Courts in Death Penalty Cases - A Comparison & Critique," 26 U.S.F. L. Rev. 41 (1991).

1   (Pet. Brief re Claim 7 (Dkt. No. 431) at 18 (quoting Kamin Decl. at 52).)

2          Petitioner builds on these experts' analyses and their terminology to render his clearest

3   articulation of his claim and what his evidence shows:

> Turning to the record before the Court in this case, petitioner has
> demonstrated that Mr. Webster received no meaningful appellate
> review.  In the aftermath of the judicial retention election of 1986,
> the California Supreme Court failed in its statutory and
> constitutional duty to review capital appeals, and petitioner was
> therefore denied this necessary element of a death penalty system
> complying with the Eighth Amendment.
>
> The authorities and evidence presented to this Court show that, as a
> result of the retention election, the Lucas Court simply stopped
> scrutinizing issues in capital appeals.  The court's approach was
> purposefully noninterventionist, intentionally laissez faire.  With an
> "extraordinary tolerance for error" in the penalty phase, the Lucas
> Court relied excessively and repetitively on the harmless error
> doctrine to avoid reversing death sentences.  Such opinions were
> result driven, contained little in the way of analysis, and constituted
> illegitimate decision making.

13  (Pet. Brief re Claim 7 (Dkt. No. 431) at 25.)

14          In light of the nature of petitioner's arguments and supporting evidence, the undersigned

15  finds that in order to be entitled to relief on a claim that he was deprived meaningful appellate

16  review by the state courts, petitioner in this case must establish each of the following three

17  elements:  (1) that at the time petitioner's conviction became final the California Supreme Court's

18  alleged "noninterventionist" practice of appellate review that "relied excessively and repetitively

19  on the harmless error doctrine to avoid reversing death sentences," if true, violated the Eighth

20  Amendment; (2) that the Lucas Court systematically applied the doctrine of harmless error for the

21  pre-determined purpose of avoiding the reversal of death sentences; and (3) that petitioner was

22  one of the capital case defendants who was denied meaningful appellate review in the Lucas

23  Court's unconstitutional method of looking for harmless error in order to affirm death sentences

24  in such cases.  Below, the undersigned will address petitioner's showing with respect to each of

25  these three elements.[47]

26

_____

27  [47] Again, the question the court must ask under Teague is whether, at the time his conviction and
    sentence became final, granting petitioner's claim on these terms would have so extended the
28  existing precedent on meaningful appellate review as to announce an entirely new constitutional
    rule.  If it would, the claim is Teague-barred.  See Stringer v. Black, 503 U.S. 222, 228 (1992).

1    b. Mechanical application of harmless error as a constitutional violation

2         In Clemons v. Mississippi, 494 U.S. 738 (1990), a case decided more than two years

3    before petitioner's conviction became final, the Supreme Court upheld the Mississippi Supreme

4    Court's practice of "reweighing" on appeal the mitigating and aggravating factors that were

5    presented to a jury during the penalty phase of the trial in a capital prosecution.[48]  The Supreme

6    Court made it clear, however, that meaningful appellate review required the Mississippi court to

7    carry out its reweighing duty conscientiously and barred it from using a pro forma analysis that

8    would deprive a capital defendant of the second look that appellate review is meant to ensure.

9    The Court said that

10        [a]n automatic rule of affirmance in a weighing State would be
          invalid . . . for it would not give defendants the individualized
11        treatment that would result from actual reweighing of the mix of
          mitigating and aggravating circumstances.
12

13   Clemons, 494 U.S. at 752.  In so ruling, the Supreme Court relied in part on its plurality opinion

14   in Barclay v. Florida, in which the Court surveyed prior appellate decisions in Florida capital

15   cases and concluded that "'the Florida Supreme Court does not apply its harmless error analysis

16   in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this

17   analysis only when it actually finds that the error is harmless.'"  Clemons, 494 U.S. at 752

18   (quoting Barclay, 463 U.S. at 958 (plurality opinion)).  As did the Supreme Court in Clemons, the

19   Barclay plurality re-emphasized the importance of "'an individualized determination on the basis

20   of the character of the individual and the circumstances of the crime.'"  Barclay, 494 U.S. at 958

21   (quoting Zant, 462 U.S. at 879).

22        The plurality's discussion of the proper role of the harmless error doctrine in Barclay and

23   the majority's ratification of that plurality opinion in Clemons would have compelled a ruling in

24   1992, when petitioner's judgment of conviction became final, that systematic invocation of the

25   harmless error doctrine to evade individualized appellate review of death sentences violates the

26

27   _____

     [48]  Like California, Mississippi has been a "weighing State" in its capital punishment process for
28   most of the post-Furman era.  In a weighing state, "the finding of aggravating factors is part of the
     jury's sentencing determination, and the jury is required to weigh any mitigating factors against
     the aggravating circumstances."  Clemons v. Mississippi, 494 U.S. 738, 745 (1990).

1  Eighth Amendment.  In light of that authority and its timing, the undersigned finds that

2  petitioner's allegation that the Lucas Court "relied excessively and repetitively on the harmless

3  error doctrine to avoid reversing death sentences" in violation of the Eighth Amendment would

4  not, if proved and accepted as the basis of habeas relief in this case, extend the definition of

5  meaningful appellate review so far that it would constitute a new rule.  On that first element then,

6  the undersigned concludes that petitioner's meaningful appellate review claim is not <u>Teague</u>-

7  barred.

8            c.  <u>Application of the harmless error doctrine in deciding petitioner's</u>

9               <u>appeal</u>

10        The proper procedure for analyzing whether the Lucas Court misapplied harmless error

11  review "in an automatic or mechanical fashion," <u>Barclay</u>, 463 U.S. at 958, is not entirely clear.

12  As noted above, the <u>Barclay</u> plurality opinion surveyed the Florida Supreme Court's post-<u>Furman</u>

13  record in capital appeals, but if there is a quantum for determining at what point an appellate

14  court's practice of applying the harmless error doctrine becomes unconstitutional – that is, for

15  determining whether the second element enumerated above is met -- the <u>Barclay</u> plurality opinion

16  left it unsaid.  However, the court need not divine the precise standard to be used in assessing

17  such a claim because there is no evidence before the court that this petitioner was one of the

18  defendants subjected to the Lucas Court's supposed misuse of the harmless error doctrine.

19        Even assuming the Lucas Court put into effect an unconstitutional method of appellate

20  review, it remains incumbent on petitioner to demonstrate how that violation manifested itself in

21  <u>his</u> direct appeal.  Petitioner has not made that showing.  Instead, petitioner's argument contains

22  only a cursory discussion of the California Supreme Court's decision affirming his judgment of

23  conviction on appeal.  Specifically, he takes issue with the California Supreme Court's affirmance

24  of the two special circumstances that made him death-eligible – <u>i.e.</u>, murder in the commission of

25  a robbery and murder while lying in wait.  Notably, however, the California Supreme Court did

26  not apply a harmless error analysis to those crucial issues when it upheld petitioner's judgment of

27  conviction and sentence.  <u>See</u> <u>People v. Webster</u>, 54 Cal.3d 411, 439-44, 448-50 (1991).  Rather,

28  it examined the sufficiency of the evidence as to the two special circumstances underpinning

1    petitioner's death sentence and found no error in that regard on either one.  Id.

2            This disconnect between petitioner's legal theory of his claim and the actual appellate

3    review he received results in an unpersuasive presentation of "evidence" in support of the claim

4    in this case.  Rather than take up the California Supreme Court's analysis on its own terms,

5    petitioner submits Professor Poulos's deposition testimony and opinion that the Lucas Court's

6    analyses of the two aggravating circumstances supporting petitioner's sentence were examples of

7    the court's "improper decision making."  (Pet. Brief re Claim 7 (Dkt. No. 431) at 21.)  But

8    Professor Poulos does not, as he cannot, assert that the analyses of the two aggravating

9    circumstances were examples of the court's practice of relying "excessively and repetitively on

10   the harmless error doctrine to avoid reversing death sentences," which is the essence of

11   petitioner's claim in this federal habeas proceeding.  (Id. at 25.)  Instead, Professor Poulos

12   testified that the California Supreme Court "manipulated the law regarding the concept of lying in

13   wait" and "expand[ed] the scope of the robbery concept 'for death penalty reasons.'"  (Id. at 21

14   (quoting Poulos Depo. (Dkt. No. 428) at 72-74, 82-85).)  According to Poulos, these two rulings

15   "mark[ed] a new tool for the Lucas Court" in which it expanded the definitions of the underlying

16   crimes in ways that "fly in the face of the history of the common law[.]"  (Poulos Depo. at 72-73.)

17   Neither Professor Poulos nor petitioner's counsel is specific about how that "tool" was used again

18   in a capital case, if it ever was.  In any event, Professor Poulos' opinion about the Lucas Court

19   brandishing its "new tool" in connection with petitioner's appeal is of little moment, for it is

20   inapposite to the claim that petitioner sets out for himself to prove, that in his case the Lucas

21   Court's existing machinery of finding harmless error produced the affirmance of a death penalty

22   conviction indicative of meaningless appellate review.[49]

23   /////

_____

24   [49]  The undersigned notes that when an expert's opinion takes the form of legal interpretation or
25   outright application of law to fact, it crosses into the forbidden category of an inadmissible legal
     conclusion.  See CFM Communications, LLC v. Mitts Telecasting Co., 424 F. Supp. 2d 1229,
26   1235-36 (E.D. Cal. 2005) (excluding an expert's report from evidence because it "read[s] like a
     legal brief" and "[t]he Court is perfectly able to review. . . decisions and regulations to decide
27   how the law applies to the present facts"); Smith v. Pacific Bell Telephone Co., Inc., 649 F. Supp.
     2d 1073, 1089 (E.D. Cal. 2009) (citations omitted) ("Testimony in the form of a legal conclusion
28   is an inappropriate matter for expert testimony.")  Because respondent raises no objection to
     Professor Poulos' opinion testimony on that ground, the court will not rule on its admissibility.

1    Professor Poulos' assertion that the California Supreme Court's decision affirming

2    petitioner's judgment of conviction contains a "new tool" is also contrary to the law of this case.

3    The Ninth Circuit previously reversed this court's decision that in upholding petitioner's sentence

4    the California Supreme Court retroactively expanded the construction of robbery and lying in

5    wait so radically that it violated the Ex Post Facto Clause under the holding in Bouie v. City of

6    Columbia, 378 U.S. 347 (1964).[50]  See Webster, 369 F.3d at 1070-1075.  Even granting Professor

7    Poulos his description of the Lucas Court's rulings on robbery and lying in wait as an expansive,

8    "new tool," it is the law of this case that those rulings were not so expansive and new that they

9    violated the constitutional prohibition on retroactive punishments.

10    Petitioner does not focus his meaningful appellate review claim on any other specific

11    issues that were decided in his appeal.  Accordingly, this court need not express any opinion, nor

12    make any finding, as to the constitutional validity of the Lucas Court's prevailing use of the

13    doctrine of harmless error when petitioner's appeal came before it.  Regardless of how the Lucas

14    Court was applying the harmless error doctrine in reviewing other capital convictions, in this case

15    the question simply does not obtain.

16    2. Conclusion

17    For all the reasons set forth above, the undersigned finds that the legal basis underlying

18    petitioner's claim that the California courts denied him constitutionally required meaningful

19    appellate review by mechanically applying the harmless error doctrine to avoid reversal of capital

20    convictions – is not Teague-barred.  However, the undersigned further finds that there is no

21    evidence before this court that petitioner suffered a constitutional violation of that sort.

22    Accordingly, it will be recommended that federal habeas relief be denied with respect to this

23    claim.

24    /////

25    /////

26

27    ───────────────────

28    [50]  In that case the Supreme Court held that "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect."  Bouie, 378 U.S. at 354.

1    C.  <u>California's Statutory Scheme Fails to Adequately Narrow Application of the Death Penalty</u>

2

3    In his Claim 2, petitioner argues that California's capital sentencing scheme failed to

4    adequately narrow the class of persons eligible for the death penalty in violation of the Eighth

5    Amendment ban on arbitrary and capricious sentencing.  With respect to this claim, the parties

6    filed points and authorities, along with evidence in the form of transcripts of in-court testimony,

7    depositions in lieu of in-court testimony, declarations and exhibits.[51]

8    As noted above, petitioner was tried and sentenced in 1983, for crimes committed in 1981,

9    under California's 1978 death penalty statute.[52]  In California under that statutory scheme, a

10   defendant was eligible for the death penalty or for a sentence of life in prison without the

11   possibility of parole if a jury convicted him of first degree murder and found at least one special

12   circumstance.[53]  Cal. Penal Code §§ 190.1, 190.2, 190.4.  If a prosecutor decided to seek the death

13   penalty, a second trial was held to determine whether a death-eligible defendant should be

14   sentenced to death or life without the possibility of parole.  Id. § 190.4(a).  At the time of

15   petitioner's trial, California had twenty-seven special circumstances.  Id. § 190.2.[54]  Petitioner

16   _____

17   [51]  As anticipated, petitioner submitted transcripts of testimony taken in Ashmus v. Ayers, No. 93
18   cv 00594 (N.D. Cal.).  (Dkt. Nos. 135, 138, 154, and 155.)  In addition, petitioner has submitted
     exhibits 134, 136, 137, 139-144 (Dkt. Nos. 442-445); and exhibits 149-153 (Dkt. No. 458).
     Petitioner states that his exhibits 149 and 150 supersede previously filed exhibits 145, 146, 147,
19   and 148.  (See Dkt. No. 472 at 2-3.)  Respondent has submitted exhibits A and B.  (Dkt. No.,
     449.)  Petitioner has also filed an Index to the Evidence which lists each exhibit and its location
20   on the docket.  (Dkt. No. 472.)  For ease of reference, exhibits referred to herein are identified by
21   their title and docket number.

22   [52]  Appendix A to petitioner's opening brief regarding the narrowing claim is the 1978 version of
     the relevant code sections.  (Dkt. No. 473-1.)
23

24   [53]  The jury in petitioner's case found that two special circumstances had been established:  (1)
     murder committed while the defendant was engaged in the commission of, or attempted
25   commission of, a robbery; and (2) "the defendant intentionally killed with victim while lying in
     wait."  People v. Webster, 54 Cal. 3d at 423.
26

27   [54]  That provision listed nineteen separately numbered special circumstances encompassing
     twenty-seven distinct categories.  However, special circumstance (a)(14), for a murder that "was
28   especially heinous, atrocious, or cruel," was found unconstitutionally vague in 1990.  People v.
     Sanders, 51 Cal. 3d 471 (1990).   The current version of Penal Code § 190.2 lists thirty-three
     distinct categories of special circumstances.

1    argues that those special circumstances are so numerous and so broad that at least one can be

2    found in almost any first degree murder case.  Therefore, he argues, California's special

3    circumstances fail to narrow the class of murderers eligible for the death penalty, as required by

4    the Eighth Amendment.

5         Petitioner supports his argument in two ways.  First, he sets out in some detail the history

6    of the 1978 ballot initiative, the so-called "Briggs Initiative," that created the current death

7    penalty scheme in California.  He argues that the intent of its drafters, and by implication the

8    intent of voters who approved the initiative, was to expand the death penalty to every first degree

9    murderer.  Second, petitioner presents empirical studies to show that the California capital

10   sentencing scheme fails to narrow the death-eligible class.  In this regard, petitioner relies

11   primarily upon what he calls California's "death sentencing ratio."  That ratio compares the

12   potentially death-eligible class under California's statutory scheme with the number of death

13   sentences imposed during the same period.  Petitioner argues that so few death sentences resulting

14   from such a large potential death-eligible class shows that the California death penalty scheme is

15   applied arbitrarily and capriciously.

16        In support of his claim petitioner has presented three empirical studies.  In the first,

17   Professor Steven Shatz of the University of San Francisco School of Law and Nina Rivkind, an

18   attorney and lecturer at the University of California at Berkeley, attempted to determine what

19   percentage of first degree murder cases in California had or could have had special circumstance

20   verdicts.  They examined published opinions from the California Supreme Court and California

21   Courts of Appeal and unpublished opinions from the California Court of Appeal for the First

22   Appellate District in first degree murder cases from 1988-1992.  Steven Shatz & Nina Rivkind,

23   The California Death Penalty Scheme: Requiem for Furman?, 72 N.Y.U. L. Rev. 1283, 1326-27

24   (Dec. 1997) (hereafter "Requiem for Furman"); (Decl. of Steven Shatz, Ex. 134 (Dkt. No. 442-1)

25   ¶ 8.).  In total, they examined 404 court opinions.  Requiem for Furman, 72 N.Y.U. L. Rev. at

26   1326.  After removing some for various reasons, they ended up with a pool of 392.  Id. & nn. 257,

27   262.  In 239 of those cases, the state factfinder had found at least one special circumstance to be

28   /////

1    true.  Id. at 1329, 1331.[55]  Two of these cases were reversed on appeal so they were considered to

2    have no special circumstance findings.  Id.  In the remaining 153 cases, there were no special

3    circumstance verdicts.  Id.[56]  Professor Shatz and attorney Rivkind determined that special

4    circumstances were present in 126 of those 153 cases in which no special circumstance verdict

5    was returned.  Id.  The legal standard they applied in reaching these conclusions was "whether,

6    under the facts stated, a reasonable juror could have found a special circumstance beyond a

7    reasonable doubt."  Id. at 1328 n. 256.

8         Based on these findings, Professor Shatz and attorney Rivkind determined that

9    approximately 84% of all first degree murder cases were "factually" special circumstance cases.

10   72 N.Y.U. L. Rev. at 1332.  During the relevant time period, California-wide there was an

11   average of 346 persons convicted of first degree murder per year and an average of 33.2 persons

12   sentenced to death.  Id. at 1327-28.  In other words, 9.6% of all first degree murderers in

13   California were sentenced to death.  Id.  Comparing the two figures, Professor Shatz and attorney

14   Rivkind determined that California's "death sentencing ratio," the percentage of potentially

15   death-eligible murderers receiving the death penalty, was 11.4%.  Id. at 1332.

16   /////

17

18   [55]  Tables 1 and 2, at pages 1329 and 1331 of the law review article categorize these cases.  While
     they are not altogether clear in the Westlaw version of the article, it can be discerned in Table 1
19   that there are three categories of published opinions:  those with a death judgment, those with a
     first degree murder verdict and a special circumstance finding, and those with only a first degree
20   murder verdict.  72 N.Y.U. L. Rev. at 1329.  Table 2 is, unfortunately, more confusing due to
     what appears to be a typographical error therein.  The table describes two categories of
21   unpublished first degree murder convictions from the California Court of Appeal for the First
     Appellate District.  However, in the chart, both categories are titled "First Degree Murder with
22   Special Circumstances."  72 N.Y.U. L. Rev. at 1331.  A review of petitioner's briefs and
     Professor Shatz's testimony submitted in this case makes clear that the second category of cases
23   should be titled only "First Degree Murder."  Death judgments were issued in 158 cases (Table
     1).  In the non-death judgment cases, state court factfinders found special circumstances in 40
24   published cases (Table 1) and 41 unpublished cases (Table 2).  Therefore, the court discerns that
     the total number of cases in the study in which state court factfinders found special circumstances
25   was 239.

26

27   [56]  Table 1 of the law review article shows 52 cases with published opinions that did not include a
     special circumstance verdict.  Table 2 shows no special circumstance verdict in 101 cases with
28   unpublished opinions.  Thus, the total number of cases reviewed in which no state factfinder had
     found a special circumstance is 153.

1    Professor Shatz's second study focused on all murder convictions in Alameda County

2    over a 23-year period and is similar in nature to his first study. See Steven Shatz, The Eighth

3    Amendment, The Death Penalty, and Ordinary Robbery-Burglary Murderers: A California Case

4    Study, 59 Fla. L. Rev. 719 (2007). For this second study, Professor Shatz relied upon the

5    Alameda County Superior Court case files to determine whether or not special circumstances

6    were present. (Shatz Testimony, Ex. 135 (Dkt. No. 442-1) at 1174.) After comparing the number

7    of "factually death eligible" first degree murderers with the number of death sentences actually

8    imposed, Professor Shatz arrived at a "death sentencing ratio" of 12.6% in the Alameda County

9    cases. (Shatz Decl., Ex. 134 (Dkt. No. 442-1) at ¶¶ 11-12.)

10    Petitioner offers a third study, the "Baldus Study," conducted by David Baldus, a law

11    professor at Iowa College of Law, and George Woodworth, Ph.D., a retired professor of statistics

12    and actuarial science. (Decls. of Woodworth and Baldus, Ex. 149 (Dkt. No. 458-1) ¶ 1; Ex. 150

13    (Dkt. No. 458-2) at ¶ 1.) The Baldus Study focused on two calculations. It first sought to

14    determine the "scope of death eligibility" in California since the decision in Furman. (Baldus

15    Testimony, Ex. 154 (Dkt. No. 458-6) at 1569:17-20.) In addition, just as with Professor Shatz's

16    two studies, it sought to determine a "death sentencing ratio" with respect to those cases. From

17    27,453 California convictions entered for first degree murder, second degree murder, and

18    voluntary manslaughter with offense dates between 1978 and 2002, Professors Baldus and

19    Woodworth studied a "representative sample" of 1,900 cases. (Baldus Decl., Ex. 150 (Dkt. No.

20    458-2) at ¶ 13.) They then developed a coding protocol to determine the presence of special

21    circumstances from the information garnered from the probation reports for each of the 1,900

22    cases. (Id. at ¶¶ 15, 20-36.) In addition, the Baldus Study developed a coding system to

23    determine whether the second degree and voluntary manslaughter cases were "factually first

24    degree murder cases." (Id.) The Baldus Study coded a second degree murder or voluntary

25    manslaughter case as "factually" first degree murder without regard for the actual conviction

26    obtained unless a defendant had been charged with first degree murder, but had been convicted by

27    a judge or jury of second degree murder or voluntary manslaughter. (Id. at ¶¶ 25, 26.) Similarly,

28    a case was coded as having a special circumstance if any special circumstance that had not been

1    rejected by a judge or jury could be found.  (Id.)  In other words, in this study the charging

2    decisions of prosecutors were not considered determinative in any way.[57]  (Id. at ¶ 26.)  In

3    addition, it was possible for a coder to apply a "jury nullification" exception where the evidence

4    of first degree murder liability or a special circumstance was "overwhelming."  (Id. at ¶ 31.)

5        Student assistants then coded each case.  (Baldus Decl., Ex. 150 (Dkt. No. 458-2) at ¶ 11.)

6    Coding was done using three separate statutory schemes reflecting three time periods:  (1) pre-

7    Furman Georgia law; (2) California law during the "Carlos window;"[58] and (3) 2008 California

8    law.  (Id. at ¶ 32.)   The coders were instructed to use a "legal sufficiency" standard in

9    determining whether a case was a "factual first degree murder case" in which a special

10   circumstance could be found.  (Id. at ¶ 28.)  According to Professor Baldus, the coders assumed a

11   first degree murder conviction and the presence of a special circumstance had been found by a

12   jury.  (Id.)  They then considered whether those convictions were supported by sufficient

13   evidence.  (Id.)  He described application of the sufficiency of the evidence principle in the study

14   as follows: "exculpatory evidence offered by the defendant (as reported in the probation report) is

15   given no weight, but incriminating evidence offered by the defendant is credited."  (Id.)

16       The Baldus Study drew a number of conclusions, including the following.  First, the study

17   determined that special circumstances were present in 91% to 95% of the actual first degree

18    /////

19    /////

20   _____

21   [57]   However, in a separate portion of his declaration submitted to this court, Professor Baldus
     indicates that coders did not rely upon the prior verdicts, stating:  "If the facts presented in the
     probation report for a case satisfy the test, the crime of conviction does not determine the factual
22   eligibility of a case."  (Dkt. No. 458-2, at ¶ 55.)  In his opening brief addressing this claim,
     petitioner also states that the Baldus Study included all factual first degree murder cases
23   "regardless of [the] crime of conviction."  (Dkt. No. 473 at 29 n. 30.)

24   [58]   As described by Professor Baldus, the "Carlos window" refers to the time period after the
25   California Supreme Court's decision in Carlos v. Superior Court, 35 Cal. 3d 131 (1983) in which
     that court held that the robbery felony-murder special circumstance required proof of intent to
26   kill.  The decision in Carlos was subsequently overruled in People v. Anderson, 43 Cal. 3d 1104
     (1987) with respect to the application of that special circumstance to the actual killer.  The
27   limitation announced in Carlos thus applied only to murders committed between the date of the
     Carlos decision, December 12, 1983, and the date of the Anderson decision, October 13, 1987.
28   (Baldus Decl., Ex. 150 (Dkt. No. 458-2) at 5 n.4.)

1    murder convictions entered during the time period applicable to the present case.[59]  (Baldus Decl.,

2    Ex. 150 (Dkt. No. 458-2) at 14, Table 1; Pet'r's Brief re Narrowing (Dkt. No. 473) at 26-27.)

3    Second, after determining which second degree murder and voluntary manslaughter convictions

4    were "factually" first degree murder cases, the study concluded that 80% of the total "factual"

5    first degree murder cases were death eligible during the time period relevant here.[60]  The term

6    "factual first degree murder case," as used in the Baldus Study, is somewhat confusing.  It is used

7    to refer to all actual first degree murder convictions and all second degree and voluntary

8    manslaughter convictions that were determined by the Study to be "factually" first degree cases.[61]

9         The Baldus Study drew two other major conclusions.  Looking at studies of death

10   eligibility rates in other states, the Baldus Study concluded that California's death eligibility was

11   significantly greater than the death eligibility rates in every other state studied.  (Baldus Decl., Ex.

12   150 (Dkt. No. 458-2) at ¶¶ 43-54.)  Finally, after comparing the total number of "factual death

13   eligible cases" and the actual number of cases in which death sentences were imposed, the Baldus

14

---

15   [59]  The Baldus Study did not consider the effect of California law as of 1981, the relevant time
     period in the present case.  The study examined the effects of California law during the Carlos
16   window period discussed in the prior footnote and also as of 2008.  The undersigned
     acknowledges that special circumstances were less likely to be found during the Carlos window
17   period than they would have been in 1981 and that special circumstances were more likely to be
     found in 2008 than in 1981 because several new special circumstances had been added to the
18   statute by 2008.  Accordingly, petitioner's use of a range between these two figures to
     approximate the likely effect of the 1981 law appears to be appropriate.  (See Dkt. No. 473 at 26-
19   27.)

20

21   [60]  It appears that California's standards for first degree murder broadened over time.  Because
     petitioner's crime preceded the Carlos window, and because the Carlos issues would not affect a
22   first degree murder determination, the court assumes that the first degree murder statute in effect
     at the time of Carlos was closer to the 1978 statute in effect in 1981, the time of petitioner's
23   crimes.  Therefore, the court will look only to the Carlos window figure when considering the
     "factual" first degree murder cases.
24

25   [61]  In Part II of Table I, it appears that under the Carlos window, there were 18,737 "factual M1
     cases."  (Dkt. No. 458-2 at 14.)  It is not clear from Table I whether that 18,737 total includes the
26   first degree murder convictions.  However, simple math shows that it must.  Of the total of 27,453
     cases in the study, 8,711 were first degree murder convictions, 7,900 were second degree murder
27   convictions, and 10,842 were voluntary manslaughter convictions.  The total number of non-first
     degree murder convictions was thus 18,742.  Because that number is more than the total "factual
28   M1 cases," the 18,737 total "factual M1 cases" reflected must also include the actual first degree
     murder convictions.

1   Study concluded that only 4.6% of factual death eligible cases resulted in a death sentence in

2   California.  (Id. ¶ 61 & Table 5, Column B.)  In other words, according to Professor Baldus,

3   California's "death sentencing rate" during the period studied was 4.6%, which "is among the

4   lowest in the nation and over two-thirds lower than the death sentencing rate in pre-Furman

5   Georgia." (Id. at ¶ 71.)

6        Respondent argues that in claiming that California's statutory scheme fails to adequately

7   narrow the application of the death penalty petitioner misconstrues the Eighth Amendment

8   narrowing requirement, uses irrelevant and inflated statistics and relies upon studies which suffer

9   numerous evidentiary flaws.  Respondent also contends petitioner's claim in this regard is

10  Teague-barred.

11          1.  Legal Standards

12       The Eighth Amendment's narrowing requirement is the product of a series of Supreme

13  Court decisions beginning with Furman v. Georgia, 408 U.S. 238 (1972).  In Furman the Court

14  held the Georgia and Texas capital sentencing statutes violated the Eighth and Fourteenth

15  Amendments.  However, there was little clear agreement among the justices on the underlying

16  rationale for that decision.  Five justices wrote separate concurring opinions.  The opinions of

17  Justices Stewart and White are considered some basis for a "majority" holding in Furman.  See

18  408 U.S. at 401 (Burger, J., dissenting) (stating that while it is "not entirely clear" what the

19  holding is, the Stewart and White opinions are the "two pivotal concurring opinions").  Both

20  Justice Stewart and Justice White focused on the fact that the states' capital sentencing statutes

21  made every murderer eligible for the death penalty but provided no guidance to assist juries in

22  deciding when to impose that penalty.  As a result, "the death penalty is exacted with great

23  infrequency even for the most atrocious crimes and . . . there is no meaningful basis for

24  distinguishing the few cases in which it is imposed from the many cases in which it is not."  Id. at

25  313 (White, J., concurring).  Justice Stewart similarly focused on the apparent arbitrariness of

26  imposition of the death penalty:

27            These death sentences are cruel and unusual in the same way that
          being struck by lightning is cruel and unusual.  For, of all the
28            people convicted of rapes and murders in 1967 and 1968, many just
          as reprehensible as these, the petitioners are among a capriciously

selected random handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. But racial discrimination has not been proved, and I put it to one side. I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

Id. at 309-310 (footnotes and citations omitted).

The Supreme Court later explained that in Furman it had held that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." Gregg, 428 U.S. at 188. Rather, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.). In his concurring opinion in Gregg, Justice White described how a constitutionally permissible death penalty statute should work:

As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to expect that juries even given discretion not to impose the death penalty will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device.

Id. at 222-23. The Court in Gregg upheld Georgia's revised death penalty statute which, at a separate penalty phase, required a jury to find at least one of ten statutory aggravating factors to be true before it imposed a death sentence. Id. at 198-205.

Thereafter, the Supreme Court examined Georgia's aggravating circumstances and held that each must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, 462 U.S. at 877. The Court concluded that each aggravating circumstance must "provide a principled basis for distinguishing" the petitioner's case "from the

1    many other murder cases in which the death penalty was not imposed under the statute." 462

2    U.S. at 878 n. 16.

3           Subsequently, the narrowing principles described by the Court in <u>Zant</u> were applied to

4    Louisiana's death penalty sentencing statute:

5                  To pass constitutional muster, a capital sentencing scheme
              must "genuinely narrow the class of persons eligible for the death
6              penalty and must reasonably justify the imposition of a more severe
              sentence on the defendant compared to others found guilty of
7              murder." Under the capital sentencing laws of most States, the jury
              is required during the sentencing phase to find at least one
8              aggravating circumstance before it may impose death. By doing so,
              the jury narrows the class of persons eligible for the death penalty
9              according to an objective legislative definition.[62]

10   <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 244 (1988) (internal citations omitted).

11          Here, petitioner points out that the Ninth Circuit Court of Appeals has twice invalidated

12   capital punishment schemes for failure to comply with the mandate of <u>Furman</u>. In <u>United States</u>

13   <u>v. Harper</u>, 729 F.2d 1216 (9th Cir. 1984), the court considered the death penalty provisions of the

14   Espionage Act, former 18 U.S.C. § 794. The Ninth Circuit in <u>Harper</u>, however, did not address

15   the narrowing of a death eligible pool of defendants under the statute at issue -- the issue raised in

16   the present case. Instead, the court held that the Espionage Act's failure to provide any legislated

17   guidelines to direct the fact-finder's discretion in imposing the death penalty violated the

18   requirements of <u>Furman</u> and the Eighth Amendment. 729 F.2d at 1224-26.

19          The second case on which petitioner relies also does not persuasively support his claim for

20   habeas relief. In <u>United States v. Cheely</u>, 36 F.3d 1439, 1442 (9th Cir. 1994), the court did

21   examine a statute's narrowing of the class of those eligible for the death penalty. At issue in

22   <u>Cheely</u> was a federal statute that authorized imposition of the death penalty for mailing

23   explosives. The Ninth Circuit found the death penalty authorization too broad because, by

24   definition, it made one eligible for the death penalty even if guilty of no more than involuntary

25   _____

26   [62] Respondent repeatedly argues that adequate narrowing of death eligible defendants is
     accomplished in a number of ways, including through the exercise of the discretion by local
27   prosecutors in charging crimes and special circumstances. Respondent's definition of narrowing
     is clearly too expansive. As defined by the Supreme Court in <u>Lowenfield</u>, narrowing, for
28   purposes of Eighth Amendment jurisprudence, must be accomplished through "objective
     legislative" standards. <u>Lowenfield</u>, 484 U.S. at 244.

1  manslaughter.  36 F.3d at 1443.  In so holding, the Ninth Circuit noted that the Supreme Court

2  had required that a mental state of at least reckless indifference to human life during the

3  commission of a felony is necessary for imposition of the death penalty.  Id. at 1443, n. 9 (citing

4  Tison v. Arizona, 481 U.S. 137, 157-58 (1987)).  The court found that the statute's overbreadth,

5  along with the lack of guidance provided to a sentencing jury, created the "potential for

6  impermissibly disparate and irrational sentencing."  Id. at 1444.  In so holding the Ninth Circuit

7  observed that:

> When juries are presented with a broad class, composed of persons
> of many different levels of culpability, and are allowed to decide
> who among them deserves death, the possibility of aberrational
> decisions as to life or death is too great.

11  Id. at 1445.  Cheely's holding is therefore inapposite here: petitioner is not arguing that the

12  California statutory scheme is so broad that it encompasses those for whom the death penalty is

13  legally inappropriate.

14      Respondent, on the other hand, argues that the Ninth Circuit has twice rejected precisely

15  the same challenge petitioner makes here.[63]  As with petitioner's argument, the cases relied upon

16  by respondent are not on point.  Petitioner's claim presented in this case is significantly different

17  than those considered by the Ninth Circuit in Karis, 283 F.3d at 1141 n. 11 and Mayfield, 270

18  F.3d at 924.  In both of those cases, the court ruled without considering any available evidentiary

19  support.  Because those decisions did not involve the consideration of the type of evidence

20  introduced in support of petitioner's claim here, the Ninth Circuit's decisions Karis and Mayfield

---

[63]  Respondent also relies upon the Supreme Court's decision in Pulley v. Harris, 465 U.S. 37, 53 (1984) in which the Court held that California's 1977 statute "limits the death sentence to a small subclass of capital-eligible cases."  Because petitioner's Claim 2 specifically challenges the changes made to California's capital sentencing scheme by the 1978 Briggs Initiative, the decision in Pulley is not on point and does not control.  California's 1977 statute included far fewer special circumstances than the 1978 statute.  Pulley, 465 U.S. at 51, n.13 (noting that the 1978 statute "greatly expanded" the category of special circumstances).  While respondent states that the decision in Brown v. Sanders, 546 U.S. 212 (2006) "conclusively confirms the correctness of Respondent's position," that case too is not on point.  In Brown, the Court considered the invalidation of two of four special circumstances.  The Court did not, as respondent claims here, state that "special-circumstance findings 'are sufficient to satisfy Furman's narrowing requirement.'" (Dkt. No. 476 at 8:3-4.)  Rather, in Brown the Court merely stated that the two remaining special circumstances in that case were "sufficient to satisfy Furman's narrowing requirement."  546 U.S. at 224.

1   are distinguishable and do not resolve petitioner's narrowing claim.[64]

2          To summarize, the goal of the Eighth Amendment's narrowing requirement is to limit the

3   possibility of arbitrary and capricious imposition of the death penalty.  States may accomplish this

4   by enacting objective legislative standards to limit the pool of those eligible for the death penalty

5   in a way that reasonably justifies imposition of a more severe sentence on them.  The sentencer

6   may then exercise discretion to determine if that sentence should be imposed in a particular

7   case.[65]  If the death eligible pool is so large that it includes persons with vastly different levels of

8   culpability, then the discretionary decision-making at the selection stage is not sufficiently

9   limited.  Without sufficiently objective limits with respect to when that ultimate sentence is

10  appropriately imposed, the system risks arbitrary and capricious application of the death penalty

11  upon those who are not necessarily the most deserving of the greatest punishment.

12          2.  Discussion

13          As described above, at the time of petitioner's crime, California's first degree murder

14  statute appeared to be quite broad, listing twenty-seven special circumstances.[66]  Many of those

15  special circumstances mirrored the first degree murder categories.  For example, many categories

16  of first degree felony/murder were also special circumstances.  Cal. Penal Code § 190.2(a)(17).

17  When comparing the first degree murder categories with the list of special circumstances, it is

18  therefore difficult to imagine many first degree murders that would not include a special

19  circumstance.[67]  Indeed, the broad coverage of California's special circumstances was noted by

20  ────────────────

21  [64]  See Frye v. Calderon, No. CIV S 99-628 LKK/JFM, Jan. 10, 2003 Order (Dkt. No. 97)
    (holding that the decision in Karis does not bar a petitioner's presentation of a narrowing claim).

22  [65]  The final selection process necessarily involves greater discretion because it requires
23  "particularized consideration of relevant aspects of the character and record of each convicted
    defendant" (Abdul-Kabir v. Quarterman, 550 U.S. 233, 247 (2007) (quoting Woodson v. North
24  Carolina, 428 U.S. 280, 303 (1976)), and consideration of "any aspect of a defendant's character
    or record and any of the circumstances of the offense that the defendant proffers as a basis for a
25  sentence less than death."  Abdul-Kabir, 550 U.S. at 247-48 (quoting Lockett v. Ohio, 438 U.S.
    586, 604 (1978)).

26  [66]  See fn. 54, above.

27
28  [67]  Professor Gerald Uelmen, who, among other positions, the Executive Director of the
    California Commission on the Fair Administration of Justice, which was charged with examining
    the administration of California's death penalty law, testified on behalf of petitioner in these

1    Justice Blackmun in his dissent in <u>Tuilaepa v. California</u>, 512 U.S. 967 (1994), wherein he

2    questioned the "constitutional adequacy of California's eligibility process" because its then

3    twenty special circumstances created "an extraordinarily large death pool." 512 U.S. at 994.

4    However, Justice Blackmun also noted that the petitioner in <u>Tuilaepa</u> had not mounted a

5    challenge to the special circumstances and the Supreme Court was not therefore called upon to

6    determine whether they sufficiently narrowed application of the death penalty under the holding

7    in <u>Zant</u>.  <u>Id.</u>

8           Despite these circumstances, the undersigned concludes that petitioner is not entitled to

9    relief with respect to his narrowing claim here.  In short, in these habeas proceedings petitioner

10   has failed to prove that California's statutory scheme violates the Eighth Amendment.  Putting

11   aside the issues of whether or not petitioner seeks application of a new rule of law in violation of

12   the holding in <u>Teague</u>, whether an Eighth Amendment narrowing violation can be proved by

13   making a mathematical showing, and whether petitioner's experts' studies suffer from such

14   serious evidentiary problems so that they are entitled to little weight under <u>Daubert v. Merrell</u>

15   <u>Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the undersigned finds four significant

16   deficiencies with petitioner's narrowing claim as presented here.  First, petitioner has not shown

17   the relevance of the history of the Briggs Initiative to the issue presented by his narrowing claim.

18   Second, petitioner's attempt to prove mathematically that California's death penalty scheme is

19   arbitrary, fails to satisfy even the test petitioner himself establishes for determining the merit of

20   his claim.  Third, the studies petitioner has presented to this court draw conclusions from

21   manufactured comparisons that do not withstand scrutiny.  And, fourth, in his argument that

22   almost every first degree murder in California would include special circumstances, petitioner

23

24   proceedings.  (Ex. 138 (Dkt. No. 442-2) at 1230-33.)  Specifically, Professor Uelmen testified
     that he could not think "of a case that we could get a first degree conviction in California that we
25   couldn't find a special circumstance."  (<u>Id.</u> at 1237.)   Professor Shatz and attorney Rivkind argue
     that only seven categories of first degree murderers are not automatically death-eligible in
26   California. and that includes rarely charged categories of crimes, such as murder of a firefighter
     or murder of a judge.  <u>Requiem for Furman</u>, 72 N.Y.U. L. Rev. at 1318-19 & n. 199, 1324-26;
27   (<u>see also</u> Decl. of Steven Shatz, Ex. 134 (Dkt. No. 442-1) at 3).  In his declaration, Professor
     Shatz increases that number by one, stating that there are "eight fact situations where a defendant
28   could theoretically have been guilty of first degree murder and not have been death-eligible."
     (Shatz Decl., Ex. 134 (Dkt. No. 442-1) at ¶ 7.)

1    never addresses or explains why or how California's division of intentional murder into degrees

2    does not contribute to narrowing the death-eligible class of criminal defendants.

3              a.  Relevance of the Briggs Initiative's History

4              Analysis of legislative history is typically used to discern the meaning of a statute that is

5    not clear on its face.  See Mohamad v. Palestinian Authority, ___ U.S. ___, ___, 132 S. Ct. 1702,

6    1709 (2012) ("'[R]eliance on legislative history is unnecessary in light of the statute's

7    unambiguous language.'") (quoting Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S.

8    229, 236 n. 3 (2010)).  Similarly, California courts have recognized that the history of passage of

9    an initiative may also be relevant where the language of the ballot initiative is unclear.  See

10   California Redevelopment Assn. v. Matosantos, 53 Cal. 4th 231, 279 (2011) ("[U]nless the text

11   [of an initiative] is ambiguous and supports multiple interpretations," courts must rely on the

12   language of the text and have no need to look to its history.)  Here, petitioner attempts to use the

13   history of the Briggs Initiative for a different purpose, attempting to show the scope of the

14   resulting statute violates the Constitution.  However, in doing so petitioner fails to allege that the

15   language of the statute, or the statute itself, is vague.

16             In fact, petitioner does not even strongly argue the relevance of the initiative's history to

17   his Eighth Amendment challenge to California's death penalty scheme.  In his opening brief,

18   petitioner merely cites a handful of decisions for the proposition that "ballot arguments and

19   analysis presented to the voters in connection with an initiative are helpful in determining the

20   meaning of the initiative and the intent of the voters."  (Dkt. No. 473 at 9:4-8.)  However,

21   petitioner has not demonstrated that the meaning of the Briggs Initiative has been placed at issue

22   in these proceeding by his narrowing claim.  Further, nothing in the cases cited by petitioner

23   suggests any relevance of the initiative's history to the issues presented by that claim.  See

24   California Democratic Party v. Jones, 530 U.S. 567, 570 (2000) (mentioning the promotions for

25   an initiative in the course of describing its history); Valeria v. Davis, 307 F.3d 1036, 1041 (9th

26   Cir. 2002) (a ballot proposition's history is directly relevant to the equal protection analysis of a

27   facially neutral law to determine if it is "motivated by discriminatory racial purpose"); Kennedy

28   Wholesale, Inc. v. State Board of Equalization, 53 Cal. 3d 245, 250 (1991) (observing that a

1   section of the California Constitution created by Proposition 13 is "ambiguous in context" and it

2   is therefore "appropriate to consider indicia of the voters' intent other than the language of the

3   provision itself"); People v. Frierson, 25 Cal. 3d 142, 185 (1979) (court looks to the intent behind

4   adoption of a constitutional amendment to determine the meaning of that amendment).  Again,

5   petitioner does not allege that California's 1978 death penalty law is ambiguous, as was the

6   statute in Kennedy; or that one requirement of the Eighth Amendment narrowing claim analysis is

7   determining the intent behind the law's passage, as in Valeria.  Nor are the parties in this

8   proceeding in conflict regarding the meaning of the statute in question, as the parties were in

9   Frierson.[68]

10         In his reply brief, petitioner cites two cases in support of the conclusory suggestion:

11   "when an initiative measure is motivated by such deliberate intent to violate the Constitution, that

12   intent should be considered in assessing its validity."  (Dkt. No. 479 at 3:25-27.)  However, the

13   cases petitioner cites for this proposition do not support its application to the present case.  Both

14   of the decisions relied upon by petitioner in this regard, like Valeria, involved equal protection

15   challenges in which examining the motivation behind facially neutral laws was a required aspect

16   of the legal analysis.  Washington v. Seattle School District, No. 1, 458 U.S. 457, 471 (1982)

17   (Court examined the motivations behind passage of a facially neutral busing law); Reitman v.

18   Mulkey, 387 U.S. 369, 380-81 (1967) (Court considered whether passage of a constitutional

19   amendment was motivated by racial factors and resulted in racial discrimination).  Having not put

20   the meaning of the 1978 law at issue, petitioner cannot put the intention of its drafters in question

21   either.

22         For these reasons, the undersigned concludes that petitioner's lengthy exposition on the

23   history of the Briggs Initiative has no apparent relevance to the issues raised by his claim that

24   California's 1978 death penalty statute failed to adequately narrow application of the death

25   penalty in violation of his right to be free from arbitrary and capricious sentencing under the

26

27   _____
     [68]   Moreover, as noted by one state appellate court, statements by initiative proponents that

28   revision of the death penalty statute was necessary to make the death penalty applicable to every
     murderer were "merely hyperbole."  Domino v. Superior Court, 129 Cal. App. 3d 1000, 1010
     (1982).

1    Eighth Amendment.

2                              b. <u>Apples and Oranges</u>

3          The second prong of petitioner's argument with respect to his Claim 2 hinges on a "death

4    sentencing ratio," upon which, he claims, the Supreme Court in <u>Furman</u> relied.[69]  Two dissenting

5    justices mentioned that about 15 to 20% of murder defendants at that time were sentenced to

6    death.  The statutes the Supreme Court considered in <u>Furman</u> made all murderers eligible for the

7    death penalty.  Therefore, the ratio was based on a comparison of all death-eligible defendants to

8    all those sentenced to death.

9          Petitioner's argument with respect to this prong is fatally flawed because the comparison

10   he uses is not the same as the one that appeared in <u>Furman</u>.  In all the studies petitioner relies

11   upon, a comparison is made between what petitioner refers to as "factual special circumstance"

12   [69]  As respondent points out, it is not at all clear that this "death sentencing ratio" was relied upon
13   by any of the justices in the <u>Furman</u> majority.  In fact, that ratio was cited only by Justices Burger
     and Powell in their dissents.  Justice Burger cited the ratio to counter the "unwarranted
14   hyperbole" that the rate of imposition of the death penalty was "freakishly rare."  <u>Furman</u>, 408
     U.S. at 386 n. 11.  Justice Powell cited the ratio to contradict the petitioners' argument that the
15   death penalty was imposed with such infrequency that it could be inferred that it was being
     "virtually unanimously repudiated by the conscience of contemporary society."  <u>Id.</u> at 434-35 &
16   n. 19, 441.  <u>See also</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 182 & n. 26 (1976) (plurality opinion citing
17   estimate that prior to <u>Furman</u> less than 20% of those convicted of capital murder were sentenced
     to death in its discussion of whether the reluctance of juries to impose the death penalty indicated
18   a per se rejection of capital punishment)  None of the justices in the <u>Furman</u> majority mentioned
     this ratio.  Indeed, statements made by the majority indicate that the justices considered the rate of
19   imposition of the death sentence to be much lower.  For instance, Justice Stewart stated that the
     death penalty was so rarely applied that it was like being "struck by lightning."  408 U.S. at 309.
20   While Justice Stewart obviously was not being literal, it is worth noting that, according to the
     National Weather Service, the odds of being struck by lightning are a far cry from a 15 to 20%
21   death sentencing rate.  <u>See</u> http://www.lightningsafety.noaa.gov/medical.htm (chance of being
     struck by lightning in a lifetime is 1 in 10,000).  That death sentencing rate also does not appear
22   to be consistent with Justice Brennan's comment in <u>Furman</u> that only a "minute fraction" of those
     eligible for the death penalty were so sentenced.  408 U.S. at 293.  The Merriam-Webster
23   dictionary defines the adjective "minute" as "very small" or "infinitesimal."  <u>See</u>
     http://www.merriam-webster.com/dictionary.  Again, 15 to 20% does not strike the undersigned
24   as an infinitesimal percentage.  Here, respondent also makes a supported argument that the
     frequency of imposition of the death penalty is not relevant to petitioner's claim.  At least one
25   court has held that the narrowing requirement is "not based on the frequency with which the death
     penalty was sought or imposed.  Rather, the primary emphasis of the Court's death penalty
26   jurisprudence has been the requirement that the discretion exercised by juries be guided so as to
     limit the potential for arbitrariness."  <u>United States v. Sampson</u>, 486 F.3d 13, 23 (1st Cir. 2007).
27   In any event, for purposes of the undersigned's discussion in the text, the court assumes that the
     death sentencing ratio is relevant to the <u>Furman</u> majority decision.

28

                                              96

1   cases and death sentences that were actually imposed.  Nowhere, at least nowhere that this court

2   can discern, does petitioner provide a ratio comparing the same figures as the <u>Furman</u> ratio.  To

3   have made the same comparison as the Supreme Court did in <u>Furman</u>, petitioner would have to

4   study how California has, in fact, applied its death penalty.  That is what was done by the Court in

5   <u>Furman</u> by looking at those criminal defendants who had been convicted of murder, and were

6   therefore death eligible, and those who had actually been sentenced to death.  In order to pursue

7   his narrowing claim here, the proper comparison for petitioner to make would have been between

8   those defendants death eligible because they had been convicted of both first degree murder with

9   a special circumstance finding and those actually sentenced to death.  That is not what petitioner's

10  experts did according to the evidence presented to this court.  Here, Professor Baldus testified that

11  his study did not examine how California in fact applies its death penalty.  (Ex. 154 (Dkt. No.

12  476) at 1599:1-3, 11-14.)  Rather, he testified that, "[w]e were interested only in the legislative

13  decision," not in "the application of the statute by decision makers."  (<u>Id.</u>)  In light of such

14  testimony, petitioner has not adequately explained why his death penalty ratio is appropriately

15  measured against that addressed in <u>Furman</u>.  In short, because petitioner is comparing apples to

16  oranges, his argument for relief with respect to his narrowing claim loses one of its primary

17  underpinnings.

                    c.  <u>Mixing Facial & Applied Challenges to the Statute</u>

19          A related deficiency with petitioner's argument in support of his narrowing claim is that

20  he therein mixes facial, or more precisely potential, and applied challenges to California' death

21  penalty statute.[70]  The ratios derived in each study relied upon by petitioner compared a possible

22  universe of death eligibility, the "factual" death-eligible cases, with the number of actual death

_____

[70]  Respondent makes much of this "as applied" vs. "facial" challenge to the statute.  In part, he
does so due to his contention that the Ninth Circuit's decisions in <u>Karis</u> and <u>Mayfield</u>, which
examined California's death penalty statute on its face, resolve the claim presented by petitioner
here.  As discussed above, the undersigned does not find respondent's reasoning regarding the
precedential nature of those cases in connection with petitioner's narrowing claim to be
persuasive.  Moreover, the "facial" and "applied" terms do not fit easily here given petitioner's
claim.  Petitioner's studies take the language of the statute and "apply" it to make determinations
about what <u>could</u> have been found – not about what <u>was</u> found.  While perhaps more than a facial
challenge to the statute, petitioner's claim is not one based upon the actual application of the
statute either.

1   sentences imposed by California juries.  Professor Shatz included in his total of death-eligible

2   defendants first degree murder cases in which he felt a special circumstance could have been

3   found.  Professors Baldus and Woodworth did the same and made their death-eligible class even

4   larger by also including voluntary manslaughter and second degree murder cases which they felt

5   posed sufficient facts to have been first degree murder cases.  Of course, because cases in which a

6   jury did not find a special circumstance never proceeded to a penalty phase, the imposition of a

7   death sentence was not possible in such cases.  Nonetheless, against this expanded potential

8   death-eligible class of cases, both studies relied upon by petitioner measured the actual death

9   sentences imposed.  This comparison results in a falsely low death sentencing rate.  To have

10  created a realistic picture of the potential of California's death penalty scheme, petitioner should

11  have measured the number of possible death-eligible defendants against the number of possible

12  death sentences.

13          Of note, Professor Baldus does draw conclusions based on the breadth of potential death

14  eligibility in California, without also referring to the number of death sentences actually imposed.

15  He concludes that over 90% of all defendants convicted of first degree murder in California could

16  have been death eligible and that over 80% of all factual first degree cases could have been death

17  eligible.  This is strong evidence of the potentially vast reach of the California death penalty

18  statute.  Yet, the legal framework for considering petitioner's Eighth Amendment narrowing

19  claim does not anticipate this sort of argument.  Petitioner has presented no precedent supporting

20  an examination of the statute in this way.  In Furman, the Supreme Court looked to the number of

21  murder convictions, in other words, the number of criminal defendants who were in fact death

22  eligible because they had been convicted.  The Court did not examine the applicable statutes to

23  determine how many other defendants could have been convicted of murder and were potentially

24  death-eligible.  Absent such precedent, the undersigned cannot extend the reasoning of the

25  Supreme Court in Furman into this uncharted territory.

26                      d.  Narrowing by Dividing Murder into Degrees

27          Respondent repeatedly points out that petitioner has incorrectly focused only on special

28  circumstances as accomplishing the narrowing of death eligible defendants required by the Eighth

98

1    Amendment.  According to respondent, California's division of intentional homicide into degrees

2    represents the first step of the required narrowing process.  In this regard, Professor Baldus's

3    study appears to demonstrate that narrowing does occur through the separation of intentional

4    homicide into degrees.  Of the 27,453 total intentional homicides in California from 1978 to

5    2002, convictions for voluntary manslaughter, second degree murder, and first degree murder

6    were, roughly, equally divided.  (Baldus Decl., Ex. 150 (Dkt. No. 458-2) at ¶ 12 (32% of the

7    cases resulted in first degree murder convictions, 29% in second degree murder convictions, and

8    39% in voluntary manslaughter convictions).)

9        Petitioner never addresses this point in any substantial way nor does his counsel put it into

10   any persuasive context.  Petitioner simply provides the court no framework to consider the extent

11   to which California's division of murder into degrees does, or does not, "genuinely narrow the

12   class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more

13   severe sentence on the defendant compared to others found guilty of murder."  Zant, 462 U.S. at

14   877.  Nor does petitioner analyze the statutory language to argue the breadth of first degree

15   murder liability under California law.[71]  Petitioner's attempts to frame his narrowing claim as

16   involving only the special circumstances identified by the California death penalty scheme is not

17   well taken.  His failure to address the import of California's division of murder into degrees is

18   fatal to his attempts to show California's statutory scheme violates the Eighth Amendment.

19                      3. Conclusion

20       In his concurrence in Gregg, Justice White described a constitutional system of capital

21   punishment as one that narrows the "types of murders for which the death penalty may be

22   imposed" to those "which are particularly serious or for which the death penalty is particularly

23   appropriate."  Furman, 428 U.S. at 222.  Justice White noted that it would be reasonable to expect

24   that juries given the discretion to impose a death sentence would do so "in a substantial portion of

25   the cases so defined."  Id.  In this federal habeas proceeding petitioner has succeeded in

26

27   _____

     [71]  Petitioner does briefly explain the wide coverage of the felony/murder doctrine in California.
28   (Dkt. No. 473 at 15-16.)  Further, he discusses the expansion of first degree murder liability in
     1990 and thereafter.  (Id. at 18-20.)  This court is limited, however, to examining the California
     statute as it existed at the time of the crimes in 1981 for which petitioner was convicted.

1   establishing that the class of death-eligible defendants in California is potentially very large.

2   However, petitioner has not borne his burden of proving that this potentially large class of death

3   eligible defendants under California's statutory scheme violates the Eighth Amendment.

4   Accordingly, federal habeas relief as to petitioner's narrowing claim should be denied.

5   II.  Non-Evidentiary Hearing Claims

6         A.  As Applied Challenge to California's Lying in Wait Special Circumstance

7         Under California law, murder perpetrated "by means of . . . lying in wait" is one type of

8   first degree murder.  Cal. Penal Code § 189.  As discussed in detail above, California law also

9   identifies and defines various "special circumstances" which, if proven, make the penalty for the

10  first degree murder in question "death or confinement in the state prison for a term of life without

11  the possibility of parole."  Cal. Penal Code § 190.2(a).  One of the special circumstances alleged

12  in petitioner's case was that "[t]he defendant intentionally killed the victim while lying in wait."

13  Cal. Penal Code § 190.2(a)(15).  The jury at petitioner's trial found him

14       guilty of first degree murder 'under the felony murder rule,' i.e.,
        homicide 'as a result' of the actual or attempted commission of
15      robbery with specific intent.  It also found that [petitioner] had
        committed first degree murder 'other than under the felony murder
16      rule,' based on instructions defining premeditated murder and
        murder by lying in wait.
17

18  People v. Webster, 54 Cal. 3d at 444.  Thus, the jury at his trial found petitioner eligible for the

19  death penalty by finding two alleged special circumstances to be true:  commission of murder

20  while lying in wait and murder while engaged in the commission or attempted commission of

21  robbery.  Id. at 423.

22        Petitioner makes two distinct challenges to California's lying in wait special circumstance:

23  (1) California's lying in wait special circumstance fails to provide a meaningful and principled

24  basis for distinguishing capital and non-capital cases in violation of the Eighth Amendment; and

25  (2) the unforeseeable expansion of the lying in wait special circumstance to include incidents of

26  non-concealment violated due process.  The parties agree the latter challenge has already been

27  determined in this action.  As to that claim, the assigned District Judge granted summary

28  adjudication in favor of petitioner and entered partial judgment with respect to this claim.  (Dkt.

100

1    Nos. 176 & 201.)  As noted above, respondent appealed that partial judgment and the Ninth

2    Circuit reversed.  See Webster v. Woodford, 369 F.3d 1062 (9th Cir. 2004).  Accordingly,

3    petitioner's claim that the expansion of California's lying in wait special circumstance to include

4    incidents of non-concealment violated his right to due process has already been resolved in

5    respondent's favor.

6          Respondent now contends that petitioner's first challenge to California's lying in wait

7    special circumstance, brought as an Eighth Amendment claim, has also been previously decided

8    or, alternatively, is a new claim for which petitioner has not properly sought leave to amend his

9    federal habeas petition to include.  The undersigned finds neither of these arguments to be

10    persuasive.

11          Petitioner's Eighth Amendment challenge to the lying in wait special circumstance is not a

12    new claim in these habeas proceedings.  In the findings and recommendations addressing the

13    parties' cross-motions for summary judgment, the undersigned discussed petitioner's two separate

14    challenges to California Penal Code § 190.2(a)(15) and, as to his challenge based on Eighth

15    Amendment grounds, specifically recommended that respondent be denied summary adjudication

16    with respect to that claim because the "issue requir[ed] further development."   (Dkt. No. 176 at

17    67, 140-41) (recommending the granting of summary judgment in favor of respondent as to

18    petitioner's claims 2G and 2H in which petitioner challenged that provision on due process

19    grounds but recommending denial of  respondent's motion as to Claim 4F in which petitioner

20    challenged the statute on Eighth Amendment grounds).  Indeed, respondent previously

21    acknowledged that petitioner's Claim 4F remained unresolved and at issue in this habeas

22    proceeding.  (Respondent's Supp. Status Rep. (Dkt. No. 423) at 2 (listing claim 4F as "at-issue").)

23    Accordingly, below the undersigned will address the merits of this claim.

24          At the outset, petitioner concedes that his claim for relief in these proceedings is now

25    limited to an *as applied* challenge in light of the Ninth Circuit's decision in Morales v. Woodford,

26    388 F.3d 1159, 1174-75 (9th Cir. 2004), which rejected an Eighth Amendment facial challenge to

27    § 190.2(a)(15).  In Morales, the Ninth Circuit held that California's lying in wait special

28    circumstance, considered on its face, adequately narrows the class of first degree murders which

1    subject the defendant to the death penalty so as to satisfy the Eighth Amendment.  Id. at 1173-78;

2    see also Bradway v. Cate, 588 F.3d 990, 992-93 (9th Cir. 2009) (holding that lying in wait special

3    circumstance supporting enhanced sentence of life without the possibility of parole was adequate

4    to survive a vagueness challenge).  Since then, however, the Ninth Circuit addressed on the merits

5    a petitioner's "as applied" challenge to that same statute.  See Edwards v. Ayers, 542 F.3d 759,

6    767 (9th Cir. 2008).  As explained below, petitioner's claim fails under Edwards.

7         Petitioner argues that the Eighth Amendment was violated in his case because there was

8    "no meaningful distinction at all between lying in wait as a theory of first degree murder and

9    lying in wait as a special circumstance."  (Dkt. No. 433 at 7.)  According to petitioner, in light of

10   the jury instructions given in his case, the lying in wait special circumstance failed to adequately

11   narrow the class of murderers subject to the death penalty as is constitutionally required.

12   Respondent counters that binding Ninth Circuit authority makes clear that the jury instructions

13   given in petitioner's case adequately distinguished first degree murder lying in wait from special

14   circumstance lying in wait.[72]

---

16   [72]  Respondent also argues the Supreme Court's opinion in Lowenfield v. Phelps, 484 U.S. 231
     (1988) compels rejection of petitioner's claim.  The question presented in Lowenfield was
17   whether the fact that an aggravating circumstance found at the penalty phase was identical to an
     element of the underlying crime violated the Eighth Amendment's narrowing requirement.  The
18   Supreme Court held that the Louisiana statutory scheme at issue there accomplished narrowing at
     the guilt phase through the definition of death-eligible murder.  Id. at 246.  Thus,
19

20        [t]he fact that the sentencing jury is also required to find the existence of
          an aggravating circumstance in addition is no part of the constitutionally
21        required narrowing process, and so the fact that the aggravating
          circumstance duplicated one of the elements of the crime does not make
22        this sentence constitutionally infirm.

23   Id.  Relying upon this statement, respondent argues that "[i]t similarly follows that there can be
     no Eighth Amendment violation if a jury is instructed on one of California's special
24   circumstances in language that duplicates the language of an instruction on a theory of first
     degree murder."  Contrary to respondent's assertion, rejection of petitioner's claim is not
25   compelled by the holding in Lowenfield.  There, the Supreme Court specifically distinguished the
     aggravating circumstance in that case as not being part of the narrowing process.  484 U.S. at 246.
26   In the present case, there is no question that the special circumstances alleged, including the lying
     in wait special circumstance, were intended to be an aspect of the Eighth Amendment's required
27   narrowing.  See People v. Bacigalupo, 6 Cal. 4th 457, 468 (1993) ("Under our death penalty law,
     therefore, the section 190.2 'special circumstances' perform the same constitutionally required
28   'narrowing' function as the 'aggravating circumstances' or 'aggravating factors' that some of the

The Ninth Circuit has explained the facial distinction between the lying in wait element of first degree murder and the lying in wait special circumstance under California law as follows:

> [L]ying in wait as a special circumstance, unlike lying in wait as a first-degree factor, requires all three elements mentioned above - concealment of purpose, watching and waiting, and surprise - and lying in wait as a special circumstance requires that the murder be committed while lying in wait.  That is, the special circumstance has the requirement that there be no gap in time between the murder and the period of watching and waiting.  This is not required for lying in wait as a substitute for premeditation and deliberation.  Thus, lying in wait as a special circumstance is more difficult to satisfy than is lying in wait as an aggravator that makes a killing first degree murder.

Morales, 388 F.3d at 1177.  In that case, the Ninth Circuit concluded that the lying in wait special circumstance is not the "functional equivalent" of lying in wait for first-degree murder.  Id.  Subsequently, the Ninth Circuit emphasized that the lying in wait special circumstance is also "distinguishable" from first degree murder itself because it requires the specific intent to kill, whereas first degree murder by lying in wait does not.  Bradway, 588 F.3d at 992 (considering the amended § 190.2(a)(15) special circumstance, which contained the language "by means of lying in wait" like that used in defining first degree murder, as opposed to "while lying in wait").

In Edwards, the Ninth Circuit considered an as applied challenge to California's lying in wait special circumstance.  The petitioner there argued that the lying in wait special circumstance instruction given at his trial was so broad that it could encompass almost all first degree murders and, therefore, failed to adequately narrow the death-eligible class.  Edwards, 542 F.3d at 767.  The Ninth Circuit disagreed, holding that the instruction given in that case differed in no meaningful way from the instruction upheld by the court in Morales.  Id. at 767-68.  The court in Edwards concluded that the jury instruction given in that case covered the three elements of special circumstance lying in wait set out in Morales:  "(1) a substantial period of waiting and watching for an opportune time to act; (2) concealment of purpose; and (3) immediately thereafter a surprise attack on an unsuspecting victim from a position of advantage."  Id. at 767 (citing Morales, 388 F.3d at 1175).

/////

other states use in their capital sentencing statutes.").

In the present case the same is true.  The relevant instruction given to petitioner's jury accurately stated the statutory requirements and made the distinctions that the Ninth Circuit found critical in ensuring that only a narrower class of first degree murder defendants are found eligible for imposition of the death penalty.  In this regard, petitioner's jury was instructed on first degree murder as follows:

> Murder which is immediately preceded by lying in wait is murder of the first degree.
>
> The term "lying in wait" is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.
>
> To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life.

(CT at 1474.)  In addition, petitioner's jury was instructed on the special circumstance of lying in wait as follows:

> To find that the special circumstance, referred to in these instructions as murder while lying in wait, is true, each of the following facts must be proved:
>
> 1. That the defendant intentionally killed the victim, and
>
> 2. That the murder was committed while defendant was lying in wait as was defined in these instructions.

(CT at 1504.)

These jury instructions adequately addressed the three elements of the lying in wait special circumstance as set out in the decision in Morales.  Petitioner makes much of the absence of a specific reference to a "substantial" period of watching and waiting in the lying in wait instructions given to his jury.  That argument is misplaced however.  As the Ninth Circuit stated in Edwards:

> Edwards is correct that the lying in wait instruction given at his trial did not include the words "a substantial period" of waiting and watching. As the California Supreme Court noted, this is not surprising as Edwards' trial pre-dated the Morales opinion. [citation omitted.]  Edwards' jury was instructed, however, that the

period of waiting and watching had to be of sufficient duration to prove beyond a reasonable doubt the elements of waiting, watching, and concealment, and that the defendant intended to kill the victim during the period of lying in wait.

542 F.3d at 767.

Moreover, the concealment element was specifically referenced in the instructions given to petitioner's jury. The instructions satisfied the temporal requirement by requiring the jury to find that the murder was committed "while" lying in wait. Finally, the instructions satisfactorily distinguished first-degree murder lying in wait from special-circumstance lying in wait. They informed the jury that, unlike lying in wait as a theory of first degree murder, to find the special circumstance of lying in wait, the jury was required to find that the defendant acted with the specific intent to kill. See Webster, 54 Cal. 3d at 448 ("On the other hand, the jury was told that it could not find the special circumstance of murder while lying in wait unless the defendant "intentionally killed" the victim."); see also Bradway, 588 F.3d at 992 (noting that California courts have concluded that "the special circumstance remains distinguishable because it still requires the specific intent to kill, whereas first degree murder by lying in wait does not"). The instructions given at petitioner's trial also advised the jury that, to find the special circumstance it had to find a different temporal requirement: that the murder was committed *"while"* petitioner was lying in wait. Webster, 54 Cal. 3d at 449 ("The special circumstance instruction set forth the statutory requirement that the murder was committed 'while' the defendant was lying in wait."); see also Morales, 388 F.3d at 1177 ("But that does not mean that the death-penalty circumstance, particularly with its requirement that the murder be committed *while* the killer lies in wait, is the 'functional equivalent' of first-degree murder."). The first degree murder instruction given at petitioner's trial correctly required only that the conduct constituting lying in wait "immediately precede" the murder and thereby permits a gap in time that the special circumstance does not. Morales, 388 F.3d at 1177. Because these distinctions were made clear, pursuant to controlling Ninth Circuit authority, it cannot be said that the special circumstance fails to narrow the class of murders subject to the death penalty. See Bradway, 588 F.3d at 992; Edwards, 542 F.3d at 766-68; Morales, 388 F.3d at 1174-78.

1   Petitioner also relies on the differences in the lying in wait jury instructions given in

2   Edwards and those given in his case.  (Dkt. No. 433 at 8, 10, appendix.)  His arguments in this

3   regard miss the mark.  In neither Edwards nor Morales did the Ninth Circuit establish minimum

4   constitutional requirements with respect to California's lying in wait jury instructions.  In

5   Edwards the court made it clear that for purposes of assessing an Eighth Amendment challenge to

6   the lying in wait jury instructions what was important was not the "differences in the words" used

7   in the particular instruction but rather whether the required "essential elements" were adequately

8   addressed by the instructions given.  Id. at 768.  Because the essential elements with respect to the

9   jury's lying in wait special circumstances finding were adequately addressed in the instructions

10  given at petitioner's trial, the undersigned cannot find any constitutional flaw in those challenged

11  instructions.

12   Accordingly, for reasons set forth above, the undersigned recommends that petitioner be

13  denied federal habeas relief with respect to his Claim 4F in which he challenges the lying in wait

14  special circumstance as applied in his case in light of the jury instructions given at his trial.

15   B.  Instructional Error in the Penalty Phase

16   Petitioner also claims that penalty phase jury instructions given at his trial

17  unconstitutionally restricted the jury's exercise of sentencing discretion.  Specifically, petitioner

18  argues that it is reasonably likely that the mandatory language of CALJIC 8.84.2 which was given

19  at his trial misled the jury into believing that a death verdict was mandatory if they found that the

20  aggravating circumstances outweighed the mitigating circumstances.  (Pet. (Dkt. No. 73) at 66-

21  67, 123-24.)  Petitioner argues that the instruction as given "fettered" the jury's sentencing

22  discretion.  (Id. at 66.)

23   Petitioner's jury was instructed at the conclusion of the penalty phase trial as follows:

24   After having heard all of the evidence and after having heard and
     considered the arguments of counsel, you shall consider, take into
25   account, and be guided by the aggravating and mitigating
     circumstances upon which you have been instructed.  If you
26   conclude that the aggravating circumstances outweigh the
     mitigating circumstances, you shall impose a sentence of death.
27   However, if you determine that  the mitigating circumstances
     outweigh the aggravating circumstances, you shall impose a
28   sentence of confinement in the state prison for life without the
     possibility of parole.

106

1   (CT 1658; RT 5536.)  This instruction was in keeping with California's standard instruction at the

2   time, former CALJIC No. 8.84.2 (1979 rev.).  That standard instruction, in turn, was taken

3   directly from the statutory language of California Penal Code § 190.3.[73]  See People v. Weaver,

4   26 Cal. 4th 876, 984-85 (2001).

5        Petitioner further contends that this presumption in favor of the imposition of the death

6   penalty if the jury finds the aggravating circumstances outweigh the mitigating circumstances is

7   insupportable under California law, which charges the jury with the broad discretion to decide

8   whether death is the appropriate punishment in light of all the evidence, even in the absence of

9   mitigating evidence.  See People v. Duncan, 53 Cal. 3d 955, 979 (1991).  Petitioner argues that

10   the instruction violated his due process rights by depriving him of a state-law procedural

11   safeguard, i.e., the right not to be sentenced to death unless the jury understands its ultimate

12   responsibility to determine the appropriate sentence.

13        1.  Legal Standards for Review of Instructional Error

14        In general, a challenge to jury instructions does not state a federal constitutional claim.

15   Estelle, 502 U.S. at 67-68; Engle, 456 U.S. at 119; Gutierrez, 695 F.2d at 1197.  In order to

16   warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable,

17   erroneous, or even "universally condemned,"' but must violate some due process right guaranteed

18   by the fourteenth amendment."  Cupp v. Naughten, 414 U.S. 141, 146 (1973).  See also Estelle,

19   502 U.S. at 72 (holding that to find constitutional error, there must be a "'reasonable likelihood

20   that the jury has applied the challenged instruction in a way' that violates the Constitution")

21   (quoting Boyde, 494 U.S. at 380); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  To

---

[73] At the time of petitioner's trial California Penal Code § 190.3 provided:

> After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances.  If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances, the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.

1    prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the

2    entire trial that the resulting conviction violates due process.'" Prantil v. California, 843 F.2d

3    314, 317 (9th Cir. 1988) (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)). See

4    also Middleton v. McNeil, 541 U.S. 433, 437 (2004); Estelle, 502 U.S. at 72; Henderson v.

5    Kibbe, 431 U.S. 145, 156-57 (1977). In making this determination, the challenged jury

6    instruction "'may not be judged in artificial isolation,' but must be considered in the context of

7    the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S.

8    at 14). See also Prantil, 843 F.2d at 317 (the habeas court must evaluate the challenged jury

9    instructions "'in the context of the overall charge to the jury as a component of the entire trial

10   process.'") (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

11          When a petitioner challenges a penalty phase jury instruction on the grounds that it is

12   ambiguous, the question posed to the reviewing court is "whether there is a reasonable likelihood

13   that the jury has applied the challenged instruction in a way that prevents the consideration of

14   constitutionally relevant evidence." Boyde, 494 U.S. at 380; accord McGuire, 502 U.S. at 72.

15   See also Murtishaw v. Woodford, 255 F.3d 926, 967 (9th Cir. 2001). Even if constitutional

16   instructional error has occurred, a petitioner is not entitled to relief unless the constitutional error

17   "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

18   Abrahamson, 507 U.S. 619, 637 (1993). See also California v. Roy, 519 U.S. 2, 6 (1996); Cavitt

19   v. Cullen, 728 F.3d 1000, 1010 (9th Cir. 2013), cert. denied ___U.S.___, 134 S. Ct. 1522 (2014).

20                        2. Petitioner's Mandatory Language Challenge

21          The Supreme Court specifically considered CALJIC 8.84.2 in Boyde, and the mandatory

22   language of penalty phase jury instructions more generally in Blystone v. Pennsylvania, 494 U.S.

23   299 (1990). In Boyde, the petitioner had argued that CALJIC 8.84.2 did not adequately inform

24   the jury as to its discretion in determining the appropriate sentence to be imposed. 494 U.S. at

25   376. The Court held that the mandatory language of the instruction did not unconstitutionally

26   restrict jury sentencing discretion. Id. at 377 ("But there is no such constitutional requirement of

27   unfettered sentencing discretion in the jury, and States are free to structure and shape

28   consideration of mitigating evidence 'in an effort to achieve a more rational and equitable

                                                     108

1   administration of the death penalty.'  Petitioner's claim that the 'shall impose' language of

2   CALJIC 8.84.2 unconstitutionally prevents 'individualized assessment' by the jury is thus

3   without merit.") (quoting Franklin v. Lynaugh, 487 U.S. 164, 181 (1988) (plurality opinion)).

4   The Supreme Court thus reasoned that there is no constitutional requirement of unfettered

5   sentencing discretion that permits a jury to have the freedom to decline to impose the death

6   penalty even if the jury decides that the aggravating circumstances outweigh the mitigating

7   circumstances.  Id.; see also Kansas v. Marsh, 548 U.S. 163, 171 (2006) ("So long as the

8   sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing

9   statute cannot be said to impermissibly, much less automatically, impose death."); Turner v.

10  Calderon, 281 F.3d 851, 871 (9th Cir. 2002); Bonin v. Calderon, 59 F.3d 815, 849 (9th Cir. 1995)

11  (finding this argument foreclosed by the decisions in Boyde and Blystone).  Additionally, the

12  Court quoted with approval the California Supreme Court's conclusion that the jury in the case

13  before it had been "adequately informed as to its discretion in determining whether death was the

14  appropriate penalty."  Id. at 376 (quoting People v. Boyde, 46 Cal. 3d 212, 253 (1988)).

15          In deciding Boyde, the Supreme Court relied heavily on its previous decision in Blystone.

16  Blystone involved a Pennsylvania death penalty statute that in part mandated the death penalty if

17  the jury unanimously found at least one aggravating circumstance and no mitigating

18  circumstances.  Blystone, 494 U.S. at 301.  The petitioner in that case had argued that the

19  mandatory nature of the instruction unconstitutionally restricted the discretion of the sentencing

20  jury to weigh the aggravating and mitigating circumstances however it deemed appropriate.  Id. at

21  302.  In rejecting the petitioner's argument, the Supreme Court held that the requirement of

22  individualized sentencing in capital cases is met by allowing the jury to consider all relevant

23  mitigating factors and that the heightened standards of the Eighth Amendment are thereby

24  satisfied.  Id. at 307-08.

25          Because the United States Supreme Court has upheld the very instruction given in this

26  case against an Eighth Amendment challenge,[74] petitioner's challenge to that instruction fails as a

27

28  _____
    [74]  Because the undersigned reaches this conclusion, it need not consider respondent's alternative
    argument that this claim advanced by petitioner is Teague barred.  (Dkt. No. 427 at 32-35.)

1  matter of law.[75]

2  ### 3.  Petitioner's Liberty Interest Challenge

3  Petitioner also asserts that the giving of CALJIC 8.84.2 at his trial, breached state-law

4  procedural safeguards which had in turn created a liberty interest protected by the Due Process

5  Clause.  Petitioner is correct that deprivation of a state-law procedural safeguard can constitute a

6  violation of due process.  See Hicks v. Oklahoma, 447 U.S. 343, 346 (1980).  In Hicks, the jury

7  imposed a forty-year prison sentence upon the petitioner, as mandated by a provision of a state

8  habitual offender statute.  Id. at 345.  The state appellate court later declared the provision

9  unconstitutional, but affirmed the petitioner's sentence.  Id.  The United States Supreme Court

10 vacated that judgment, holding that a defendant's interest in the exercise of the jury's discretion

11 in imposing punishment is not merely a matter of state procedural law, but is a liberty interest that

12 the Fourteenth Amendment preserves against arbitrary deprivation by the state.  Id. at 346.  The

13 Court stated:

14 > Where . . . a State has provided for the imposition of criminal
   > punishment in the discretion of the trial jury, it is not correct to say
15 > that the defendant's interest in the exercise of that discretion is
   > merely a matter of state procedural law.  The defendant in such a
16 > case has a substantial and legitimate expectation that he will be
   > deprived of his liberty only to the extent determined by the jury in
17 > the exercise of its statutory discretion, cf. Greenholtz v. Nebraska
   > Penal Inmates, 442 U.S. 1, 99 S. Ct. 2100, 60 L.Ed.2d 668 (1979),

18

---

19 [75]  This issue is properly resolved as matter of law.  Nonetheless, the undersigned notes that the
20 "shall" language of the challenged jury instruction was further clarified by the trial court.  At the
   request of defense counsel, petitioner's jury was provided additional instructions governing their
21 consideration of aggravating and mitigating circumstances, including the following instruction:

22 > In considering, taking into account, and being guided by the
   > aggravating and mitigating circumstances, you may not decide the
23 > effect of such circumstances by the simple process of counting the
   > number of circumstances on each side.  The particular weight of
24 > such opposing circumstances is not determined by the relative
   > number, but rather by their relative convincing force on the ultimate
25 > question of punishment.

26 (CT at 1666; RT at 5539.)  The California Supreme Court, after considering the instructions given
   as a whole and the arguments of counsel, concluded that the prosecution did not "exploit possible
27 ambiguities" in this jury instruction.  Webster, 54 Cal. 3d at 451.  Considered together, the
   closing arguments of counsel and the instructions provided by the court diminished any possible
28 confusion in the jury's mind regarding their discretion or sentencing role resulting from the use of
   the word "shall" in CALJIC 8.84.2.

110

1
2

and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.

3

Id. See also Murtishaw, 255 F.3d at 969-71.

4

However, the deficiency in petitioner's argument on this point is that California law had

5

not created the claimed liberty interest at the time of the petitioner's trial in 1983.  Not until two

6

years later did the California Supreme Court raise concerns over the language and use of CALJIC

7

8.84.2.  See People v. Brown, 40 Cal. 3d 512, 541 (1985).[76]  The petitioner in Brown had asserted

8

that the mandatory language of CALJIC 8.84.2 confined the jury's sentencing discretion to a

9

mechanical counting of aggravating versus mitigating factors.  Brown, 40 Cal. 3d at 538.  At that

10

time, the California Supreme Court commented that CALJIC 8.84.2 carried the potential for

11

confusion in the law, "which calls for certain prophylactic instructions in future death penalty

12

trials."  Id. at 538 n. 9.  However, the California Supreme Court ultimately ruled that the

13

mandatory language of the instruction *did not* unconstitutionally restrict the discretion of the jury.

14

Id. at 544.  See also Turner v. Calderon, 970 F. Supp. 781, 810 (E.D. Cal. 1997) ("The absence of

15

this explanatory language from sentencing instructions, however, does not render a death

16

sentence unconstitutional."), aff'd in relevant part 281 F.3d 851 (9th Cir. 2002).

17

Petitioner's claim that the mandatory language of the penalty phase instruction given at

18

his trial, CALJIC 8.84.2, unconstitutionally restricted the jury's sentencing discretion has been

19

addressed and answered adversely to him by the United States Supreme Court in both Boyde and

20

Blystone.  Consequently, any concerns raised by the California Supreme Court's decision in

21

Brown are unavailing to petitioner in light of the later holding that the challenged instruction is

22

constitutionally valid.

23

Moreover, even if California procedural law, at the time of petitioner's sentencing, created

24

a constitutionally protected liberty interest in limiting the imposition of its death penalty to only

25

those individuals for whom a jury has determined that the aggravating factors outweigh the

26

mitigating factors and where death is also appropriate, that liberty interest was not violated here.

27

See McClain v. Calderon, No. CV 89-3061 JGD, 1995 WL 769176, at * 82-83 (C.D. Cal. Aug.

28

---

[76]  The United States Supreme Court reversed Brown on other grounds in California v. Brown, 479 U.S. 538 (1987).

1    22, 1995), aff'd 134 F.3d 1383 (9th Cir. 1998) (rejecting a similar claim in light of the record

2    reflecting that counsel's arguments to the jury on the whole correctly represented California law).

3    Here, the record reflects that the prosecutor's closing argument did not focus on the challenged

4    instruction or its language.  He mentioned that aggravating factors far outweighed the mitigating

5    factors in the case only once in passing and certainly did not misrepresent California law at the

6    time.  This aspect of the record, when considered along with the additional jury instructions given

7    with respect to consideration of aggravating and mitigating circumstances (see fn. 75, above),

8    compels the court's conclusion.

9           Therefore, the undersigned finds that CALJIC 8.84.2 did not unconstitutionally restrict the

10   jury's discretion in determining the appropriate penalty in petitioner's case.  Accordingly, the

11   undersigned recommends that federal habeas relief be denied as to this aspect of petitioner's

12   claim.

13          C.  Trial Court's Failure to Exercise Independent Review According to California Law

14          In his Claim 42, petitioner alleges that in reviewing the aggravating and mitigating

15   circumstances in response to his automatic application for modification of the jury verdict under

16   California Penal Code § 190.4, the trial court violated petitioner's "constitutional rights" by

17   misconstruing the factors and applying unconstitutional definitions and standards.[77]

18          At the time of petitioner's trial, § 190.4 provided that, if a jury has returned a "finding

19   imposing the death penalty, the defendant shall be deemed to have made an application for

20   modification of such verdict or finding" in the trial court.  Cal. Penal Code § 190.4(e).  Under

21   that statute the trial court is required to

22                  review the evidence, consider, take into account, and be guided by
                    the aggravating and mitigating circumstances referred to in Section
23                  190.3, and . . . make a  determination as to whether the jury's
                    findings and verdicts that the aggravating circumstances outweigh
24                  the mitigating circumstances are contrary to law or the evidence
                    presented.
25   /////

26

27   ───────────────────────
     [77]  Petitioner did not identify in his federal habeas petition which constitutional rights he claims
28   were violated.  However, in ruling on the parties' cross-motions for summary judgment, the court
     construed this claim as alleging violations of the Due Process Clause of the Fourteenth
     Amendment and the Eighth Amendment.  (Dkt. No. 176 at 139-40.)

1    <u>Id.</u>  The provision requires that the trial judge "state on the record the reasons for his findings."

2    <u>Id.</u>  It appears undisputed that this procedure was followed in petitioner's case.  (RT at 5641-56.)

3          Petitioner nonetheless challenges the trial court's decision denying his modification

4    motion, arguing that it erred in three respects:  (1) the trial court's review was not an independent

5    assessment of the appropriateness of the death penalty in petitioner's individual case; (2) the trial

6    court improperly considered the probation report in conducting the its review under § 190.4; and

7    (3) the trial court improperly considered statutory sentencing factor § 190.3(j), "[w]hether or not

8    the defendant was an accomplice to the offense and his participation in the commission of the

9    offense was relatively minor," as an *aggravating* factor.

10          In moving for summary judgment in his favor with respect to this claim, respondent

11   argued the state trial court's refusal to reverse petitioner's sentence on state law grounds was not

12   reviewable in these federal habeas proceedings, and even if it was, the claim was wholly refuted

13   by the record in this case.  This court agreed with respondent's argument with respect to any

14   alleged due process violation stemming from the trial courts review under § 190.4, finding:

15   "Petitioner's allegations are clearly insufficient to state a claim that his due process rights were

16   violated because the trial court's ruling on his automatic application for modification was

17   fundamentally unfair."  (Dkt. No. 176 at 140.)  However, with respect to any alleged Eighth

18   Amendment violation, the undersigned recommended that respondent's motion for summary

19   judgment be denied as "premature" since questions concerning the efficacy of the trial court's

20   § 190.4 review appeared "logically intertwined with petitioner's arguments challenging the

21   sufficiency of the California death penalty statute's narrowing function under <u>Zant</u>, 462 U.S. at

22   890 . . . and with arguments attacking the lack of meaningful appellate review."  (Dkt. No. 176 at

23   140.)  That recommendation was adopted by the assigned District Judge.  (Dkt. No.  201.)

24          Thus, in arguing that the trial court erred in conducting its review under § 190.4, petitioner

25   can state a cognizable claim, if at all, only under the Eighth Amendment.  Petitioner, however,

26   has failed to set forth any legal basis for such an Eighth Amendment claim.  Indeed, he

27   acknowledges that the Ninth Circuit has "suggested" that a challenge to a court's § 190.4 review

28   may only constitute an error of state law, not reviewable in a federal habeas proceeding.  In fact,

113

1   the Ninth Circuit has done more than merely "suggest" that this is the case, expressly stating that

2   "at most the [trial court's] error [in ruling on the section 190.4(e) motion] would be one of state

3   law" and thus not one cognizable as a habeas claim.  Turner, 281 F.3d at 871 (citing Pulley, 465

4   U.S. at 41 (federal court may not issue a writ based on a perceived error of state law)).

5          In Turner, the petitioner argued, just as petitioner does here, that the trial court violated §

6   190.4 by considering non-statutory aggravating factors and failing to consider mitigating factors

7   when reviewing the petitioner's automatic application for modification of a death verdict.  There,

8   the petitioner  asserted that his Fifth, Eighth, and Fourteenth Amendment rights were violated as a

9   result.  The Ninth Circuit rejected the petitioner's arguments, ruling that:

> Because Turner provides no legal authority to support his constitutional claim, and because the trial court made an individualized determination of whether death was the proper punishment, we agree with the district court that 'at most the [trial court's] error would be one of state law.'

13  Id.  Here, petitioner fails to cite any contrary authority establishing a legal basis for this claim.

14  Although he cites one district court opinion that analyzing a § 190.4(e) challenge brought in a

15  federal habeas petition, that decision pre-dates the decision Turner.  See Williams v. Vasquez,

16  817 F. Supp. 1443, 1490-91 (E.D. Cal. 1993).[78]  Moreover, in that case the district court

17  concluded that although the trial court had considered invalid factors, it had cited sufficient

18  additional factual support for its independent determination that the evidence supported the jury's

19  findings and verdict and that, therefore, no constitutional violation had occurred.  Id. at 1491.

20  The same can be said of the errors alleged by this petitioner with respect to the sentence

21  modification hearing in his case.

22          The decision in Turner is binding on this court.  In Turner the Ninth Circuit specifically

23  considered the issue of whether an Eighth Amendment claim based upon alleged error in the trial

24  court's § 190.4 review rises to the level of a constitutional violation and found that it did not.

25  Turner, 281 F.3d at 871; see also Hunter v. Vasquez, C 90-3275 JW, 1995 WL 429242, at *8

26

---

27  [78]  Although not relied upon by petitioner, the undersigned is aware that in two decisions

following Turner, the Ninth Circuit addressed, without comment on the propriety of doing so,

petitioners' § 190.4(e) challenges on the merits.  See Belmontes v. Ayers, 529 F.3d 834, 877-78

28  (9th Cir. 2008) (rejecting claim), rev'd on other grounds, Wong v. Belmontes, 558 U.S. 15

(2009); Allen v. Woodford, 395 F.3d 979, 1017-18 (9th Cir. 2005) (finding any error harmless).

1   (N.D. Cal. July 17, 1995) ("Petitioner has a federal constitutional right to be free from arbitrary

2   and capricious decisions at the modification hearing" held pursuant to California Penal Code

3   §190.4(e).)

4       For these reasons the undersigned recommends that petitioner be denied federal habeas

5   relief with respect to his Claim 42 that the trial court failed to properly exercise independent

6   review of the jury's finding imposing the death penalty in his case as required under California

7   Penal Code § 190.4.

8       D.  Ineffective Assistance of Counsel re Investigating and Presenting a Defense in the
        Guilt Phase of the Trial
9

10      Petitioner claims that his trial counsel also provided ineffective assistance in the guilt

11  phase of his trial by failing to investigate and introduce evidence of petitioner's alcohol and drug

12  use, post-traumatic stress syndrome (PTSD), exposure to Agent Orange, and brain damage or

13  dysfunction.  (Pet. (Dkt. No. 73) at 75, 77, 82; claims 19A, 19G, 19H, 20B, 20B.4, and 20B.5.)

14  Petitioner argues that the introduction of evidence on these issues would have supported a defense

15  of diminished capacity or negated the element of intent.  (Id. at 75, 82.)  For the reasons set forth

16  below, the undersigned concludes that petitioner is not entitled to relief because the evidence

17  before the court reflects that his trial counsel did conduct investigation into these issues and that

18  his decision not to further pursue a defense based on alcohol and drug use and/or petitioner's

19  mental impairment based upon a PTSD condition or exposure to Agent Orange did not fall below

20  an objective standard of reasonableness.[79]

21  /////

22  /////

23  _____

24  [79]  Petitioner did not request an evidentiary hearing with respect to his claim that he received
    ineffective assistance of counsel at the guilt phase of his trial, and none was granted.  Rather, the
25  evidentiary hearing in these habeas proceedings was limited to petitioner's claims of ineffective
    assistance of counsel at the penalty phase of his trial.  Additionally, petitioner's traverse did not
26  include any additional points and authorities in support of his ineffective assistance claims
    relating to the guilt phase of his trial.  Instead, the traverse simply cited to the undersigned prior
27  findings and recommendations addressing the parties' cross-motions for summary judgment.
    (Dkt. No. 434 at 2.)  Therefore, it appears that petitioner is relying on his prior briefing on the
28  cross-motions for summary judgment in support his claims of ineffective assistance of counsel at
    the guilt phase of his trial.

1           1. Relevant Trial Background

2           At petitioner's trial, the defense relied upon a theory of self-defense.  Webster, 54 Cal. 3d

3    at 426.  Petitioner testified in his own defense as follows.  (RT at 3682-3712, 3753-3858.)

4    Petitioner and Burke met and devised a plan to use the car then in Burke's possession to sell

5    drugs and commit robberies.  (RT at 3690, 3698.)  They drove around together for a while.  (RT

6    at 3696-98.)  Then, as petitioner, Burke, Madrigal and Williams walked toward the campsite,

7    petitioner and Burke argued over how to split the money they expected to obtain later from the

8    drug sales and robberies.  (RT at 3702-03.)  Burke suddenly grabbed a knife from his pants

9    pocket.  (RT at 3703-04.)  Petitioner then grabbed Burke's hand and a fight ensued.  (RT at 3704-

10   06.)  Petitioner received a cut on his left leg.  (RT at 3704-05.)  During the fight, petitioner got the

11   knife away from Burke.  (RT at 3705-06.)  When the fight ended, Burke was on the ground.  (RT

12   at 3706.)  Petitioner and the others at the campsite decided to hide the body.  (RT at 3707.)  The

13   group then fled in the car and threw Burke's and all of their knives in a river.  (RT at 3709-10.)

14          Petitioner's counsel also called Larry Moser as a witness in petitioner's defense.  (RT at

15   4643.)  Moser testified that Burke had started a fight with him in a bar in 1978.  (RT at 4643-45.)

16   Moser said that, even after being escorted from the premises, Burke returned and hit him in the

17   face with a bar glass.  (RT at 4645.)  Moser sustained injuries requiring thirty stitches.  (RT at

18   4645.)

19          The jury was instructed on self-defense.  (CT at 1436-48.)  In his closing argument to the

20   jury petitioner's counsel, O'Brien, contended that the evidence showed that petitioner had acted

21   in self-defense.  He pointed out that, unlike Burke, petitioner had sustained a "defensive wound"

22   (RT at 4785, 4789), drawing on his cross-examination of the forensic pathologist (RT at 2795-

23   96).  In this regard, attorney O'Brien asserted that petitioner's leg wound was consistent with his

24   testimony that Burke had pulled out a knife and turned toward petitioner with it.  (RT at 4785.)

25   Attorney O'Brien argued that the evidence that Burke's pants pocket had been turned out was

26   also consistent with petitioner's own testimony that Burke grabbed a knife from his pants pocket.

27   (RT at 4787.)  Petitioner's counsel also pointed to Moser's testimony as supporting petitioner's

28   testimony that Burke initiated the fight.  (RT at 4790-91.)  Attorney O'Brien also argued that the

116

1    evidence reflecting that a fight had taken place on the trail near the camp was not consistent with

2    the prosecution's theory of a carefully planned murder.  In particular, petitioner's counsel in his

3    closing argument attacked the credibility of prosecution witnesses Michelle Cram and Bruce

4    Smith.  (RT at 4775, et seq.)

5                            2.  Procedural History

6        Petitioner first alleged that his trial counsel was ineffective by failing to investigate and

7    present evidence supporting a defense of diminished capacity, specifically based upon his drug

8    and alcohol abuse and his PTSD condition related to his military service in Vietnam, in his

9    petition for writ of habeas corpus filed in the California Supreme Court.  Webster, 54 Cal. 3d at

10   423, 456-58; (see also 1988 Petition for Writ of Habeas Corpus, case number S007757 ("First

11   State Petition"), lodged herein Nov. 30, 1994 (see Dkt. No. 38).)[80]  Petitioner's claim of

12   ineffective assistance in connection with the guilt phase of his trial was addressed by that court

13   and rejected, Webster, 54 Cal. 3d at 456-58, and the habeas petition was denied on every ground.

14   Id. at 423, 459-60.

15       Petitioner also included this claim of ineffective assistance of trial counsel in a second

16   petition for writ of habeas corpus he filed in the California Supreme Court on April 23, 1996.

17   (See Dkt. No. 176 at 46; see also 1996 Petition for Writ of Habeas Corpus, case number S053140

18   ("Second State Petition"), lodged herein Dec. 5, 1996 (see Dkt. No. 100).)  Therein, petitioner

19   added a claim that his trial counsel should have pursued a trial defense of mental deficiency based

20   on petitioner's exposure to Agent Orange in Vietnam.  That habeas petition was summarily

21   denied by the California Supreme Court.  (See Dkt. No. 176 at 3.)

22       These claims of ineffective assistance of counsel at the guilt phase were renewed in

23   petitioner's Second Amended Petition for Writ of Habeas Corpus filed in this court.  (Dkt. No. 73

24   at 74-75, 77, 81-82.)

25                            3.  Evidence Relating to these Claims

26       In support of his ineffective assistance claims with respect to a possible defense based

27   upon his mental state, petitioner presented the California Supreme Court with declarations from

28
─────────────────────────
[80]   That state habeas petition was ruled upon by the California Supreme Court in conjunction
with petitioner's direct appeal on August 30, 1991

1    his trial counsel O'Brien, clinical psychologists John Podboy and Catherine Popell,

2    pharmacologist David E. Smith, and petitioner himself, along with petitioner's military records.

3    (Exs. A, B, and C to First State Petition, Exs. to Petitioner's Informal Reply to Respondent's

4    Informal Resp. ("IR") to the First State Petition; Decls. in Supp. of Second State Petition.[81])   In

5    response, the state presented a second declaration from petitioner's trial counsel O'Brien.  (Ex. 1

6    to IR to First State Petition.)

7         Attorney O'Brien stated in his first declaration, submitted by petitioner in support of his

8    claim, that he was aware of his duty to investigate petitioner's mental state both at the time of trial

9    and at the time the offense in question was committed.  (Ex. C to First State Petition at 2.)

10   O'Brien  also acknowledged that he was "aware of the existence and significance of . . . post

11   traumatic stress syndrome."  (Id.)  Attorney O'Brien stated that he had petitioner examined for

12   these issues.  (Id.)

13        In his own declaration, petitioner acknowledged that his trial attorney O'Brien had

14   arranged to have him examined by "some psychiatrists who pronounced me legally sane and also

15   mentally competent to stand trial."  (Ex. A to First State Petition at 4.)  Petitioner complained,

16   however, that he was not told that "matters short of legal insanity" could have provided a partial

17   defense or resulted in a lesser degree of homicide.  (Id.)

18        Attorney O'Brien provided significantly more detail regarding his guilt phase preparation

19   in his second declaration, which was filed by the respondent in the state habeas proceedings.  (Ex.

20   1 to IR to First State Petition.)  In that second declaration, attorney O'Brien stated as follows.

21   O'Brien knew that petitioner had served in Vietnam and had seen combat there.  (Id. at 1-2.)

22   However, petitioner did not tell O'Brien that he had flashbacks or any other psychiatric problems

23   related to his military service.  O'Brien did know that petitioner's discharge was "less than

24   honorable."  Nevertheless, attorney O'Brien did investigate mental defenses, including PTSD,

25   and was told none existed.  (Id. at 2, 5.)  In this regard, attorney O'Brien explained in his second

26

27   [81]  All pleadings and exhibits with respect to petitioner's First State Habeas Petition were lodged
     with this court on November 30, 1994.  (See Dkt. No. 38.)  All pleadings and exhibits regarding
28   his Second State Habeas Petition were lodged with this court on December 5, 1996.  (See Dkt.
     No. 100.)

declaration:

> I had petitioner examined by psychologist Howard Budwin and psychiatrist Alfred French. I specifically had Budwin examine petitioner for PTSD. I informed both French and Budwin of what I had learned from petitioner, hoping that they could learn more from him in their examinations. Both Budwin and French informed me that they had found no evidence of PTSD in petitioner. Budwin found nothing that would assist from a psychological standpoint, including PTSD. Budwin found petitioner to be perfectly capable of killing and rational. Budwin found petitioner to be a sociopath.

(Id. at 2.)

O'Brien also stated that he had tried to obtain petitioner's military records. (Id. at 4.) However, in light of the findings of his mental health experts, O'Brien decided he did not need the military records for the guilt phase of petitioner's trial, but would use them if he could in the penalty phase. (Id. at 4-5.) Attorney O'Brien further explained that petitioner "had maintained throughout that Burke had attacked him with a knife, just as he testified to at trial." (Id. at 2.) According to O'Brien,

> petitioner wanted to keep to his explanation of the event just as he had repeatedly explained to me and as he later so testified at trial; petitioner recognized that his specific and detailed recall of the events would foreclose joining with his codefendants in a defense of diminished capacity due to abuse of alcohol and drugs.

(Id. at 4.) O'Brien also pointed out that he was able to find and present a witness, Moser, whose testimony provided some support for petitioner's claim that he acted in self-defense upon being attacked by Burke. (Id. at 6.)

In support of this claim in the state habeas proceedings, petitioner also offered the declaration of Dr. Podboy, a clinical psychologist. (Ex. B to First State Petition.) Dr. Podboy met with petitioner on November 26, 1985, and January 28, 1986. (Id. at 3.) He also reviewed petitioner's military records and spoke with petitioner's family members. (Id.) Dr. Podboy stated his opinion based upon his review as follows:

> Based on my examinations, I am of the opinion that Mr. WEBSTER suffered from a psychological condition at the time of the homicide, produced by a combination of drug abuse, alcohol abuse, and post-traumatic stress from his military service, which if properly presented to the guilt-phase jury could have led to a verdict of less than first-degree murder with special circumstances.

119

1    (Id. at 1.)

2         In 1996, in support of petitioner's second state habeas application, psychologist Dr. Popell

3    executed a declaration stating that "[t]he records I have reviewed and my discussions with Mr.

4    Webster, to date, indicate that he began using drugs and alcohol extensively while serving in the

5    armed forces in Vietnam." (Popell Decl. in Supp. of Second State Petition.)  Dr. Popell advised

6    that her testing and evaluation were not complete, but that "preliminary test results strongly

7    suggest the presence of neuropsychological brain dysfunction in Mr. Webster."  (Id.)

8         Also in 1996, Dr. Smith examined petitioner and reviewed a number of records relating to

9    petitioner.  (Smith Decl. in Supp. of Second State Petition.)  Based on that review, Dr. Smith

10   concluded "that there is ample evidence to establish that at the time of the homicide . . . Mr.

11   Webster was suffering from profound alcohol and drug abuse, as well as post-traumatic stress

12   disorder."  (Id.)

13        Petitioner's military records, which had finally been obtained by his counsel prior to the

14   penalty phase of his trial, were submitted to the California Supreme Court as exhibits in support

15   of petitioner's informal reply in the first state habeas proceeding.[82]  Petitioner's military records

16   revealed some misconduct on his part and reflected disciplinary actions taken against him.  As

17   noted above, while serving in Vietnam, petitioner was absent without leave for ten days and then

18   escaped from the custody of the military police.  (Ex. F to Second State Petition.)  For this,

19   petitioner was demoted from a Specialist Four to a Private First Class E-3 and forfeited some pay.

20   (Id. at 2, 4-5.)  After his tours of duty in Vietnam, petitioner was stationed at Fort Carson,

21   Colorado.  (Id. at 7-24.)  There, petitioner was further disciplined and demoted in rank for drug

22   use and failure to report for duty.  (Id. at 7-24.)

23        Petitioner's commanding officer at Fort Carson initiated proceedings to have petitioner

24   discharged for unfitness.  (Ex. F to Second State Petition.)  As part of those proceedings,

25   petitioner  was examined by a psychiatrist.  (Exs. G and H to Second State Petition.)  Petitioner's

26   military records included a report in which that psychiatrist made these comments after

27

28   ────────────────────
     [82]  Evidence that petitioner had received the Bronze Star and Army Commendation Medal for
     heroism in Vietnam was summarily introduced during the penalty phase of his trial.  (Ex. B to
     Second State Petition; RT at 5420-21.)

                                                120

1  interviewing petitioner:

2  > [Petitioner] uses marijuana daily and has used LSD and mescaline
3  > about 20 times in the past. [Petitioner] disagrees with what the
>   Army stands for . . . .  He feels no responsibility toward the Army
>   and does whatever he feels like doing.  [Petitioner] seemed to lack
4  > any motivation to do a job well.  He expressed the desire to be
>   separated from the Army by way of "212" action.  [Petitioner] has
5  > several Articles 15 for being AWOL.

6  (Ex. H to Second State Petition at 1.)

7  The psychiatrist at that time concluded that petitioner "was and is mentally responsible,

8  able to distinguish right from wrong and to adhere to the right, and has the mental capacity to

9  understand and participate in board proceedings."  (Id.)  The psychiatrist diagnosed petitioner as

10  having a passive-aggressive personality.  (Id.)  The psychiatrist opined that counseling at the

11  Mental Hygiene Consultation Service would not alter petitioner's attitude and recommended his

12  separation from service. (Id.)  The resolution of the proceedings was that petitioner was

13  discharged from the Army for unfitness under honorable conditions and his rank was reduced to

14  E-1, the entry level.  (Ex. K to Second State Petition.)

15  4. Legal Standards - Review

16  The legal standards to be applied in considering a claim based upon alleged ineffective

17  assistance of counsel have been set out in detail above.  In short, to establish ineffective

18  assistance, a petitioner must show both that counsel's actions fell below an objective standard of

19  reasonableness and that the alleged errors resulted in prejudice.  Strickland, 466 U.S. at 687-88.

20  To succeed with respect to the first component of that legal standard, a petitioner must overcome

21  a "strong presumption" that counsel's performance fell within the "wide range of reasonable

22  professional assistance," that counsel's actions and omissions were part of sound trial strategy

23  and that all significant decisions were the result of acceptable professional judgment.  Id. at 689-

24  90.  In this regard, "counsel has a duty to make reasonable investigations or to make a reasonable

25  decision that makes particular investigations unnecessary . . . [.]"  Id. at 691.  See also Daniels,

26  428 F.3d at 1203 (counsel found "ineffective where he neither conducted a reasonable

27  investigation nor made a showing of strategic reasons for failing to do so"); Douglas, 316 F.3d at

28  1085 ("Trial counsel has a duty to investigate a defendant's mental state if there is evidence to

1    suggest that the defendant is impaired.").

2        Even where counsel's performance is found to be deficient, in order to prevail on such a

3    claim a petitioner is required also to show that counsel's conduct prejudiced him.  Strickland, 466

4    U.S. at 691-92.  In order to establish such prejudice, a petitioner "must show that there is a

5    reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

6    would have been different.  A reasonable probability is a probability sufficient to undermine

7    confidence in the outcome."  Id. at 694.  Ultimately, the "focus of inquiry must be on the

8    fundamental fairness of the proceeding whose result is being challenged."  Id. at 696.  There is no

9    constitutional violation unless counsel made "errors so serious as to deprive the defendant of a

10   fair trial, a trial whose result is reliable."  Id. at 687.

11        5.  Analysis

12        In this case, the undersigned finds that petitioner has not met his burden of establishing

13   that his trial counsel failed to act within professional norms in conducting a pretrial investigation

14   into a possible defense based on mental impairment and/or intoxication[83] and, thereafter, based on

15   the results of mental health examinations of petitioner, in choosing to rely on a theory of self-

16   defense at the guilt phase of petitioner's trial.

17        To the extent the facts and circumstances suggested the possibility of a mental impairment

18   defense, attorney O'Brien fulfilled his required duty by retaining a psychologist and a psychiatrist

19   to examine petitioner for mental health issues, including PTSD.  Following their examinations of

20   

_____

21   [83]  The defense of diminished capacity was abolished in California in 1982, but was available to
     petitioner because his crime of conviction was committed in August of 1981.  People v. Payton, 3

22   Cal. 4th 1050, 1060 n. 3 (1992) (citing People v. Pensinger, 52 Cal. 3d 1210, 1241 (1991)).  If
     evidence showed that due to diminished capacity caused by mental illness, mental defect or

23   intoxication, the defendant did not have the capacity to form the mental state of malice
     aforethought, the killing would have been voluntary manslaughter.  People v. Turk, 164 Cal. App.

24   4th 1361, 1373 (2008).  However, even at that time it had been recognized that "merely showing
     that the defendant had consumed alcohol or used drugs before the offense, without any showing

25   of their effect on him, is not enough to warrant an instruction on diminished capacity."
     Pensinger, 52 Cal. 3d at 1241.  Also at that time, evidence of a defendant's mental condition or

26   intoxication could be relevant to show whether the defendant actually formed the requisite mental
     state, including malice, both express and implied, and the intent to kill.  Turk, 164 Cal. App. 4th

27   at 1376.  Although not in specific reference to petitioner, the jury in his case was instructed with
     respect to both diminished capacity and the relevance of intoxication to the element of specific

28   intent.  (CT at 1420-33).

                                                            122

1    petitioner, those experts reported to defense counsel that they had uncovered no support for a

2    psychological defense, including one based on PTSD.  As has been recognized, "[i]t is certainly

3    within the 'wide range of professionally competent assistance' for an attorney to rely on properly

4    selected experts."  Harris v. Vasquez, 949 F.2d 1497, 1525 (9th Cir. 1990).  Accord Stokley v.

5    Ryan, 659 F.3d 802, 813, n.8 (9th Cir. 2011), cert. denied ___U.S.___, 133 S. Ct. 134 (2012);

6    Crittenden v. Ayers, 624 F.3d 943, 965 (9th Cir. 2010); Williams v. Woodford, 384 F.3d 567, 611

7    (9th Cir. 2004) ("Given that the mental-health experts' evaluations of Williams did not support a

8    mental-state defense, Ingber's decision not to investigate further or ultimately pursue the defense

9    was a reasonable strategic choice."); Hendricks, 70 F.3d at 1038; Morgan v. Bunnell, 24 F.3d 49,

10   52 (9th Cir. 1994) ("In light of these expert opinions, defense counsel reasonably declined to try

11   these [insanity or diminished capacity] defenses.").

12          Significantly, petitioner does not contend nor has he offered evidence to suggest that the

13   medical professionals retained by his trial counsel were not competent or that counsel acted

14   unreasonably in hiring them.  See Hendricks, 70 F.3d at 1037 ("There is no evidence that the

15   conclusions of the experts were tentative, snap judgments, or otherwise based on anything less

16   than a full analysis of complete data."); Harris, 949 F.2d at 1525 ("Harris has not alleged any

17   facts showing that Ryan should not have chosen the two psychiatrists who assisted the defense, or

18   that Ryan had any reason to believe the defense psychiatrists were incompetent, or that their

19   credentials were deficient in any way.").  While an investigation cannot be cursory, "counsel need

20   not investigate interminably."  Mickey v. Ayers, 606 F.3d 1223, 1237 (9th Cir. 2010) (citing

21   Hendricks, 70 F.3d at 1037), cert. denied ___U.S.___, 132 S. Ct. 419 (2011).  Moreover, there is

22   no requirement that defense counsel "shop around" for an expert who will render the desired

23   opinion.  Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995).  Accord Payton v. Cullen, 658

24   F.3d 890, 896 (9th Cir. 2011) ("Having retained qualified experts, it was not objectively

25   unreasonable for Merwin not to seek others."), cert. denied ___U.S.___, 133 S. Ct. 426 (2012);

26   Winfield v. Roper, 460 F.3d 1026, 1041 (8th Cir. 2006).  "[S]trategic choices made after thorough

27   investigation of law and facts relevant to plausible options are virtually unchallengeable . . . [.]"

28   Strickland, 466 U.S. at 690.

It is true that attorney O'Brien failed to obtain petitioner's military records before he retained his experts, and it is certainly troubling that he decided he did not need those records for the guilt phase of petitioner's trial.  (Ex. 1 to IR to First State Petition at 4-5.)  However, there is no indication in the record before this court that the mental health professionals retained by petitioner's counsel definitely required those military records to form their opinions.  With respect to guilt phase preparation, as opposed to penalty phase, counsel has no affirmative duty to anticipate and gather the background information an expert might need.  Hendricks, 70 F.3d at 1038-39.

As the Ninth Circuit has recognized:

> To now impose a duty on attorneys to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert, would defeat the whole aim of having experts participate in the investigation. An integral part of an expert's specialized skill at analyzing information is an understanding of what information is relevant to reaching a conclusion.

Id. at 1038.  Accord Murtishaw, 255 F.3d at 945 ("Absent such a specific request for information, [attorney] Feringa was not required to provide either expert with additional information."); Coleman v. Calderon, 150 F.3d 1105, 1114-15 (9th Cir.) (same), rev'd on other grounds, 525 U.S. 141 (1998).[84]  Rather, as recognized by the Ninth Circuit it is the expert who is in the best position to identify what background information is relevant to the task for which the expert is retained.  Hendricks, 70 F.3d at 1038; Coleman, 150 F.3d at 1115.  Part of the value of an expert is in "guid[ing] the attorney's efforts toward collecting relevant evidence."  Hendricks, 70 F.3d at 1039.  See also Coleman, 150 F.3d at 1115.

Here, not only did the defense experts' evaluations of petitioner fail to support the offering of a defense based on intoxication or mental impairment, attorney O'Brien's own discussions

---

[84]  As indicated above, case law requires a more proactive role for counsel in regard to penalty phase experts and evidence relating to mitigation.  Murtishaw v. Woodford, 255 F.3d 926, 945 n.9 (9th Cir. 2001) (citing Caro v. Calderon, 165 F.3d 1223, 1226-27 (9th Cir. 1999)); see also Pizzuto v. Arave, 385 F.3d 1247, 1256, n. 8 (9th Cir. 2004) (noting that in holding "defense counsel is not ineffective for failing to provide a mental health expert with unrequested background information about the defendant for the guilt phase of trial the court [in in Murtishaw] specifically distinguished existing precedent that held that, to be effective in the penalty phase of a capital case, defense counsel must provide background information to mental health experts who are examining the client, even if the experts do not request those facts").

1    with petitioner reasonably led O'Brien to adopt self-defense as the theory of the case.  As O'Brien

2    has attested, petitioner "maintained throughout that Burke had attacked him with a knife, just as

3    he testified to at trial."  (Ex. 1 to Informal Response to First State Petition at 2.)   Moreover,

4    O'Brien has stated that petitioner insisted on testifying at his trial to present that account to the

5    jury himself.  (Id. at 4.)  Attorney O'Brien also maintained that petitioner acknowledged to him

6    that the "specific and detailed recall of the events" to which petitioner would testify would be

7    inconsistent with a diminished capacity defense.  (Id. at 4.)  See Turk v. White, 116 F.3d 1264,

8    1266-67 (9th Cir. 1997) (defense counsel found to have acted reasonably in choosing a self-

9    defense theory over a mental health defense theory where a mental health defense would have

10   been inconsistent the defendant's version of events and other evidence and justified counsel's

11   decision not to investigate further a mental health defense).

12        Attorney O'Brien's declaration in this regard is corroborated by petitioner's own trial

13   testimony.  Petitioner testified at his trial and gave a detailed account of events leading up to the

14   stabbing of Burke, as described above.  (RT at 3690-3703.)  Petitioner also described the

15   argument over money as the group walked along the trail to their campsite.  (RT at 3702-03.)

16   Petitioner further testified clearly and coherently about the fight itself.  He explained that Burke

17   suddenly grabbed a knife from his pants pocket and that petitioner grabbed Burke's hand and the

18   fight ensued.  (RT at 3703-06.)  Petitioner testified that he received a cut on his left leg but that as

19   the fight continued, he got the knife away from Burke and when the fight ended, Burke was on

20   the ground.  (RT at 3704-06.)  Although petitioner testified that he was "excited" and "upset"

21   when the fight was over, he certainly did not describe any break with reality, flashback, blackout

22   or unusual mental state during his account of the incident at his trial.  Petitioner also gave a

23   detailed account during his testimony of the group's subsequent disposal of Burke's body and

24   their flight.  (RT at 3707-10.)  Moreover, in his declaration submitted in support of his state

25   habeas application, petitioner did not repudiate any of his trial testimony in this regard.   (See Ex.

26   A to First State Petition.)

27        A defense attorney may rely on his client's statements and preferences in choosing a

28   defense of alibi, self-defense or innocence over a defense based on some type of mental

125

1    impairment.  See Stankewitz v. Woodford, 365 F.3d at 720 n.7 ("An attorney's performance is

2    not deficient where, as here, it reflects a reasonable strategic choice that aligns with his client's

3    wishes."); Bean, 163 F.3d at 1082 ("In light of Bean's assertion to Roehr that he had not been at

4    the Schatz residence at the time of the crimes, his reluctance to blame his alleged co-burglar, and

5    his own refusal to adopt the diminished capacity defense, Roehr made a reasonable strategic

6    choice to present an alibi defense."); Campbell v. Kincheloe, 829 F.2d 1453, 1463 (9th Cir.

7    1987); see also Middleton v. Roper, 455 F.3d 838, 848 (8th Cir. 2006) ("Counsel's adherence to

8    Middleton's desired defense supports a conclusion of reasonably effective assistance.");

9    Campbell v. Polk, 447 F.3d 270, 280 (4th Cir. 2006) ("We further cannot fault counsel for

10   heeding petitioner's protestations of his own innocence.  To have pursued a different tack in the

11   face of those assertions would have presented problems of its own.").

12       "The reasonableness of counsel's actions may be determined or substantially influenced

13   by the defendant's own statements or actions.  Counsel's actions are usually based, quite

14   properly, on informed strategic choices made by the defendant and on information supplied by the

15   defendant." Strickland, 466 U.S. at 691.  Here, petitioner has failed to establish that attorney

16   O'Brien's decision to present a self-defense theory at trial, in reliance on petitioner's account of

17   the events and petitioner's expressed preference to tell his story to the jury, was an unreasonable

18   one.  This is particularly true given the examination results reported by the psychologist and the

19   psychiatrist employed by counsel.

20       Having reasonably adopted the strategy of self-defense, attorney O'Brien cannot be found

21   ineffective for not continuing to pursue a guilt-phase defense based on petitioner's mental

22   impairment, whether based on PTSD, intoxication or exposure to Agent Orange.  See Williams v.

23   Woodford, 384 F.3d at 611 ("Having reasonably selected an alibi defense as the primary defense

24   theory, Ingber no longer had a duty to investigate a conflicting mental-state defense."); Bean, 163

25   F.3d at 1082 ("Once Roehr reasonably chose that theory, largely on the basis of Bean's own

26   representations, his duty to investigate the directly conflicting diminished capacity defense was at

27   an end.") (citing Turk, 116 F.3d at 1267).  "[W]hen the facts that support a certain potential line

28   of defense are generally known to counsel because of what the defendant has said, the need for

126

1   further investigation may be considerably diminished or eliminated altogether." Strickland, 466

2   U.S. at 691.  Here, once attorney O'Brien reasonably adopted the self-defense theory supported

3   by petitioner's own representations, his duty to investigate the directly conflicting diminished

4   capacity defense as part of his guilt phase preparation ended.[85]

5          In sum, petitioner has failed to establish deficient performance on the part of his trial

6   counsel at the guilt phase of his trial.  Because petitioner has failed to establish this first prong,

7   the court need not consider the issue of prejudice stemming from the alleged ineffective

8   assistance. Strickland, 466 U.S. at 697 (recognizing that a court need not address Strickland's

9   components in any particular order or even address both if the defendant makes an insufficient

10  showing with respect to one component).  For the reasons set forth above, the undersigned

11  recommends that petitioner be denied federal habeas relief with respect to his claim that he

12  received ineffective assistance as a result of his trial counsel's failure to investigate and present a

13  mental health defense.

14          E.  Ineffective Assistance of Counsel - Petitioner's Motion to Suppress Evidence

15          Petitioner also contends that he was deprived of the effective assistance of trial counsel

16  based on three instances in which he contends his counsel failed to adequately cross-examine the

17  prosecution's witnesses at the pretrial hearing on his motion to suppress evidence.  (Pet. (Dkt. No.

18  73) at 82-83, 85 (claims 20B.7, 20B.8, 20B.9, and 21B).)  For the reasons set forth below, the

19  undersigned concludes that petitioner has not carried his burden of establishing deficient

20  performance by his counsel in these instances.

---

21  [85]  Petitioner also complains that his trial counsel did not explain to him that "matters short of

22  legal insanity could provide a partial defense to the charges against me, nor did he tell me that
    expert witnesses could be hired to explain to the jury that my combat experiences, and the use of

23  drugs, use of alcohol and resulting psychological problems could legally result in my being found
    guilty of some degree of homicide less than first-degree murder."  (Ex. A to First State Petition at

24  4.)  Petitioner's argument notwithstanding, he has failed here to establish deficient performance
    on the part of his trial counsel.  It is not disputed that the examinations conducted by the mental

25  health professionals retained by trial counsel provided no support for a defense based upon a
    claim that petitioner suffered from a mental impairment.  (See Exh. 1 to Informal Response at 2)

26  As such, no duty on counsel's part to pursue that issue any further was ever triggered.  Doe v.

27  Woodford, 508 F.3d 563, 569 (9th Cir. 2007) ("The defendant fails to point to any credible
    evidence of mental incapacity which would have triggered a duty on the part of his counsel to

28  investigate for possible defenses.").  Counsel's explaining to petitioner the nuances of the
    potentially available legal theories of defense would not have changed this fact.

1          1. Relevant Background

2          After killing Burke, petitioner and his five companions loaded their belongings into the

3    car that Burke had been driving and drove south through the night. Webster, 54 Cal. 3d at 425.

4    Early the next morning, petitioner and three of the others robbed a convenience store in Pacoima,

5    California. Id. at 427. Armed with knives, they took food and money from the store. Id.

6    Petitioner forced the store clerk, Eli Yitshaky, to lie on the floor, took his wallet and watch, and

7    struck him in the head. Id.; (RT at 5365-81.) Los Angeles police took a report regarding the

8    Pacoima robbery and a description of the robbers was broadcast. (RT at 70-74.) Later that day,

9    petitioner was stopped for speeding, and Mr. Yitshaky's wallet was found in the car. Webster, 54

10   Cal. 3d at 429. The discovery of this evidence ultimately tied the group to the Pacoima robbery

11   and the Burke killing.

12         In pretrial proceedings, petitioner and his codefendants joined in filing a motion to

13   suppress evidence. Id. at 429; (CT at 1069; RT 68.) An evidentiary hearing was held pursuant to

14   California Penal Code §1538.5 before trial. (RT at 65-521, 533.) Petitioner's counsel argued that

15   the search of the vehicle leading to the discovery of Mr. Yitshaky's stolen wallet was invalid and

16   that the police lacked cause to impound the vehicle driven by petitioner. Webster, 54 Cal. 3d at

17   430; (CT at 1069; RT at 68, 498.) The trial court denied in part and granted in part the motion to

18   suppress evidence. (RT at 533.)[86]

19         The following evidence relevant to the instant ineffective assistance of counsel claims was

20   adduced at the evidentiary hearing in state court on the motion to suppress. On the afternoon of

21   the Pacoima robbery, Officer Leslie Abbott of the California Highway Patrol stopped a Chrysler

22   vehicle for speeding near Barstow. Webster, 54 Cal. 3d at 429. The driver, petitioner, got out of

23   the vehicle and approached the officer. (RT at 107.) Petitioner presented his birth certificate for

24   identification and told the officer that he had no driver's license. (RT at 109, 111.) Officer

25   Abbott asked petitioner who the owner of the car was, and petitioner responded that it belonged to

26   one of the passengers in the back seat of the car. (RT at 114.) However, petitioner also told the

27

28       [86] The trial court suppressed bedrolls and the items found therein that were seized by officers,
     finding that those items were not closely enough associated with the defendants at the time of
     their arrests. (RT at 533.) The motion to suppress was denied in all other respects. (Id.)

1   officer that the passengers were hitchhikers.  (RT at 130-31.)  Officer Abbott then requested a

2   check for wanted persons over his radio.  (RT at 111.)  As Officer Abbott was writing petitioner a

3   speeding ticket, he received word that petitioner had an outstanding felony arrest warrant.  (RT at

4   112.)  Petitioner was wanted for escaping from a Washington prison.  (RT at 115.)  Officer

5   Abbott arrested petitioner and waited a few minutes for backup officers to arrive.  (RT at 113,

6   115.)  Officer Abbott then asked the passengers who owned the car.  (RT at 116.)  He received no

7   verbal response; each of the passengers simply shook his or her head or shrugged.  (RT at 117.)

8   Officer Abbott asked the passengers to exit the car.  (Id.)  As they did so, the officer noticed that

9   the passenger who had been sitting in the middle of the front seat, codefendant Coville, was

10  intoxicated.  (RT at 117-18.)  Officer Abbott then arrested Mr. Coville for public drunkenness.

11  (RT at 123.)

12          With all of the occupants out, Officer Abbott leaned into the car and looked for the vehicle

13  registration in the glove compartment and above the visors.  (RT at 123, 125.)  As he did so, he

14  saw a wallet in plain view on the front seat.  (RT at 125.)  When no one who had been in the car

15  claimed the wallet, Officer Abbott looked inside.  (RT at 127-28.)  There, he found identification

16  for Eli Yitshaky.  (RT at 129.)  All of those who had been inside the car denied knowing Mr.

17  Yitshaky.  (Id.)

18          Officer Abbot then received information that the car was registered to a Mr. Glover of

19  Oroville.  (RT at 132.)  All of those who had been in the car also denied knowing Mr. Glover.

20  (Id.)  Petitioner and Coville were then transported to the local Sheriff's Department, the car was

21  impounded and the other four occupants were released.  (RT at 133.)

22          When petitioner was booked, it was discovered that he had a credit card in his pocket

23  bearing the name of Robert K. Woodington.  (RT at 134-135.)  The credit card had been reported

24  stolen in the Pacoima robbery.  (RT at 135.)  Officer Abbott realized that the description of the

25  suspects in that case matched the other occupants of the car, whom he had just released.  (RT at

26  137.)  The four occupants of the car who had initially not been arrested were then located.  (RT at

27  140.)  In addition, items matching the description of items taken during the Pacoima robbery

28  littered the impounded car.  (Id. at 429-30.)  Once taken into custody, Smith and Cram made

1     statements about the killing of Burke.  Webster, 54 Cal. 3d at 429.

2          Detective George Rock was also assigned to investigate the Pacoima robbery.  (RT at

3     326.)  He transported petitioner and two of the other arrestees from Barstow to Los Angeles.  (RT

4     at 331.)  When he booked petitioner into jail, Detective Rock observed a fresh stab wound above

5     petitioner's left knee and retrieved credit card receipts in the name of Mr. Woodington from

6     petitioner's wallet.  (RT at 335-36.)

7          On direct appeal, the California Supreme Court held that Officer Abbott "acted properly

8     when he removed the occupants of the Chrysler and entered the car for the limited purpose of

9     finding the registration."  Webster, 54 Cal. 3d at 430.  The court further found that the wallet was

10    "lying in plain view" when Officer Abbott found it.  Id.  In light of evidence of the occupants'

11    denials of ownership, the court concluded that Officer Abbott was justified in opening the wallet

12    to find out to whom it belonged.  Id.  The court also found that the search was constitutionally

13    reasonable, (id.), and that impounding the vehicle was "entirely proper."  Id. at 432.  The court

14    noted that law enforcement had probable cause to believe that the car could be stolen.  Id.

15         Petitioner first claimed that his counsel was ineffective in examining witnesses at the

16    suppression hearing in his second state habeas petition.  His claim was summarily rejected by the

17    California Supreme Court.[87]  In this court, petitioner originally raised several claims based on the

18    assertion that evidence incriminating him in the murder was obtained as a result of an illegal

19    search and seizure.  (See Dkt. No. 176 at 89.)  The undersigned found that these claims were not

20    cognizable under the holding in Stone v. Powell, 428 U.S. 465 (1976), or had been abandoned by

21    petitioner and therefore recommended the granting of summary judgment in favor of respondent

22    with respect to those claims.  (Dkt. No. 176 at 89-92, 201.)  Those recommendations were

23    adopted.  (Dkt. No. 201.)

24         Claims of ineffective assistance of counsel relating to search and seizure issues litigated in

25    state court are cognizable on federal habeas review.  Kimmelman v. Morrison, 477 U.S. 365, 382-

26    83 (1986).  Only those claims survived here because the undersigned found summary judgment

27    premature since petitioner was still conducting investigation with respect to his ineffective

28

[87]  That petition and order were lodged here on December 5, 1996.  (See Dkt. No. 100.)

1   assistance of counsel claims at that time.  (Dkt. No. 176 at 92-93.)  As noted above, petitioner did

2   not seek an evidentiary hearing with respect to these specific claims of ineffective assistance.

3                          2. Legal Standards

4          As discussed above, to establish ineffective assistance a petitioner must show both that

5   counsel's actions fell below an objective standard of reasonableness and that the alleged errors

6   resulted in prejudice.  Strickland, 466 U.S. at 687-88.  Again, to succeed with regard to the first

7   component, a petitioner must overcome a "strong presumption" that counsel's performance fell

8   within the "wide range of reasonable professional assistance," that counsel's actions and

9   omissions were part of sound trial strategy and that all significant decisions were the result of

10  acceptable professional judgment.  Id. at 689-90.  "The defendant must show that there is a

11  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

12  would have been different.  A reasonable probability is a probability sufficient to undermine

13  confidence in the outcome."  Id. at 694.  Finally, "in order to show prejudice when a suppression

14  issue provides the basis for an ineffectiveness claim, the petitioner must show that he would have

15  prevailed on the suppression motion, and that there is a reasonable probability that the successful

16  motion would have affected the outcome."  Bailey v. Newland, 263 F.3d 1022, 1029 (9th Cir.

17  2001) (quoting Van Tran v. Lindsey, 212 F.3d 1143, 1156 (9th Cir. 2000)).  See also

18  Kimmelman, 477 U.S. at 385; Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1170 (9th Cir. 2003).

19                          3. Analysis

20         Petitioner contends that he was deprived of the effective assistance of counsel based on

21  three instances in which he believes counsel could have performed more effectively in cross-

22  examining the prosecution's witnesses at the evidentiary hearing on his motion to suppress

23  evidence.  (Pet. (Dkt. No. 73) at 82-83, 85; claims 20B.7, 20B.8, 20B.9, and 21B.)[88]  It is well-

24  recognized, however, that "choices in emphasis during cross-examination are prototypical

25  examples of unchallengeable strategy."  Phoenix v. Matesanz, 233 F.3d 77, 83 (1st Cir. 2000).

26  As one court has observed:

27  _____

28  [88]  Notably, this case does not involve the failure of defense counsel to bring a motion to suppress
    evidence in the first instance or claims that petitioner's defense counsel was deficient in failing to
    subject the prosecution's evidence to adversarial testing.

1
2
3
4

> This is not the type of error, if indeed it is error at all, that the Sixth Amendment functions to correct. The cross-examination of a witness is a delicate task; what works for one lawyer may not be successful for another. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel.

5   Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997).   In keeping with these authorities, the

6   Ninth Circuit has held that "counsel's tactical decisions at trial, such as refraining from cross-

7   examining a particular witness or from asking a particular line of questions, are given great

8   deference and must similarly meet only objectively reasonable standards." Dows v. Wood, 211

9   F.3d 480, 487 (9th Cir. 2000) (citing Strickland, 466 U.S. at 688-89). Accord Brown v. Uttecht,

10  530 F.3d 1031, 1035 (9th Cir. 2008); see also Silva, 279 F.3d at 852.

11          Aside from these governing standards, petitioner's claim is unsupported by the record

12  before this court. Petitioner has presented no evidence regarding his trial counsel's reasoning and

13  strategy in cross-examining the law enforcement officers at the evidentiary hearing on his motion

14  to suppress evidence. As discussed above, cross-examination is an inherently tactical matter, and

15  there is a strong presumption that counsel was competent. Strickland, 466 U.S. at 689-90;

16  Brown, 530 F.3d at 1035; Dows, 211 F.3d at 487. Petitioner "must rebut this presumption by

17  proving that his attorney's representation was unreasonable under prevailing professional norms

18  and that the challenged action was not sound strategy." Kimmelman, 477 U.S. at 384. Where the

19  record is silent regarding counsel's reasoning, counsel cannot be found ineffective where an

20  objectively reasonable basis for counsel's actions can be ascertained. See Murray v. Schriro, 746

21  F.3d 418, 457 (9th Cir. 2014) (stating that the petitioner must "overcome the presumption that,

22  under the circumstances, the challenged action might be considered sound trial strategy")

23  (quoting Strickland, 466 U.S. at 689); see also Chandler v. United States, 218 F.3d 1305, 1314

24  (11th Cir. 2000) ("[C]ounsel cannot be adjudged incompetent for performing in a particular way

25  in a case, as long as the approach taken 'might be considered sound trial strategy.'") (quoting

26  Darden v. Wainwright, 477 U.S. 168 (1986)); Silva, 279 F.3d at 852.

27  /////

28  /////

132

1                                a.  Officer Abbott

2           Petitioner first asserts that his trial counsel should have impeached Officer Abbott at the

3    evidentiary hearing with his prior testimony, adduced at a preliminary hearing, that Coville was

4    too intoxicated to understand that Officer Abbott was trying to identify the owner of the wallet

5    during the traffic stop.  (Pet. (Dkt. No. 73) at 82-83; claim 20B.7.)   Petitioner believes that

6    Officer Abbott's preliminary testimony on this point conflicted with his suppression hearing

7    testimony in which he characterized Coville as "coherent and denied owning the wallet."  (Pet. at

8    83.)  While it is true that petitioner's counsel did not raise this point through his cross-

9    examination at the suppression hearing, in making this claim petitioner ignores the fact that this

10   very "inconsistency" in Officer Abbott's testimony was raised by counsel for petitioner's

11   codefendant Madrigal at the evidentiary hearing.  (RT at 201-04.)  In this regard, the following

12   exchange took place at the evidentiary hearing:

13
14           Q.: [by counsel for codefendant Madrigal]: . . . I think you testified yesterday that Mr. [Coville] made some offhand remarks when you showed him the wallet?

15
16           A.: Yes. Sir. He made some offhand remarks, plus shaking his head.  And he – I can't recall.  He may have even said, "No," when I asked him about it.  I do know that he would not claim ownership of the wallet.

17

18           Q.:  Okay.  Now, you remember testifying about this at the Preliminary Hearing, do you not?

19           A.:  I believe there was [sic] some questions to this respect, yes.

20
21           Q.:  Okay.  And I'd – I'm going to ask you if you recall giving this testimony on Page 204, Lines 15 through 19. . . .  Let me ask you – I'll ask you if you recall giving this testimony, referring to taking the wallet back to [Coville]:

22

23           "Question: You tried to talk to [Coville]?  Answer: As I recall, I took the wallet  back and showed it to him and asked if it was his and received no response at all.  Question:  He was drunk, is that

24   true?  Answer:  He was intoxicated."

25           A.:  I recall that, yes, sir.

26
27           Q.:  Now, does that refresh your memory as to whether or not he made some offhand remarks at the time you showed him the wallet or at some other time possibly?

28           A.:  Well, he was continually making offhand remarks during the whole deal.   I recall that – that he made no response in the

1    affirmative to my question.

2    (RT at 201-02.)

3         Mr. Madrigal's counsel continued his cross-examination of Officer Abbott in this same

4    vein at the evidentiary hearing, but in the end he only confirmed the point that Coville had failed

5    to claim the wallet as his own, leaving Officer Abbott with the "duty of reasonable diligence to

6    ascertain and notify the owner of apparently lost property . . . ." Webster, 54 Cal. 3d at 431.

7    Because the impeachment identified by petitioner as not having been raised by his counsel was

8    brought forth in the cross-examination of Officer Abbott by counsel for his co-defendant,

9    petitioner's counsel was not ineffective for not plowing the same infertile ground. See, e.g.,

10   Middleton v. Evatt, 855 F. Supp. 837, 847 (D. S.C. 1994) (finding counsel not deficient since the

11   subject of the alleged failure to cross-examine a witness was covered by the examination of the

12   petitioner's expert witness).

13        Because there is simply no evidence of deficient performance with respect to trial

14   counsel's cross-examination of Officer Abbott at the suppression hearing, petitioner is not entitled

15   to federal habeas relief with respect to this aspect of his ineffective assistance of counsel claim.

16                              b.  Detective Rock

17        Petitioner next asserts that his counsel also should have cross-examined Detective Rock

18   regarding his allegedly inconsistent suppression hearing testimony.  In this regard, at one point

19   during the evidentiary hearing, Detective Rock testified that petitioner did not specifically

20   acknowledge that he understood his Miranda rights.  (RT at 367-68.)  Later, petitioner

21   emphasizes, Detective Rock testified that petitioner did indicate that he understood his Miranda

22   rights.  (RT at 379.)  Petitioner maintains that his trial counsel was ineffective in failing to

23   highlight this inconsistency in the testimony.  (Pet. (Dkt. No. 73) at 83; claim 20B.8.)

24        The record before this court reflects that on cross-examination by counsel for petitioner's

25   co-defendant Coville, Detective Rock testified at the suppression hearing that petitioner did not

26   reply in the affirmative when asked if he understood his Miranda rights.  (RT at 367.)  The

27   detective testified:  "Other than refusing to waive his rights, I don't believe there was any other

28   statement made."  (Id.)  Detective Rock agreed that petitioner had not told him that "he didn't

134

1    understand; he simply refused to waive his rights." (RT at 367-68.) However, on cross-

2    examination by counsel for petitioner's co-defendant Williams, Detective Rock testified that

3    petitioner had responded affirmatively when asked if he understood his <u>Miranda</u> rights. (RT at

4    379.)

5            While petitioner has identified an inconsistency in the detective's testimony at the

6    suppression hearing, that inconsistency concerns an immaterial and collateral matter. The focus

7    of petitioner's motion to suppress evidence was the legality of the search of the car petitioner was

8    driving when he was apprehended, leading to law enforcement's discovery of the wallet as well

9    as the subsequent search of the impounded car, all of which linked petitioner and the other

10   occupants to the Pacoima robbery. <u>See</u> <u>Webster</u>, 54 Cal. 3d at 430; (<u>see</u> <u>also</u> RT 498-506).

11   Petitioner's <u>Miranda</u> advisement took place sometime later, and the legality of that advisement

12   was not placed at issue by petitioner's motion to suppress evidence. Rather, it was undisputed

13   that petitioner invoked his right to remain silent and that his rights in that regard were not

14   violated.

15           Here, petitioner challenges only his trial counsel's failure to cross-examine a witness

16   regarding inconsistent testimony that witness gave on whether petitioner indicated he understood

17   his <u>Miranda</u> rights. However, "claims that an attorney should have cross-examined further on

18   inconsequential matters do not establish constitutionally deficient performance." <u>Johnson v.</u>

19   <u>Alabama</u>, 256 F.3d 1156, 1186 (11th Cir. 2001). Moreover, "[m]ere criticism of a tactic or

20   strategy is not in itself sufficient to support a charge of inadequate representation." <u>Gustave v.</u>

21   <u>United States</u>, 627 F.2d 901, 904 (9th Cir. 1980). The Sixth Amendment simply does not require

22   counsel to "exploit every potential inconsistency." <u>Roberts v. Singletary</u>, 794 F. Supp. 1106,

23   1122 (S.D. Fla. 1992). "The issue is not whether counsel attacked a prosecution witness on every

24   conceivable point but whether they subjected his testimony to the adversarial

25   testing that is integral to the trial process." <u>Johnson v. Nagle</u>, 58 F. Supp. 2d 1303, 1356 n.42

26   (N.D. Ala. 1999), <u>aff'd.</u> 256 F.3d 1156 (11th Cir. 2001).

27           Here, petitioner's counsel was not required to highlight Detective Rock's inconsistent

28   testimony, now pointed out by petitioner, since it had no bearing on the central issues raised by

135

1   the defense motion to suppress evidence.  In this regard, petitioner has failed to identify any

2   deficiency in his counsel's conduct which was relevant to the trial court's resolution of the motion

3   to suppress evidence.  Accordingly, he is not entitled to habeas relief on this aspect of his claim.

4        Finally, in his Claim 20B.9, petitioner criticizes his trial counsel for not attempting to

5   pursue further a question he posed on re-cross examination that was ruled by the trial court to be

6   beyond the scope of redirect examination.  (Pet. at 83; claim 20B.9.)  Specifically, at the

7   suppression hearing petitioner's trial counsel sought to ask Detective Rock whether "in the

8   personal property of Defendant Webster, did you find any papers with the identification or the

9   name of Glover or Burke?"  (RT at 381.)  Petitioner concedes, however, that counsel later asked

10  this question on re-cross examination and received an answer.  (RT at 385.)  Thus, there can be no

11  claim of deficient performance based upon counsel's alleged failure to pursue the matter further.

12  The record establishes that the very subject petitioner claims should have been pursued was in

13  fact covered by defense counsel.

14       In sum, petitioner has failed to meet his burden of demonstrating deficient performance on

15  the part of his trial counsel in connection with his examination of witnesses during the evidentiary

16  hearing on the motion to suppress evidence.[89]  The undersigned therefore recommends that

17  petitioner be denied habeas relief on this aspect of his ineffective assistance of counsel claim.

18       F.  Ex Post Facto Clause Violation by Application of Proposition 8

19       In his Claim 18, petitioner contends that the trial court's application of California's

20  Proposition 8 to his motion to suppress evidence violated the constitutional ban on ex post facto

21  laws.  (Pet. at 74; Dkt. No. 141 at 36.)  **I**n 1982, the voters of California passed an initiative

22  measure known as Proposition 8, which by its terms barred California courts from applying the

23  exclusionary rule to suppress evidence except as required by the United States Constitution.

24  Otherwise, Proposition 8 provided that:  "relevant evidence shall not be excluded in any criminal

25  proceeding."  In re Lance W., 37 Cal. 3d 873, 879 (1985).  Proposition 8 took effect on June 9,

26  1982, after petitioner's crimes of conviction were committed in August 1981.

27  /////

28  ---

[89]  Accordingly, the undersigned need not address the prejudice prong of the Strickland test with respect to this aspect of petitioner's ineffective assistance of counsel claim.

At the hearing on petitioner's motion to suppress evidence seized as a result of the traffic stop described above, petitioner and his codefendants urged the trial court to apply California law as it existed prior to the passage of Proposition 8 in deciding that motion.  (RT at 510-12.) Indeed, counsel for one of petitioner's codefendants specifically argued that application of Proposition 8 would violate the Ex Post Facto Clause.  (Id.)   As indicated above, the trial court denied in part and granted in part the defendants' motion to suppress evidence.  (RT at 533.) While it is somewhat unclear what law the trial judge applied in ruling on this motion,[90] it is clearly reflected in the record that in making other pretrial rulings the trial court applied Proposition 8 to the case of petitioner and his co-defendants.  (See RT at 625.)  Petitioner raised this claim in his second state habeas petition and the California Supreme Court summarily denied that petition.[91]

In his petition before this court, petitioner relies on the California Supreme Court's decision in People v. Smith, 34 Cal. 3d 251, 258-63 (1983), in which it held that Proposition 8, which prohibited trial courts from excluding evidence based on violations of state law, altered substantive constitutional rights such that its retroactive application to crimes committed before its effective date offended ex post facto principles.  However, the California Supreme Court subsequently called into question its holding in Smith in light of the United States Supreme Court's decision in Collins v. Youngblood, 497 U.S. 37 (1990), which clarified the analysis for determining whether a law violates the Ex Post Facto Clause.[92]  Tapia v. Superior Court, 53 Cal. 3d 282, 294 (1991).  Thus, in Tapia the California Supreme Court concluded that the concerns it had raised in its decision in Smith regarding retroactive application of Proposition 8 were

[90]   In announcing its ruling on the motion to suppress evidence the trial court expressly relied only upon the decision of the United States Supreme Court in United States v. Chadwick, 433 U.S. 1 (1977), subsequently abrogated by California v. Acevedo, 500 U.S. 565 (1991).  (RT at 533.)

[91]   That petition and order were lodged here on December 5, 1996.  (See Dkt. No. 100.)

[92]   In Collins, the Supreme Court held that application of a law is prohibited by the ex post facto clause if it:  (1) punishes as a crime an act previously committed, which was innocent when done; (2) makes more burdensome the punishment for a crime after its commission; or (3) deprives one charged with a crime of any defense available under the law at the time when the act was committed.  Collins, 497 U.S. at 42.

1    unfounded in that the "United States Supreme Court has [since] resolved the analytical difficulty

2    which led us to conclude in Smith that it would be impractical to consider ex post facto

3    challenges to Proposition 8's provisions on a case-by-case basis." Id. at 294.  After Collins, a

4    court need not determine "how substantial is the right that the statute impairs and how significant

5    is [the] impairment." Id.  Instead, the court may resolve such challenges by applying the

6    categories set forth in Collins.[93]  However, the California Supreme Court in Tapia did not

7    expressly overrule the decision in Smith since the challenge before it involved Proposition 115,

8    not Proposition 8.[94]

9           Following the decision in Smith, the Ninth Circuit also made clear that the retroactive

10   application of Proposition 8 by California courts did not violate the Ex Post Facto Clause.

11   Toomey v. Bunnell, 898 F.2d 741 (9th Cir. 1990).  Similar to petitioner's arguments here, in

12   Toomey, the petitioner argued that his due process rights were violated first by the California

13   courts' application of Proposition 8 to his case, thus subjecting him to an ex post facto law.  The

14   Ninth Circuit rejected the claim as "meritless," holding "the prohibition of ex post facto

15   legislation does not apply to changes in state matters of criminal procedure, such as the scope of

16   the exclusionary rule." Id. at 745 (citing Dobbert v. Florida, 432 U.S. 282, 293 (1977) (finding

17   that a law changing the methods used to determine whether the death penalty would be imposed

18   did not violate the Ex Post Facto Clause)).[95]  The court in Toomey also rejected the  closely

19   _____

20   [93]  It was formerly held that a law violated the constitutional prohibition against ex post facto
     legislation if it eliminated a "substantial protection," whether substantive or procedural, existing
21   at the time of the offense.  Tapia, 53 Cal. 3d at 292.  However, the United States Supreme Court
     repudiated that analysis in Collins.
22

23   [94]  Proposition 115 altered the procedure for voir dire in criminal prosecutions, among other
     changes to the state's criminal laws.

24   [95]  In this regard, the United States Supreme Court has held that a procedural change does not
25   disadvantage a criminal defendant for purposes of the ex post facto clause because it does not
     make criminal a previously innocent act, increase the punishment for a crime, or change the proof
26   necessary to convict.  Dobbert v. Florida, 432 U.S. 282, 293-94 (1977); see also Doe v. Busby,
     661 F.3d 1001, 1023 (9th Cir. 2011) (statute permitting the admission of a type of evidence that
27   was previously excluded for the purpose of showing propensity to commit a crime does not
     violate ex post facto clause because it does "alter the quantum of evidence needed to convict a
28   defendant"); United States v. McCahill, 765 F.2d 849, 850 (9th Cir. 1985) (change in standard for
     granting bail pending appeal does not violate ex post facto clause).

1    related argument, advanced by petitioner there, that the California courts violated his due process

2    rights by failing to apply California constitutional law which had held pre-Proposition 8 searches

3    unconstitutional under similar facts.  Id.  The Ninth Circuit emphasized that Proposition 8 has

4    been held on its face not to violate the Due Process Clause, and thus, the court held that "Toomey

5    has no federal constitutional right to have pre-Proposition 8 state case law applied to his case,

6    even if California courts generally have chosen not to apply Proposition 8 retroactively."  Id.

7    (citing California v. Greenwood, 486 U.S. 35, 44 (1988)).

8         The Ninth Circuit's decision in Toomey binds this court.  Under that decision petitioner is

9    not entitled to federal habeas relief with respect to his Claim 18 in which he alleges that the state

10   court's application of Proposition 8 to his case violated the Ex Post Facto Clause.

11        G.  Failure to Record and Transcribe Sidebar Conferences

12        Petitioner complains that the trial court allowed its sidebar conferences with counsel to be

13   unrecorded and not transcribed, resulting in an inadequate record for purposes of appellate

14   review.  (Pet. (Dkt. No. 73) at 78 (Claim 19L), 113 (Claim 35B).)  Petitioner further claims that

15   his trial counsel was ineffective for not objecting to the unreported sidebar conferences and not

16   requesting a settled statement of the record with respect to those conferences.  (Id. at 78.)

17        In his petition pending before this court, petitioner identifies by citation to the reporter's

18   transcript those points in the trial where sidebar conferences took place.  (Id.; see also Dkt. No.

19   141 at 38-39.)  He alleges the "unreported sidebars deprived [him] of the opportunity to assert

20   additional claims in his direct Appeal and in his Petition before this court,"[96] thus violating his

21   due process rights.  (Dkt. No. 141 at 38.)  However, petitioner has never explained what those

22   claims on appeal or on collateral review might have been.

23        Previously in this habeas action, in the findings and recommendations addressing the

24   parties' motions for summary judgment, the undersigned found that petitioner had "fail[ed] to

25   proffer a tenable theory as to what unrecorded error might have been involved."  (Dkt. No. 176 at

26

_____

27   [96]  Petitioner first raised these claims in his second state petition, and it was summarily denied by
     the California Supreme Court.  That petition and order were lodged here on December 5, 1996.
28   (See Dkt. No. 100.)

99.)  However, because petitioner identified, at least with respect to the guilt phase of his trial,

two significant places in the trial proceedings where unrecorded sidebar conferences took place,[97]

the undersigned recommended that respondent's motion for summary judgment with respect to

this this claim be denied as "premature."[98]  The undersigned concluded at that time ruling on the

motion to be premature because without an evidentiary hearing to determine what value a

reporter's transcript or other record of such conferences might have had to petitioner on appeal,

the record was potentially incomplete.  See Madera v. Risley, 885 F.2d 646, 648 (9th Cir. 1989)

(district court conducted an evidentiary hearing to determine whether the record could be

sufficiently reconstructed to establish that alleged improprieties during the unrecorded sidebar

conference were not committed).  Nonetheless, petitioner did not move for an evidentiary hearing

with respect to these claims.

 Preliminarily, the court notes that to the extent petitioner alleges the trial court violated

California procedure by holding unreported sidebar conferences, that claim is not cognizable in

these proceedings.  As noted above, federal habeas relief is only available to a prisoner in custody

in violation of the United States Constitution or laws or treaties of the United States.  Estelle, 502

U.S. at 68.  "A federal court may not issue the writ on the basis of a perceived error of state law."

Pulley, 465 U.S. at 41.  See also Turner, 281 F.3d at 867.

 Moreover, even if petitioner could state a cognizable claim in this regard, the record

reflects no violation of state law in connection with the unreported sidebar conferences in this

case.  At the time of petitioner's trial in 1982 and 1983, California law did not require that all

court proceedings be transcribed.  People v. Pinholster, 1 Cal. 4th 865, 919-20 (1992) ("[W]e

---

[97]  The undersigned found that petitioner's Claim 19L described two "significant unrecorded exchanges:  (1) a sidebar which occurred after the testimony of law enforcement agents, and (2) one which preceded the entry of a stipulation regarding witness Michelle Cram's discussions with police officers prior to receiving legal representation."  (Dkt. No. 176 at 99.)

[98]  The undersigned recommended the granting of summary judgment in favor of respondent as to petitioner's allegations of error based on claimed unrecorded sidebar conferences during the penalty phase of petitioner's trial.  (Dkt. No. 176 at 100) (finding "petitioner has not made any showing regarding the value of the transcript with respect to unrecorded sidebar conferences during the penalty phase of his trial").  Again, those findings and recommendations were adopted with respect to this issue.  (Dkt. No. 201.)

1   have found no case, nor has defendant cited any, requiring that in every instance [sidebar

2   conferences] must be reported."); see also People v. Tuggles, 179 Cal. App.4th 339, 356 (2009)

3   ("Counsel may object to the admission of evidence in an unreported sidebar conference.") [99]   In

4   1985, after petitioner's trial, § 190.9 was added to the California Penal Code and provided for the

5   first time that "in a case in which a death sentence may be imposed 'all proceedings conducted

6   after the effective date of this section in the justice, municipal, and superior courts, *including*

7   *proceedings in chambers*, shall be conducted on the record with a court reporter present.'"

8   Pinholster, 1 Cal. 4th at 920. Accordingly, at the time of petitioner's trial, conferences between

9   the trial court and counsel at sidebar and in chambers were a "permissible part of the record on

10  appeal," but it was not required that those informal conferences be placed on the record and

11  available for transcription.  Id.

12          With respect to petitioner's argument that his due process rights were violated by the

13  failure to have the trial's sidebar conferences reported, the Ninth Circuit has set forth the

14  following test for determining when the unavailability of a transcript of proceedings violates due

15  process, finding that a court assessing such a claim must measure two criteria:  "(1) the value of

16  the transcript to the defendant in connection with the appeal or trial for which it is sought; and (2)

17  the availability of alternative devices that would fulfill the same functions as a transcript."

18  Madera, 885 F.2d at 648.  With respect to this first criteria, a petitioner is "not required to make a

19  showing of need tailored to the facts of the specific case," so long as he identifies "a tenable

---

20  [99]  At the time of petitioner's trial, California Code of Civil Procedure § 269 provided:

21
22              The official reporter of a superior court, or any of them, where there
                are two or more, must, at the request of either party, or of the court
23              in a civil action or proceeding, and on the order of the court, the
                district attorney, or the attorney for the defendant in a criminal
24              action or proceeding, take down in shorthand all the testimony, the
                objections made, the rulings of the court, the exceptions taken, all
25              arraignments, pleas, and sentences of defendants in criminal cases,
                the arguments of the prosecuting attorney to the jury, and all
26              statements and remarks made and oral instructions given by the
                judge; and if directed by the court, or requested by either party,
27              must, within such reasonable time after the trial of such case as the
                court may designate, write out the same, or such specific portions
28              thereof as may be requested, in plain and legible longhand, or by
                typewriter, or other printing machine, and certify to the same as
                being correctly reported and transcribed, and when directed by the
                court, file the same with the clerk of the court.

1     theory as to what error might have been involved."  Id.

2          The undersigned has previously found that petitioner had not yet made the requisite

3     showing here.  (Dkt. No. 176 at 99-100) (finding that petitioner's general allegations that the

4     court "permitted numerous unrecorded sidebars" failed to proffer a tenable theory as to what

5     unrecorded error might have been involved).   Nonetheless, the court granted petitioner leave to

6     seek an evidentiary hearing on this issue, but he has declined to do so.  Additionally, petitioner

7     has not offered additional legal argument addressing these claims in his traverse or supporting

8     memorandum of points and authorities.  Thus, the record before this court remains the same as it

9     was at the time the undersigned issued its findings and recommendations on the parties' cross-

10    motions for summary judgment.  That record is clearly an insufficient basis upon which to grant

11    petitioner the relief he seeks.  At no time has petitioner articulated what he believes occurred

12    during the various sidebar conferences that might have been relevant either to his direct appeal or

13    to his collateral attacks on his judgment of conviction and sentence.  Simply pointing to parts of

14    the trial transcript that indicate unrecorded sidebar conferences took place is not sufficient.  See

15    Scott v. Elo, 302 F.3d 598, 604 (6th Cir. 2002) ( stating that "federal habeas relief based on a

16    missing transcript will only be granted where the petitioner can show prejudice"); White v. State

17    of Florida, Department of Corrections, 939 F.2d 912, 914 (11th Cir. 1991) (stating that "in a

18    federal habeas corpus case brought by a state prisoner, the absence of a perfect transcript does not

19    violate due process absent a showing of specific prejudice"); Bransford v. Brown, 806 F.2d 83, 86

20    (6th Cir. 1986) (holding that it is not "per se denial of [the] due process right to a fair appeal"

21    when transcripts are missing); Mitchell v. Wyrick, 698 F.2d 940, 941-42 (8th Cir. 1983)

22    ("[Petitioner] has failed to allege any prejudice or harm which resulted from not having a

23    complete transcript.").  In order to obtain relief on such a claim a petitioner must present

24    something "more than gross speculation that the transcripts were requisite to a fair appeal."

25    Bransford, 806 F.2d at 86.

26          Petitioner has not done so here.  He has not identified any issue he raised on appeal or

27    claim he brought by way of collateral attack which could have been supported by a transcript of

28    the sidebar conferences at his trial, nor has he identified any new claim or issue that he could have

1   raised had he been provided a transcript of those off-the-record exchanges.  The court cannot

2   assume simply because certain sidebar conferences between the trial judge and counsel during

3   petitioner's trial were not reported, that any error exists.  Rather, petitioner must offer some

4   "modicum of evidence" to support such a conclusion and he has failed to do so in this case.  Id.

5   Petitioner is therefore not entitled to federal habeas relief on his claim that his due process rights

6   were violated due to the fact that sidebar conferences at his trial were not reported.

7       As noted, petitioner alternatively claims that his trial counsel was ineffective for not

8   objecting to the unreported sidebar conferences and for not requesting a settled statement of the

9   record with respect to those conferences.  Again, however, petitioner fails to present any evidence

10  to support this claim either with respect to the deficient performance or the prejudice prong of the

11  test under Strickland.  Petitioner has presented no evidence regarding his trial counsel's reasoning

12  in acquiescing to sidebar conferences at trial that were unrecorded and not transcribed.  As

13  discussed above, there is a "strong presumption" that counsel's performance fell within the "wide

14  range of reasonable professional assistance," that counsel's actions and omissions were part of

15  sound trial strategy, and that all significant decisions were the result of acceptable professional

16  judgment.  Strickland, 466 U.S. at 689-90.  Petitioner "must rebut this presumption by proving

17  that his attorney's decision was an unreasonable one under prevailing professional norms and that

18  the challenged action was not sound strategy."  Kimmelman, 477 U.S. at 384.  Where, as here, the

19  record is silent regarding the reasoning employed, counsel cannot be found ineffective where an

20  objectively reasonable basis for counsel's actions can be ascertained.  See Murray, 746 F.3d at

21  457 (petitioner must "overcome the presumption that, under the circumstances, the challenged

22  action might be considered sound trial strategy") (quoting Strickland, 466 U.S. at 689); Chandler,

23  218 F.3d at 1314 ("[C]ounsel cannot be adjudged incompetent for performing in a particular way

24  in a case, as long as the approach taken 'might be considered sound trial strategy.'").

25      Moreover, it was entirely consistent with California law as it existed at the time of

26  petitioner's trial for his trial counsel to participate in unreported sidebar conferences as well as

27  unreported chambers conferences.  The undersigned cannot conclude that petitioner's counsel

28  acted unreasonably in participating in these unreported conferences or by failing to insist that they

1   be reported.  As for the alleged failure of trial counsel to move for a settled statement of the

2   sidebar conferences, it is certainly possible that nothing took place during the unreported sidebar

3   conferences that would have been material to petitioner's appeal or that if something of import

4   was discussed that it was later put on the record.  In any event, petitioner has not established that

5   his trial counsel acted unreasonably or performed deficiently in failing to seek a settled statement

6   with respect to the unreported sidebar conferences.

7        Finally, as discussed above, petitioner has failed to make any showing that he was

8   prejudiced by his trial counsel's failure to object to the unreported sidebar conferences or to seek

9   a settled statement of the record with respect to those conferences.  Petitioner has not identified

10  any issue or claim that he could have successfully pursued had his counsel objected or obtained a

11  settled statement and thus has failed to establish any prejudice.[100]  Therefore, petitioner is not

12  entitled to federal habeas relief on any aspect of his claim based on the failure to record and

13  transcribe sidebar conferences that took place during his trial.

14        H.  Improper Admission of the Testimony of Michelle Cram and Detective Burchett

15        Petitioner contends that witness Michelle Cram's statements were obtained through

16  "prosecutorial misconduct"[101] and that his constitutional rights were violated by the admission at

17  trial of both her testimony and that of Detective Burchett's regarding Cram's statements to him.

18  (Pet. (Dkt. No. 73) at 95-96 (claims 29C-F), 97-98 (claims 30.A.3-6), 106 -07 (claim 31).)  In

19  recommending that the parties' motions for summary judgment on these claims be denied as

20  premature, the undersigned advised petitioner that he would be required to develop facts to

21

22  [100]  Under California law, "[a] settled statement operates to make up for the absence of a
    reporter's transcript of oral proceedings . . . ."  People v. Anderson, 141 Cal. App. 4th 430, 440

23  (2006).

24  [101]  While petitioner broadly uses the term "prosecutorial misconduct" in conjunction with these

25  claims, his allegations do not assert a violation of law based on the prosecutor's actions in this
    case but rather on certain law enforcement officers' actions, including Detective Burchett, who

26  had contact with Michelle Cram.  More specifically, petitioner contends Ms. Cram's statements
    were obtained by law enforcement officers unlawfully in violation of her Miranda rights and/or

27  were obtained by false promises, and thus, her testimony and the testimony of Detective Burchett
    about her statements should have been excluded.  Accordingly, the court does not treat these

28  claims as raising issues of prosecutorial misconduct but rather the propriety of the admission of
    certain testimony.

1    support these claims if he wished to pursue them.  (Dkt. No. 176 at 107 (finding grounds to defer

2    ruling on the motions pursuant to Fed. R. Civ. P. 56(f) to permit petitioner time to discover facts

3    necessary to support these claims).)  Petitioner, however, did not move for an evidentiary hearing

4    with respect to these claims.  Thus, no additional facts were developed nor evidence presented by

5    petitioner to substantiate the claims.  Based on the court's prior finding, this failure of proof alone

6    is grounds to deny relief.  Nonetheless, below the undersigned will briefly discuss the applicable

7    record before this court with regard to these claims.

8          At the time of Burke's killing, Michelle Cram was living on the river with the group of

9    people that included petitioner.  Webster, 54 Cal. 3d at 423.  Ms. Cram was then only seventeen

10   years old.  Id.  She was one of two "principal prosecution witnesses" at petitioner's trial and was

11   granted immunity in return for her testimony.  Id.  Ms. Cram testified at trial in detail about

12   petitioner's plan to kill Burke, take his car and bury him.  (See, e.g., RT at 2978-88.)  She testified

13   about the murder itself.  (See, e.g., RT at 2990-94.)  Finally, Ms. Cram testified regarding the

14   group's flight following the murder.  (See, e.g., RT at 3006-09.)

15         At petitioner's trial Detective Burchett testified about speaking briefly with Ms. Cram

16   after the murder, while she was being held at a juvenile hall.  (RT at 3090.)  On September 8,

17   1981, several days after the murder and following her arrest on August 31, 1981 (see RT at 3491),

18   Ms. Cram asked to speak to Detective Burchett.  (RT at 3091-92.)  Detective Burchett testified

19   that he advised Ms. Cram of her right not to answer questions and that he did not threaten her in

20   any way.  (RT at 3091-92.)  As the detective was about to testify regarding the statement Ms.

21   Cram then gave to him, counsel for petitioner's co-defendant interposed an objection and, in

22   response thereto, the trial court held a hearing to determine whether this evidence could be

23   admitted as a prior consistent statement under California Evidence Code §§ 791 and 1236.  (RT at

24   3092-3106, 3231-82, 3485-3534.)

25         After some argument on the record, a recess was taken and some further discussion took

26   place off the record.  (See RT at 3112-13.)  The parties then reached an agreement whereby it was

27   stipulated that Ms. Cram had refused to speak with Detective Burchett on September 3, 1981, and

28   that on September 8, 1981, Ms. Cram contacted an officer at juvenile hall on her own and asked

1   to speak with Detective Burchett.  (RT at 3115-17.)

2        Later, the court heard the following testimony out of the presence of the jury.  Detective

3   Wood and Lieutenant Gaida transported Michelle Cram from Barstow, where the vehicle driven

4   by petitioner at the time of his arrest was detained, to Los Angeles on September 2, 1981.  (RT at

5   3223-24, 3246.)  During that drive there was no discussion about the case.  (RT at 3224, 3248.)

6   In Los Angeles, after receiving information from Bruce Smith, the officers began trying to find

7   out where the victim was and whether he might still be alive and in need of help, without success.

8   (RT at 3226-31, 3252-53.)  Lieutenant Gaida decided to speak with Ms. Cram.  (RT at 3253.)  He

9   did not threaten her or make any promises to her.  (RT at 3254.)  He did not, however, advise her

10  of her rights at that time because he believed that she had already been advised and because he

11  was not asking about the robbery for which she had been detained by the officers.  (RT at 3255.)

12  In speaking to Ms. Cram at this time Lieutenant Gaida only wanted to determine whether there

13  was an injured victim in Sacramento.  (RT at 3255.)  Ms. Cram spoke with him and described the

14  location of the victim.  (RT at 3255, 3261.)

15       At petitioner's trial Ms. Cram also testified outside the presence of the jury for the

16  purpose of allowing the court to resolve the Evidence Code § 791 issue raised by defense

17  counsel's objection to Detective Burchett's testimony.  (RT at 3486.)  At that time Ms. Cram

18  testified that she had spoken to law enforcement officers in Barstow at the time of her arrest and

19  in Los Angeles after being transported there.  ( RT at 3486-87.)  According to Cram's testimony

20  the officer in Los Angeles did not threaten her, but he did tell her "it would make it easier on me

21  if I talked."  (RT at 3488.)  On cross-examination, Cram acknowledged that she thought this

22  meant she would not be charged with the robbery.  (RT at 3502.)  It was after this statement to her

23  that she told the officer where Burke's body was.  (RT at 3488.)

24       Ms. Cram testified that Detective Burchett met with her on September 3, 1981, in Los

25  Angeles, and advised her of her rights.  (RT at 3489.)  Ms. Cram declined to speak with him at

26  that time.  (RT at 3489.)  Several days later, after she had been placed in juvenile hall in

27  Sacramento, she asked an intake officer to contact Detective Burchett for her because she had

28  decided to speak with him.  (RT at 3490.)  According to Ms. Cram, when she gave her statement

1    to Detective Burchett, no promises had been made to her, and she did not know whether she was

2    going to be prosecuted.  (RT at 3490-91, 3496.)  She admitted, however, that she was "scared."

3    (RT at 3506.)

4         On cross-examination by petitioner's trial counsel, Ms. Cram testified that Detective

5    Burchett had told her on September 3, 1981, that "the people that are involved in this case could

6    get the death penalty . . . ."  (RT at 3493.)  On redirect examination, she testified that she could

7    not remember which officer made this statement about the death penalty.  (RT at 3516.)

8         The trial court found as follows.  It was undisputed that Ms. Cram had invoked her

9    privilege against self-incrimination while in Los Angeles.  (RT at 3530.)  Lieutenant Gaida

10   subsequently questioned her about the location of the victim because it was unknown at that time

11   whether the victim had survived the stabbing and might need assistance.  (RT at 3530-31.)  Gaida

12   assumed that he would not be able to use her response to his questions about the victim's location

13   as evidence.  (RT at 3531.)  The trial court expressly found that no offers, promises or threats

14   were made by law enforcement officers to Ms. Cram at that time.  (RT at 3532.)  After that,

15   Detective Burchett approached Ms. Cram, but she declined to talk to him.  (RT at 3532.)  Ms.

16   Cram was eventually promised immunity after she gave Detective Burchett her statement on her

17   own initiative.  (RT at 3533.)  No promises or threats were made to Ms. Cram by officers.  (RT at

18   3533-34.)  Based on these findings, the trial court ruled that Detective Burchett would be allowed

19   to testify about Ms. Cram's statement to him and that a limiting instruction to the jury would be

20   given.  (RT at 3534.)

21        Detective Burchett then returned to the witness stand and, in the presence of the jury,

22   testified about the statement Ms. Cram had given him implicating petitioner. (RT at 3584-89.)

23        In his second state habeas petition petitioner presented his claims alleging that the

24   testimony of Ms. Cram and Detective Burchett was erroneously admitted at his trial.[102]  Those

25   claims were summarily rejected.

26        Federal habeas review is generally not available with respect to  questions regarding the

27   admissibility of evidence.  See Estelle, 502 U.S. at 67-68 ("We have stated many times that

28
_____

[102]  That petition and order were lodged here on December 5, 1996.  (See Dkt. No. 100.)

1   federal habeas corpus relief does not lie for errors of state law."); Winzer v. Hall, 494 F.3d 1192,

2   1198 (9th Cir. 2007) ("State court rulings on the admissibility of evidence generally fall outside

3   the scope of federal habeas relief, which is designed only to remedy violations of federal law.");

4   Little v. Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006) (same).  A federal habeas court does not

5   interfere with a state evidentiary ruling unless the challenged evidence was so prejudicial that its

6   admission or exclusion violated fundamental due process and the right to a fair trial.  Estelle, 502

7   U.S. at 67-68; Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).

8          To the extent that petitioner has stated a cognizable federal constitutional claim, the issue

9   presented may fairly be described as whether the admission of Ms. Cram's and Detective

10  Burchett's testimony violated petitioner's fundamental right to a fair trial.  The undersigned

11  concludes that it did not.  In ruling the testimony admissible, the trial court expressly found that

12  no offers, promises or threats were made by law enforcement officers to Ms. Cram to obtain her

13  statement.  (RT at 3532-34.)  The trial court further found that Ms. Cram was only promised

14  immunity in exchange for her testimony, after she voluntarily gave Detective Burchett her

15  statement.  (RT at 3533.)  It was undisputed that Detective Burchett advised Ms. Cram of her

16  Miranda rights prior to taking her statement.  (RT at 3091-92, 3489.)  Regarding Lieutenant

17  Gaida's questioning, the trial court found that he spoke to Ms. Cram without giving a Miranda

18  advisement but only in order to aid in locating the victim since it was unknown whether the

19  victim might be alive and in need of help.  (RT at 3255.)  The trial court also held an extensive

20  hearing outside the presence of the jury regarding all of Ms. Cram's contacts with law

21  enforcement officers.  Based upon that hearing the trial court concluded there was no evidence of

22  misconduct on the part of any officer.  Petitioner has never offered any evidence to the contrary.

23         Accordingly, the undersigned finds that plaintiff's claims based upon the alleged

24  erroneous admission of the testimony of Ms. Cram and Detective Burchett lack any factual

25  support and are not cognizable and recommends that his request for federal habeas relief in this

26  regard be denied.[103]

27
_____

28  [103]  Because the court finds that petitioner has failed to state a cognizable claim relating to the
    admission of Ms. Cram's and Detective Burchett's testimony, it need not reach respondent's
    alternative argument that these claims are Teague-barred.

1    I.  Ineffective Assistance of Counsel during Jury Selection

2         In Claims 20C, 20D, 39A and 39B of his petition,[104] petitioner contends that his trial

3    counsel provided ineffective assistance by:  (1) failing to rehabilitate jurors who were opposed to

4    the death penalty but should not have been excused for cause under the Supreme Court's holding

5    in Witherspoon v. Illinois, 391 U.S. 510 (1968); and (2) in failing to object to the trial court's

6    improper voir dire questioning and jury selection procedures.  (Pet. at 84, 118.)   Respondent

7    addressed these claims in his answer and memorandum of points and authorities in support

8    thereof.  (Dkt. No. 427 at 67-68).  Petitioner did not list these claims as being at-issue in his

9    traverse.  (Dkt. No. 434 at 2-3) (listing the "remaining claims").  Nor did petitioner address the

10   merits of these claims in any other memoranda filed with the court.  It appears that petitioner may

11   have abandoned his Claims 20C, 20D, 39A and 39B, in which case federal habeas relief would be

12   properly denied with respect to them on that basis.

13        In any event, these claims lack merit.  See Davis, 384 F.3d at 643 (no deficient

14   performance in declining to exercise unused peremptory challenges on two jurors who expressed

15   views suggesting that they were grappling with their views regarding the death penalty). They are

16   alleged, in their entirety, in two conclusory paragraphs of the pending petition.  (Pet. at 84.)

17   Without the allegation of any factual support whatsoever, the claims are properly denied.  James

18   v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a

19   statement of specific facts do not warrant habeas relief.")  It not incumbent on respondent or this

20   court to comb the nearly 2,000 pages of the reporter's transcript of jury selection to identify, first,

21   the prospective jurors who were excused for cause, and second, determine which prospective

22   jurors petitioner believes should not have been excused.  Nor is it up to the court to determine

23   which specific jury selection procedures petitioner is seeking to challenge.  Finally, given this

24   lack of specificity and showing of any kind, petitioner has clearly failed to establish any

25   prejudice, as is required, even if his trial counsel was somehow deficient in his performance at

26   jury selection.

27   /////

28

---

[104]  Petitioner's Claims 39A and 39B simply duplicate his Claims 20C and 20D.

1        J. Cumulative Error

2        Finally, petitioner contends that the various errors of constitutional magnitude that

3    occurred in connection with his trial, when considered cumulatively, deprived him of a fair trial.

4        Although the United States Supreme Court has not articulated a claim of "cumulative

5    error," the Ninth Circuit has stated that where "no single trial error examined in isolation is

6    sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

7    prejudice a defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). See also

8    Cunningham v. Wong, 704 F.3d 1143, 1165 (9th Cir.) (and cases cited therein), cert. denied

9    ___U.S.___, 134 S. Ct. 169 (2013); Karis, 283 F.3d at 1132 (same).

10       The Due Process Clause of the Fourteenth Amendment encompasses the right to a fair

11   trial. In re Murchison, 349 U.S. 133, 136 (1955). However, as the Supreme Court has stated:

12          The thrust of the many constitutional rules governing the conduct of
            criminal trials is to ensure that those trials lead to fair and correct
13          judgments. Where a reviewing court can find that the record
            developed at trial establishes guilt beyond a reasonable doubt, the
14          interest in fairness has been satisfied and the judgment should be
            affirmed. As we have repeatedly stated, "the Constitution entitles a
15          criminal defendant to a fair trial, not a perfect one."

16   Rose v. Clark, 478 U.S. 570, 579 (1986) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 681

17   (1986)).

18       The undersigned has addressed each of the claims raised by petitioner in his application

19   for federal habeas relief and has found merit with respect to one of those claims – finding that

20   petitioner received ineffective assistance of counsel in connection with the penalty phase of his

21   trial. With respect to petitioner's remaining claims of error, the undersigned has concluded that

22   he is not entitled to federal habeas relief. The undersigned has considered petitioner's claims of

23   error cumulatively as well and does not find that when so considered that they rendered

24   petitioner's trial fundamentally unfair or had a substantial and injurious effect or influence in

25   determining the jury's verdict. See Parle v. Runnels, 505 F.3d 922, 927-28 (9th Cir. 2007).

26       Therefore, the undersigned recommends that federal habeas relief be denied with respect

27   to petitioner's cumulative error claim.

28   /////

1

CONCLUSION

2    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of

3 habeas corpus be granted on the grounds that he received ineffective assistance of counsel in

4 connection with the penalty phase of his trial in violation of his rights under the Sixth

5 Amendment, as alleged in Claim 22 of his petition.  Federal habeas relief should be denied in all

6 other respects.

7    These findings and recommendations are submitted to the United States District Judge

8 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after

9 being served with these findings and recommendations, any party may file written objections with

10 the court and serve a copy on all parties.  Such a document should be captioned "Objections to

11 Magistrate Judge's Findings and Recommendations."  Any reply to objections shall be served and

12 filed within twenty-one days after service of the objections.  The parties are advised that failure to

13 file objections within the specified time may waive the right to appeal the District Court's order.

14 Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  The parties are further advised to address any

15 request for an extension of time to file such objections or reply to objections to the assigned

16 District Judge.

17 Dated:  June 4, 2014

18

19    _Dale A. Drozd_
    _____

20    DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

21 Dad1.capital
   Webster.final.fr.docx
22

23

24

25

26

27

28